## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| RICHARD H. PENSKE AND PATRICIA L. PENSKE, | : : : | |
| PLAINTIFFS, | : : | CIVIL ACTION NO. _____ |
| V. | : : | |
| LEWIS, RICE & FINGERSH, L.C., | : : | JURY TRIAL DEMANDED |
| DEFENDANT. | : : : | |

Plaintiffs Richard and Patricia Penske ("Plaintiffs"), by and through their attorneys, allege as follows:

### NATURE OF THE ACTION

1.      This is a Complaint alleging claims for damages against defendant Lewis, Rice & Fingersh, L.C. ("LRF") for legal malpractice, breach of fiduciary duty and breach of contract in connection with LRF's representation of Plaintiffs as their counsel and attorneys-at-law.  Acting in concert with The Heritage Organization, Inc., The Heritage Organization, Inc. d/b/a Heritage Legacy Organization, Inc., and The Heritage Organization LLC (collectively, "Heritage"), LRF targeted and promoted to individuals who had acquired large capital gains, including Plaintiffs, a financial "plan" that incorporated an array of estate and tax planning services including a complicated, tax-driven transaction promoted as a means of substantially reducing or eliminating the sizeable federal tax liability attributable to the capital gains produced by profitable but unrelated business transactions.  The tax-driven transaction incorporated as part

of the financial plan promoted by Heritage and LRF is among the abusive tax shelters designated by the Internal Revenue Service (IRS) as "Son of Boss" transactions. LRF and Heritage knew, or should have known, that the Son of Boss transaction that they designed and promoted to Plaintiffs and others was an abusive tax shelter designed solely to create tax benefits unintended by any reasonable interpretation of the tax laws. In December 2000, relying upon the advice and counsel of LRF, Plaintiffs executed a Son of Boss transaction and subsequently reported it on their joint IRS Form 1040 for the tax year ending December 31, 2000. LRF's use of the Son of Boss transaction as the principal component in the financial "plan" promoted and sold to Plaintiffs was negligent and wrongful and has caused substantial damage to Plaintiffs as described herein.

2.      LRF has served continuously as Plaintiffs' counsel since November 2000 with regard to various tax and estate planning matters, including the IRS tax audits of Plaintiffs' joint federal tax returns for 1997, 1998, 1999, 2000 and 2001. In December 2001, shortly after LRF executed a retention agreement with Plaintiffs that included a commitment to provide advice regarding the tax consequences of the transactions that LRF recommended and subsequent to Plaintiffs' execution of the Son of Boss transaction, the IRS issued IRS Announcement 2002-2 providing for the waiver of certain accuracy-related penalties for those taxpayers who, within the period provided in the Announcement, voluntarily disclosed their use of questionable tax avoidance transactions, including those known as "Son of Boss" transactions. LRF intentionally or recklessly failed to disclose to Plaintiffs the existence of the IRS "amnesty" program set forth in Announcement 2002-2, proximately causing substantial damage to Plaintiffs as described herein.

## THE PARTIES

3.      Plaintiffs Richard H. and Patricia L. Penske are adult individuals residing in Bethlehem, Pennsylvania.

4.      Defendant Lewis, Rice & Fingersh, L.C. ("LRF" or "Defendant") is a law firm, organized as a Missouri limited liability corporation, with its principal place of business located at 500 North Broadway, Suite 2000, St. Louis, Missouri 63102.  LRF represents that it "collaborate[s] across disciplines [and] pool[s the firm's] knowledge, experience and creativity in order to achieve the greatest benefit for our clients."  LRF promotes its relationship with its clients as a partnership "in a continuing and ever-changing relationship."

5.      At all times material to the events described in this Complaint, LRF and Heritage each acted as the actual, apparent, ostensible or, by estoppel, agent of the other. Heritage has filed for bankruptcy and is protected against inclusion as a defendant in this action by the automatic stay provisions of 11 U.S.C. § 362.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332 (a) since the matter in controversy as to each plaintiff exceeds $75,000, exclusive of interests and costs, and Plaintiffs and the Defendant are citizens of different states so there is diversity of citizenship.

7.      This Court has personal jurisdiction over defendant LRF pursuant to 42 Pa. C. S. A. § 5322(a)(1), (a)(2), (a)(3) and (a)(4).  LRF has purposefully availed itself of the privilege of conducting business in the Commonwealth of Pennsylvania with respect to the claims alleged herein as demonstrated by, *inter alia:* (a) LRF, independently and through

Heritage, targeted and actively solicited Plaintiffs in Pennsylvania by actions that included

repeated telephone calls and mailings directed to Plaintiffs and their agents located in

Pennsylvania; (b) LRF, acting through Heritage, entered Pennsylvania for the purpose of

soliciting Plaintiffs' business; (c) LRF, acting through Heritage, came to Pennsylvania for the

purpose of transporting Plaintiff Penske from Pennsylvania to Dallas and then on to St. Louis to

meet with LRF representatives for discussions aimed at obtaining Plaintiffs' business; (d) LRF

entered into an attorney-client relationship with Plaintiffs to provide ongoing, comprehensive

legal advice and services in Pennsylvania relating to the Penskes' financial and estate planning;

(e) LRF undertook to represent Plaintiffs in connection with the audit of the 2001 federal gift tax

return that LRF had prepared on behalf of Plaintiffs, and directed numerous communications to

Plaintiffs in Pennsylvania in connection with both the preparation and subsequent audit of that

2001 gift tax return; (f) LRF undertook to represent Plaintiffs in connection with the audit of

their 1997 joint federal income tax return and directed numerous communications to Plaintiffs in

Pennsylvania in connection with that representation; (g) LRF undertook to represent Plaintiffs in

connection with the audit of their 1998 joint federal income tax return and directed numerous

communications to Plaintiffs in Pennsylvania in connection with that representation; (h) LRF

undertook to represent Plaintiffs in connection with the audit of their 1999 joint federal income

tax return and directed numerous communications to Plaintiffs in Pennsylvania in connection

with that representation; (i) LRF undertook to represent Plaintiffs in connection with the audit of

their 2000 joint federal income tax return and directed numerous communications to Plaintiffs in

Pennsylvania in connection with that representation; (j) LRF continues to represent and provide

legal services to Plaintiffs in connection with various gift tax and estate planning matters; (k)

LRF continues to represent Plaintiffs in preparing and submitting required filings associated with

the corporate entities created by LRF as part of the Plan; (l) LRF attorneys have engaged in extensive phone, email, fax and letter correspondence with Plaintiffs in Pennsylvania and sent invoices to, and collected monies from, Pennsylvania in connection with the services rendered throughout the course of LRF's attorney-client relationship with Plaintiffs and pursuant to the contractual relationship of the parties; and (m) LRF's negligent and wrongful acts in connection with its representation of Plaintiffs caused harm and tortious injury to Plaintiffs in the Commonwealth of Pennsylvania.

8.     Upon information and belief, LRF is also subject to personal jurisdiction in the Commonwealth of Pennsylvania pursuant to 42 Pa. C. S. A. § 5301 because, among other things, it continuously and systematically conducts business in the Commonwealth of Pennsylvania with an extensive client base and with other law firms located in the Commonwealth.

9.     Venue is proper in this district pursuant to 28 U.S.C. §1391(a)(2) because a substantial part of the events or omissions giving rise to the claims of Plaintiffs occurred in this district.

## FACTUAL AVERMENTS

10.     Plaintiff Richard Penske ("Penske") was the president, chief executive officer, principal stockholder, and member of the board of directors of Piercing Pagoda, Inc. ("Pagoda" or the "Company"), a national chain of retail jewelry stores, from 1986 through September 20, 2000.

11.     In 1983, KPMG LLP ("KPMG") was hired to serve as the outside auditor for Pagoda and continued to work with Pagoda through the Company's initial public offering of

Pagoda stock in 1994.  In 1996, KPMG began to provide personal estate planning and investment advice to Plaintiff Penske that, in 1997, included a recommendation that Plaintiffs invest the proceeds they personally received from a 1997 secondary offering of Pagoda stock into a complex tax and investment transaction involving European bank stocks known as FLIP ("Foreign Leveraged Investment Portfolio").

12.     In 1997, relying upon the advice provided by KPMG and tax counsel, Plaintiffs executed a FLIP transaction the results of which were reflected on their joint federal income tax return filed for the calendar year ending December 31, 1997.

13.     In August 2000, the IRS issued IRS Notice 2000-44, identifying the FLIP transaction as an abusive tax shelter that artificially generated tax losses that did not reflect the actual economic consequences for the taxpayer.

14.     In September 2000, Plaintiffs sold their remaining shares of Pagoda stock and realized a substantial capital gain.

15.     Shortly after Plaintiffs completed the sale of their remaining Pagoda stock, they were aggressively targeted by Heritage which sought to procure Plaintiffs as clients of the complex tax and financial "plan" developed by Heritage and LRF and promoted as a tax strategy for individuals with large, lump sum capital gains.  Representatives of Heritage engaged in extensive communications with Plaintiff Penske and made personal visits to Plaintiffs' home in Bethlehem, Pennsylvania to solicit Plaintiffs as clients.  Heritage also made arrangements to transport Plaintiff Penske to Dallas and then to defendant LRF's offices in St. Louis in furtherance of their efforts to procure Plaintiffs as clients.

16.     Between October 2000 and March 2001, Plaintiffs paid Heritage fees totaling approximately $4.3 million for detailed consultations concerning Plaintiffs' tax, estate planning, and asset allocation issues with a view towards developing a comprehensive financial plan ("Plan"). The principal tax planning element of the Plan was a series of complex, short-term investments involving the short sale of Treasury notes (the "Tax Transaction") which has since been identified by the IRS as an abusive Son of Boss tax shelter.   To maximize the impact of their marketing and promotional efforts, on several occasions Heritage transported Plaintiff Penske from Pennsylvania to Dallas for consultation and presentation of the overall Plan.

17.     Heritage's role within the Plan was to function as a consultant and promoter. Heritage did not serve as an attorney or tax advisor, and did not implement the plans it promoted. Instead, Heritage worked closely with and endorsed the services of the LRF law firm, promoting LRF as experts in tax and estate planning who would effectively incorporate the Tax Transaction into the overall contours of the Plan.

18.     During the consultations regarding the Plan held in the Fall of 2000, Heritage recommended that Plaintiff Penske meet with LRF. Heritage described LRF as an independent, professional law firm with expertise in transactions similar to the Tax Transaction. In conjunction with one of the Fall 2000 trips where Heritage transported Plaintiff Penske to Dallas for consultation regarding the Plan, Heritage provided transportation from Dallas to St. Louis so that Plaintiff Penske could meet with LRF.

19.     Plaintiff Penske's first meeting with LRF was with Michael Mulligan, Lawrence Weltman, William J. Falk and Jaime Mendez, partners in LRF. LRF promoted its services to Plaintiff, emphasizing Defendant's expertise in implementing the broad ranging

financial plans promoted by Heritage as well as Mulligan and Falk's own individual expertise in analyzing the tax implications of undertakings similar to the Tax Transaction proposed to Plaintiffs by Heritage.

20.    Following this meeting in St. Louis, LRF pursued Plaintiffs for several more weeks through telephone calls and written correspondence directed to Plaintiffs in Pennsylvania.  After receiving repeated assurances from LRF that the Plan and the Tax Transaction were sound financial and tax vehicles, Plaintiff Penske hired LRF to represent the Penskes in implementing the Plan.

21.    Upon information and belief, LRF received substantial benefits from Heritage in connection with providing legal services to support transactions for Heritage clients but  LRF never disclosed to Plaintiffs the full scope or extent of its relationship with Heritage either before or after Plaintiffs retained LRF as counsel.

22.    By letter dated December 1, 2000, LRF recorded the terms and conditions of its initial representation of Plaintiffs.  The retention letter describes the services that LRF was to provide as including (a) preparing documents forming various entities to implement Plaintiffs' planning decisions, (b) rendering advice concerning the tax and legal consequences of the transactions in which Plaintiffs engage, and (c) furnishing "a written legal opinion as to the tax consequences of those transactions."  For these services, Plaintiffs agreed to pay LRF a non-refundable retainer of $75,000.  Subsequently, pursuant to the terms of a second retainer letter drafted by LRF and executed  in February 2001, Plaintiffs paid LRF an additional $75,000 for estate planning services related to the Plan.

23.     In reliance upon the assurances provided by LRF regarding the legality of the Tax Transaction and the financial soundness of the Plan, Plaintiffs agreed to initiate the Tax Transaction in December of 2000 so that it would be effective with respect to Plaintiffs' federal tax liability for the 2000 tax year.  As contemplated by the December 1, 2000 retainer agreement, LRF prepared the documents necessary to consummate the Tax Transaction and implement the Plan.

24.     In January 2001, Plaintiff Penske met jointly with representatives of Heritage and LRF at an estate planning convention in Miami, Florida.

25.     On March 1, 2001, LRF issued the legal opinion ("Opinion"), constituting 58 pages, and stating, *inter alia,* that "[b]ased upon the "Facts" set forth [in this opinion], the "Analysis" set forth below, and subject to the "Conditions and Limitations" set forth below, we are of the opinion that there is substantial authority for the Federal income tax treatment of the Financial Plan in accordance with the opinions enumerated below, and that it is more likely than not that the Federal income tax treatment of the Financial Plan as set forth in the opinions enumerated below is proper…."  The Opinion assures Plaintiffs that, especially with respect to the assessment of "accuracy-related" penalties, its opinions are expressed in the terms "substantial authority" and "more likely than not" so that, if the Opinion is relied upon reasonably and in good faith, Plaintiffs should avoid the assessment of any accuracy-related penalties in the event that the Tax Transaction is challenged by the IRS.  A copy of the Opinion is attached as Exhibit 1.

26.     At the time that LRF presented the Opinion to Plaintiffs, the IRS already had issued IRS Notice 2000-44 describing a transaction substantially similar to the Tax

Transaction endorsed by the Opinion as a tax avoidance transaction and designating such transaction (and all "[t]ransactions that are the same as or substantially similar") as "listed" transactions under IRS Income Tax Regulations.

27.    As LRF knew or reasonably should have known, the Tax Transaction it recommended to the Plaintiffs was substantially similar to the transaction described in IRS Notice 2000-44.  Only cosmetic, non-substantive differences existed between the two forms of transactions such that it was highly likely that, upon examination, the IRS would conclude that the Tax Transaction was an impermissible Son of Boss transaction and would disallow all of the benefits attributable to the Tax Transaction reflected on Plaintiffs' joint federal income tax return.

28.    In the Opinion, LRF specifically addresses IRS Notice 2000-44 and attempts to distinguish the Tax Transaction that LRF was recommending to Plaintiffs when LRF knew that the scope of IRS Notice 2000-44  was specifically intended to embrace all transactions that, like the Tax Transaction, were substantially similar to the transaction described in the Notice and were intended to produce tax losses by artificially overstating basis.

29.    LRF knew or reasonably should have known that there was no substantial authority for the tax treatment expressed in the Tax Transaction nor was it more likely than not that the Tax Transaction would survive IRS scrutiny if audited.  Consequently, as LRF then knew or should have known, Plaintiffs reliance on the Opinion would not be considered by the IRS as reasonable or in good faith and would provide no basis upon which to avoid the imposition of accuracy-related penalties.

30.     The likelihood of adverse tax consequences to Plaintiffs resulting from their participation in the Tax Transaction was exacerbated by Plaintiffs' earlier participation in the FLIP transaction which, as LRF knew at the time it presented its Opinion to Plaintiffs, made it more likely that Plaintiffs joint federal income tax returns reflecting the results of the Tax Transaction would be audited by the IRS.

31.     In May 2001, the IRS notified Plaintiffs that their joint federal income tax returns for the "1997, 1998 and 1999 Tax periods" were being examined "to determine your correct federal tax liability." The 1997 return was the return that reflected Plaintiffs participation in the FLIP transaction.

32.     As contemplated by the December 1, 2000 and February 22, 2001 retainer letters, LRF continued to represent Plaintiffs in the implementation of their tax and estate planning following the issuance of the Opinion. Thus, upon receipt of the notice regarding the IRS audit, Plaintiff Penske contacted LRF and LRF immediately assumed responsibility for the IRS audit as part of its work on behalf of Plaintiffs regarding the Plan. Accordingly, in August 2001, with Plaintiffs' knowledge and consent, defendant LRF provided the IRS with a power of attorney authorizing LRF to represent Plaintiffs in connection with the examination of their 1997, 1998 and 1999 federal income tax returns.

33.     On July 31, 2001, the IRS issued a series of Information Document Requests (IDRs) detailing the information that the IRS required to "expedite the examination of your tax return(s)." On behalf of Plaintiffs, LRF undertook to respond to these IDRs.

34.     At no time did LRF seek to revise, amend, or terminate the terms and conditions of its attorney-client relationship with Plaintiffs as LRF continued its representation of

Plaintiffs in connection with all facets of the ongoing IRS audit of Plaintiffs' tax returns until a substitute power of attorney was submitted to the IRS on Plaintiffs' behalf in October 2003 by new tax counsel representing Plaintiffs solely in connection with the audit of their federal income tax returns.  Even thereafter, LRF remained involved with certain aspects of the IRS audit of Plaintiffs' income tax returns through the Spring of 2004.  While serving as principal income tax counsel for Plaintiffs, LRF remained in constant contact with Plaintiffs in Pennsylvania and with the IRS on behalf of the Penskes, and LRF remains in contact with Plaintiffs in Pennsylvania regarding LRF's continuing representation of Plaintiffs in estate planning and gift tax matters.

35.    In September 2001, with the knowledge and consent of Plaintiffs, LRF retained the services of KPMG to assist in its representation regarding Plaintiffs' "federal tax matter."  The retention letter between LRF and KPMG, dated September 14, 2001, states that KPMG will render provide "services of a character and quality that will be a necessary adjunct to our services as attorneys."

36.    On October 31, 2001, the IRS informed Plaintiffs that the ongoing audit was being expanded to include Plaintiffs' 1998 joint federal income tax return.

37.    In response to the October 31, 2001 IRS letter, LRF, on December 4, 2001, provided the IRS with a revised Power of Attorney with respect to the audit of Plaintiffs'1997, 1998, and 1999 federal income tax returns.  Again, LRF did not seek to revise, amend, or terminate the terms or conditions of LRF's representation of Plaintiffs in conjunction with this filing or at any other time during the existence of the attorney-client relationship.

38.    On December 22, 2001, the IRS issued IRS Announcement 2002-2 entitled "Disclosure Initiative for Certain Transactions Resulting in Waiver of Certain Penalties

Under §6662 of the Internal Revenue Code" which offered taxpayers the opportunity to voluntarily disclose their participation in questionable tax avoidance transactions not already under audit and, thereby, avoid the imposition of accuracy-related penalties constituting as much as 40% of any underpayment attributable to a particular tax item.  The Announcement stated that the "amnesty" period would close on April 23, 2002.

39.    Although the IRS already had commenced auditing Plaintiffs' participation in the 1997 FLIP transaction rendering it ineligible for "amnesty" under Announcement 2002-2, the Tax Transaction was clearly eligible for participation in the "amnesty" program provided that it was properly disclosed to the IRS within the period specified in the Announcement.  As tax counsel for Plaintiffs and authors of the Opinion, LRF had a duty to inform Plaintiffs of Announcement 2002-2's potential application to the Tax Transaction.

40.    Upon information and belief, LRF knew of IRS Announcement 2002-2 and recommended participation in its "amnesty" program to other LRF clients.  Further, LRF knew or should have known that the Tax Transaction represented a "tax shelter [or] other item[s] for which the imposition of the accuracy-related penalty may be appropriate" such that Plaintiffs could substantially benefit from participation in the "amnesty" program.  Moreover, given that LRF (a) had specifically addressed the significant similarities between the Tax Transaction and the tax shelter transactions identified in IRS Notice 2000-44, and (b) knew that Plaintiffs' already had participated in a FLIP transaction that had been designated by the IRS as an abusive tax shelter, LRF knew or should have known that it was highly likely that the Tax Transaction would be audited and Plaintiffs would be subjected to the imposition of accuracy-related penalties.

41.     LRF did not notify Plaintiffs or any representative of Plaintiffs of the existence or terms of IRS Announcement 2002-2.  LRF recognized that advising Plaintiffs to voluntarily disclose the Tax Transaction to the IRS under the terms of  Announcement 2002-2 as an abusive tax shelter for which the imposition of accuracy-related penalties might be appropriate directly conflicted with the legal advice that LRF had provided in the Opinion wherein LRF had concluded that there was substantial authority for the tax treatment expressed in the Tax Transaction and that it was more likely than not that the IRS would accept that tax treatment.  LRF resolved this conflict of interest against the Plaintiffs and elected not to inform Plaintiffs of the existence, terms or conditions of IRS Announcement 2002-2.

42.     On March 19, 2002, the IRS expanded its audit to include Plaintiffs' 1999 federal income tax return.  LRF continued to represent Plaintiffs in the ongoing audit and did not seek to revise, amend, or terminate the terms or conditions of LRF's representation.

43.     In March 2002, LRF prepared, and forwarded to Plaintiffs for filing with the IRS, Plaintiffs' 2001 federal gift tax returns.  These returns reflected some of the gift tax implications associated with Plaintiffs' execution of the Tax Transaction in 2000 but at no time during its work on Plaintiffs' 2001 federal gift tax returns did LRF indicate to Plaintiffs, by word or by deed, that LRF's representation of Plaintiffs in connection with Plaintiffs' ongoing dealings with the IRS was limited or restricted in any way.

44.     On April 23, 2002, the "amnesty" period provided in IRS Announcement 2002-2 closed without LRF having advised Plaintiffs of the existence or terms of the Announcement.  Consequently, neither LRF nor Plaintiffs disclosed the Tax Transaction to the IRS in accordance with the terms of Announcement 2002-2.

45.     Within nine weeks of the close of the "amnesty" period, in July of 2002, LRF informed Plaintiffs of the likelihood that the IRS would expand the scope of its audit to Plaintiffs' 2000 joint federal income tax return which reflected the tax treatment of the Tax Transaction.

46.     In August of 2002, the IRS notified Plaintiffs and LRF that its audit was being expanded to include Plaintiffs' joint federal income tax returns for 2000 and 2001.

47.     LRF has continuously represented Plaintiffs in ongoing estate planning activities, including gift tax matters, since November 2000, and served as principal tax counsel in connection with the IRS audit of Plaintiffs' joint federal income tax returns until replaced by substitute counsel in October 2003.  Even after being replaced as principal tax counsel, LRF continued to work on certain aspects of the IRS audit of Plaintiffs' income tax returns through the Spring of 2004.  At no time did LRF seek to revise, amend, or terminate the terms and conditions of its attorney-client relationship with Plaintiffs and LRF undertook to represent Plaintiffs in connection with all facets of the IRS audit of Plaintiffs' joint federal income tax returns until replaced by substitute counsel in the Spring of 2004.  Even after being replaced as income tax counsel in the Spring of 2004, defendant LRF has continued to represent Plaintiffs in estate planning and gift tax matters as demonstrated by LRF's filing a power of attorney with the IRS in July 2003 confirming LRF's representation of Plaintiffs in connection with the IRS audit of Plaintiffs' 2001 federal gift tax returns.

48.     On May 5, 2004, the IRS issued IRS Announcement 2004-46 providing taxpayers the opportunity to resolve their tax liabilities associated with "Son of Boss" transactions.  Plaintiffs were notified of their opportunity to participate in this settlement

initiative by correspondence from the IRS dated May 21, 2004.  Contrary to the Opinion and to

the representations made to Plaintiffs by LRF, the IRS determined that the Tax Transaction was a

"substantially similar arrangement" to the "Son of Boss" transaction described in IRS Notice

2000-44 and, accordingly, disallowed the tax treatment produced by the Tax Transaction as

reflected on Plaintiffs' joint federal income tax returns for 2000 and 2001.

      49.     Pursuant to the terms and conditions of IRS Announcement 2004-46,

Plaintiffs entered into a settlement agreement with the IRS.  The Closing Agreement between the

IRS and Plaintiffs, executed by Plaintiffs and the IRS in March 2005 and subsequently approved

by the IRS in April 2005, concluded that "none of the Federal income tax benefits attributable or

derived, directly or indirectly, from participation by the Taxpayer in the [Tax Transaction] is

allowable."  Consequently, Plaintiffs were assessed a tax deficiency totaling more than $13

million and, because Plaintiffs had failed to disclose the Tax Transaction in accordance with the

terms of IRS Announcement 2002-2, Plaintiffs were assessed accuracy-related penalties totaling

more than $2.6 million.  Additionally, Plaintiffs were charged interest in excess of  $1.8 million

on the tax deficiency and related penalties.  All of these amounts were assessed by the IRS in

connection with the Tax Transaction that LRF assured Plaintiffs was supported by "substantial

authority" and would "more likely than not" survive IRS audit.

## CLAIMS FOR RELIEF

## COUNT ONE

### (Professional Malpractice)

      50.     Plaintiffs incorporate by reference and reallege the preceding paragraphs

as if fully set forth herein.

51.     LRF and Plaintiffs entered into an attorney-client relationship in or about October 2000 during a meeting between Plaintiff Penske and representatives of LRF. Subsequently, on December 1, 2000, Plaintiffs and LRF executed a written retainer agreement regarding LRF's provision of a broad array of legal services to Plaintiffs, including services relating to the Tax Transaction.  The terms and conditions of the December 2000 retention letter were subsequently broadened again by a written agreement executed in February 2001 under which LRF agreed to provide extensive estate planning and additional tax services.

52.     No additional writings were executed between LRF and Plaintiffs purporting to document, amend, revise or terminate the terms and conditions of their attorney-client relationship.  However, by oral agreement and course of dealing as described above, LRF also undertook to represent Plaintiffs in all matters relating to the IRS audits of Plaintiffs' joint federal income tax returns for the years 1997, 1998, 1999, 2000, and 2001.  Through the same oral agreements and course of dealing, LRF has undertaken to provide, and has billed Plaintiffs for, additional services that have included, *inter alia,* estate planning, preparation of gift tax returns, and representation of Plaintiffs with regard to the audit of Plaintiffs' 2001 federal gift tax returns.

53.     Plaintiffs have paid substantial amounts to LRF for the legal services rendered by the firm including, *inter alia,* a nonrefundable retainer of $75,000, a fee of $75,000 for certain estate planning services, and monthly invoices for fees and costs of varying amounts for services rendered by LRF relating to additional estate and tax planning work as well as the services provided by the firm in connection with the IRS audits.

54.     Based on the attorney-client relationship between Plaintiffs and LRF, LRF had a duty to represent Plaintiffs with the skill, diligence, and knowledge ordinarily possessed and employed by practitioners of the legal profession and Plaintiffs were entitled to rely on LRF's skill, knowledge and diligence.

55.     LRF breached its duty to Plaintiffs and failed to exercise the skill and knowledge generally possessed and employed by practitioners in the profession by failing to inform Plaintiffs of the existence and terms of IRS Announcement 2002-2 which provided "amnesty" from certain accuracy-related penalties with respect to transactions disclosed to the IRS under the terms of that Announcement.  LRF knew or should have known that Plaintiffs should have been afforded the opportunity to disclose the Tax Transaction under the provisions of IRS Announcement 2002-2.

56.     LRF's failure to disclose the existence and terms of IRS Announcement 2002-2 also reflected its breach of duty to Plaintiffs in failing to disclose that LRF had a conflict of interest in terms of its duties to Plaintiffs because, upon information and belief, LRF had authored and issued numerous legal opinions similar to the Opinion provided to Plaintiffs opining that the Tax Transaction, or substantially similar transactions developed and implemented by LRF and Heritage, were supported by "substantial authority" and would "more likely than not" survive IRS audit.  As LRF understood, disclosing the terms and conditions of IRS Announcement 2002-2 to Plaintiffs would immediately raise suspicion regarding the contents of the Opinion and would potentially subject LRF and Heritage to scrutiny regarding other opinions and transactions involving LRF and Heritage clients.

57.     As a proximate result of LRF's breach of duty and intentional or negligent failure to inform Plaintiffs of the existence and terms of IRS Announcement 2002-2 and the application of that Announcement to the Tax Transaction, Plaintiffs have been harmed and suffered substantial damages including, but not limited to, payment of accuracy-related penalties in excess of $2.6 million and interest attributable to those accuracy-related penalties.

## COUNT TWO

### (Professional Malpractice)

58.     Plaintiffs incorporate by reference and reallege the preceding paragraphs as if fully set forth herein.

59.     Based upon LRF's representations that there was "substantial authority" to support the tax treatment reflected in the Tax Transaction and that it was "more likely than not" that the tax treatment reflected in the Tax Transaction would be accepted by the IRS, Plaintiffs executed the Tax Transaction in December 2000.

60.     As LRF knew or should have known, there was no substantial authority in support of the Tax Transaction and it was highly likely that the IRS would disallow the tax treatment taken in the Tax Transaction, especially in light of the provisions of IRS Notice 2000-44 identifying as an abusive tax shelter a transaction that, in all material respects, was the same as the Tax Transaction.

61.     LRF breached its duty to Plaintiffs and failed to exercise the skill and knowledge generally possessed and employed by practitioners in the profession by orally advising Plaintiff Penske, in December 2000, and issuing the Opinion, in March 2001, stating that there was "substantial authority" to support the tax treatment reflected in the Tax

Transaction and that it was "more likely than not" that the tax treatment reflected in the Tax

Transaction would be accepted by the IRS.

62.     As a proximate result of LRF's breach of duty and intentional or negligent

failure to inform Plaintiffs of the existence and terms of IRS Announcement 2002-2 and the

application of that Announcement to the Tax Transaction, Plaintiffs have been harmed and

suffered substantial damages including, but not limited to, payment of accuracy-related penalties

in excess of $2.6 million, payment of interest attributable to the tax deficiency and the

corresponding accuracy-related penalties assessed by the IRS, and payment of substantial fees to

LRF and Heritage in excess of $4.3 million in connection with executing the Tax Transaction

and the Plan.

## COUNT THREE

### (Breach of Contract)

63.     Plaintiffs incorporate by reference and reallege the preceding paragraphs

as if fully set forth herein.

64.     LRF and Plaintiffs entered into an attorney-client relationship and an oral

contract for the provision of legal services in or about October 2000 during a meeting between

Plaintiff Penske and representatives of LRF.   Subsequently, on December 1, 2000, Plaintiffs and

LRF executed a written retainer agreement regarding LRF's provision of a broad array of legal

services to Plaintiffs, including services relating to the Tax Transaction.  The terms and

conditions of the December 2000 retention letter were subsequently broadened again by a written

agreement executed in February 2001 under which LRF agreed to provide extensive estate

planning and additional tax services.

65.    The agreement between LRF and Plaintiffs regarding the provision of legal services included an agreement that LRF would represent Plaintiffs' interests regarding matters arising in connection with the IRS audit of Plaintiffs' joint federal income tax returns.

66.    LRF's contractual undertakings included an obligation to inform Plaintiffs of all material developments in the audit proceedings and to notify Plaintiffs of all matters that impacted upon Plaintiffs' potential tax liabilities related to the audit including, but not limited to, any tax liability arising from or related to the Tax Transaction.

67.    LRF breached its contractual obligation to represent Plaintiffs' interests and provide legal services by failing to inform Plaintiffs of the existence or terms of IRS Announcement 2002-02.

68.    LRF's breach of its contractual obligations caused Plaintiffs injury and loss including, but not limited to, payment of accuracy-related penalties in excess of $2.6 million, and the interest related thereto, attributable to the Tax Transaction.

## COUNT FOUR

### (Negligent Misrepresentation)

69.    Plaintiffs incorporate by reference and reallege the preceding paragraphs as if fully set forth herein.

70.    LRF owed Plaintiffs duties of loyalty and due care during the existence of the attorney-client relationship.  Those duties embraced the duty to provide Plaintiffs with accurate information and opinions based on professional skill and knowledge.

71.    LRF made numerous misrepresentations, acting either intentionally or negligently, in promoting and opining on the Tax Transaction including: (a) that LRF would provide an independent and objective Opinion regarding the Tax Transaction; (b) that there was "substantial authority" under existing tax law for the tax treatment used in the Tax Transaction; (c) that it "is more likely than not" that the partnership anti-abuse rules found in IRS regulations "will not alter the Federal income taxation of the Financial Plan;" and (d) that "[d]espite a theoretical similarity to the way in which the transfer of the brokerage account in the present transaction [i.e., the Tax Transaction] increases basis, the transaction addressed in the recent IRS Notice [i.e., IRS Notice 2000-44] presents a significantly different nontax economic profile than the present transaction."

72.    In reasonable and justifiable reliance upon LRF's representations regarding the Tax Transaction and the tax treatment it would receive, Plaintiffs executed the Tax Transaction.  Given their own lack of experience and expertise in complicated tax matters, Plaintiffs would not have executed the Tax Transaction but for LRF's misrepresentations regarding the Tax Transaction and the tax treatment it would receive.

73.    As a proximate result of LRF's negligent misrepresentations, Plaintiffs have been harmed and suffered substantial damages including, but not limited to, payment of accuracy-related penalties in excess of $2.6 million, payment of interest attributable to the tax deficiency and the corresponding accuracy-related penalties assessed by the IRS, and payment of substantial fees to LRF and Heritage in excess of $4.3 million in connection with executing the Tax Transaction and the Plan.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully demand that judgment be entered in their favor and against defendant LRF on all Counts in this Complaint and that the Court award Plaintiffs:

    (a) compensatory damages in an amount to be determined at trial;

    (b) costs of suit;

    (c) pre- and post-judgment interest; and

    (d) such further relief as may be necessary and appropriate.

Dated:   August 19, 2005

Joseph C. Kohn
George W. Croner
Hilary E. Cohen
Kohn, Swift & Graf, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA 19107
(215-238-1700)

Attorneys for Plaintiffs