# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RICHARD H. PENSKE AND PATRICIA L. PENSKE, <br><br> Plaintiffs, <br><br> v. <br><br> LEWIS, RICE & FINGERSH, L.C., <br><br> Defendant. | : : : : : : : : : : : : | CIVIL ACTION NO. 05-CV-4436-CG |

## REPLY BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

HANGLEY ARONCHICK SEGAL & PUDLIN
William T. Hangley (I.D. No. 03533)
Shawn A. Weede (I.D. No. 90402)
One Logan Square, 27th Floor
Philadelphia, Pennsylvania 19103

OF COUNSEL:

VINSON & ELKINS L.L.P.
George M. Kryder
3700 Trammell Crow Center
2001 Ross Avenue
Dallas, TX 75201-2975
(214) 220-7700
Fax: (214) 220-7716

# TABLE OF CONTENTS

I.   PLAINTIFFS HAVE NOT MET THEIR BURDEN TO DEMONSTRATE THAT THE COURT HAS SPECIFIC JURISDICTION OVER LEWIS, RICE. ................................- 2 -

   A.   LEWIS, RICE DID NOT SOLICIT THE PLAINTIFFS' BUSINESS. ............................................ - 2 -

   B.   PLAINTIFFS HAVE NOT ALLEGED INTENTIONAL TORTS AND THEREFORE THE "EFFECTS TEST" IS INAPPLICABLE TO THE COURT'S INQUIRY HERE. ................................................ - 7 -

   C.   SINCE THE LEGAL WORK IN QUESTION WAS PERFORMED OUTSIDE OF THE FORUM, IT IS IRRELEVANT THAT LEWIS, RICE ENGAGED IN TRANSACTIONAL WORK AS OPPOSED TO LITIGATION ON BEHALF OF THE PLAINTIFFS. .................................................................... - 9 -

   D.   THE COMMUNICATIONS SENT INTO PENNSYLVANIA THAT RELATE TO PLAINTIFFS' CLAIMS ARE INSUFFICIENT TO ESTABLISH PERSONAL JURISDICTION OVER LEWIS, RICE. .......... - 10 -

      1.   *Communications Directed to Lewis, Rice in Missouri From the Plaintiffs or Third Parties in Pennsylvania Do Not Establish Purposeful Availment.* ...........................- 12 -

      2.   *Most of the Communications Listed in Exhibit G Are Irrelevant to the Claims Asserted Here.* ..................................................................................................................- 13 -

II.  PLAINTIFFS HAVE NOT MET THEIR BURDEN TO DEMONSTRATE THAT THE COURT HAS GENERAL JURISDICTION OVER LEWIS, RICE. ...............................- 17 -

I.       INTRODUCTION

At its core, Plaintiffs' Response Brief attempts to distract the Court from the fact that Plaintiffs' claims all relate to legal work performed in Missouri, by Missouri attorneys whom Plaintiffs solicited in Missouri, and who never entered Pennsylvania in connection with Plaintiffs' matters.  Besides relying on an agency relationship with a third party that simply did not exist, as well as mischaracterizing claims for legal malpractice as intentional torts in their own Complaint, Plaintiffs' primary bases for the assertion of specific jurisdiction over Lewis, Rice & Fingersh, L.C. ("Lewis, Rice") are (1) an alleged negligent misrepresentation that occurred in Missouri in late 2000, (2) an omission allegedly made by Lewis, Rice while performing legal services in Missouri, and (3) correspondence that was either never sent into Pennsylvania at all, or that has nothing to do with the actual claims in this case.  Plaintiffs lay these arguments on a poor foundation.  As articulated in Lewis, Rice's Opening Brief, communications sent into Pennsylvania, without more, are insufficient to confer jurisdiction over an out-of-state law firm for services performed outside the forum.  Accordingly, Plaintiffs have failed to meet their burden to establish specific jurisdiction over Lewis, Rice.

Plaintiffs' assertion that Lewis, Rice is subject to general jurisdiction in Pennsylvania is similarly without merit.  The fraction of matters that Lewis, Rice handled for Pennsylvania residents related, almost universally, to litigations or transactions that took place outside of the Commonwealth.  Indeed, over the course of five years, the only services that Lewis, Rice actually performed in the Commonwealth boil down to several visits to Pennsylvania in connection with two different clients, and three administrative filings.  When these minimal contacts are measured against the volume of legal services it performed outside of the Commonwealth during the relevant time period, Lewis, Rice plainly does not purposefully avail itself of conducting a continuous and substantial portion of its business in the Commonwealth,

and therefore is not subject to general jurisdiction in Pennsylvania.  Lewis, Rice's motion to dismiss for lack of personal jurisdiction should be granted.

## II.   PLAINTIFFS HAVE NOT MET THEIR BURDEN TO DEMONSTRATE THAT THE COURT HAS SPECIFIC JURISDICTION OVER LEWIS, RICE.

In its Opening Brief, Lewis, Rice cited various cases holding that when a Pennsylvania resident solicits an out-of-state law firm to perform services outside of the forum, and the only contacts between the law firm and Pennsylvania are correspondence and phone calls, there is no personal jurisdiction over the law firm.  Opening Brief at 6-10.  In their Response Brief, Plaintiffs attempt to distinguish the present case from this principle through the following four arguments:  (1) Lewis, Rice solicited the Plaintiffs in Pennsylvania; (2) Lewis, Rice committed an "intentional tort" against Plaintiffs; (3) the cases cited by Lewis, Rice in its Opening Brief involve litigation matters as opposed to the transactional work performed in this case; and (4) Lewis, Rice sent more communications into the forum than the defendants in the other cases cited in Lewis, Rice's Opening Brief.  As explained below, these arguments are either contrary to fact, fail as a matter of law, or both.

### A.   Lewis, Rice Did Not Solicit the Plaintiffs' Business.

Throughout their Response Brief, Plaintiffs assert that Lewis, Rice targeted and solicited the Penskes in Pennsylvania.  They do this for good reason – much of the case law involving professional relationships between a forum resident and an out-of-state law firm focuses on whether the plaintiff was solicited in the forum state.  E.g., Sher v. Johnson, 911 F.2d 1357, 1363 (9th Cir. 1990) ("Out-of-state legal representation does not establish purposeful availment of the privilege of conducting activities in the forum state, *where the law firm is solicited in its home state* and takes no affirmative action to promote business within the forum state.") (emphasis added).  Lewis, Rice, however, did not solicit the Penskes; rather, it was the other way around.

As articulated in the declaration of William J. Falk, attached as Exhibit 1 to Lewis, Rice's

Opening Brief, no member of Lewis, Rice ever entered Pennsylvania in representing Plaintiffs.

Declaration of William J. Falk ("Falk Decl.") ¶ 21.  The first time that Mr. Penske had contact

with any member of Lewis, Rice was at their initial meeting on November 27, 2000, in St. Louis,

Missouri at the Lewis, Rice offices.  Deposition of Richard H. Penske ("Penske Dep."), Ex. I, at

43.  This meeting was set up after Mr. Penske, during a meeting with members of the Heritage

Organization ("Heritage"), "asked for a recommendation" for a law firm that could provide him

with a legal opinion about the tax transaction that Heritage proposed to him.  Id. at 39-40.[1]  After

receiving this recommendation, Mr. Penske decided that he wanted to meet with Lewis, Rice in

St. Louis:

Q.    Was it your idea to go to St. Louis on November 27th?

A.    I wanted – it was my idea to meet Lewis Rice.

Q.    Okay.

A.    Not necessarily the 27th, but it was – it was my desire to meet with Lewis, Rice.

Q.    It was your desire to go to St. Louis to meet with Lewis Rice.

A.    Correct.

. . . .

Q.    What was the first contact you had with any members of Lewis, Rice?

A.    When we arrived in St. Louis on the – on the 27th.

Id. at 38, 43.

---

[1] Notably, although members of Heritage represented to Mr. Penske that they were aware of "a number" of firms that could render this type of legal opinion, Mr. Penske did not ask for the names of any Pennsylvania law firms.  Id. at 41-42.

Plaintiffs seek to attribute to Lewis, Rice the actions of Heritage, which allegedly solicited the Penskes in the Commonwealth.  Mr. Penske, however, had already entered a contract with Heritage weeks before Mr. Penske traveled to Missouri to meet with Lewis, Rice for the first time.  See infra note 3.  Moreover, attributing the actions of a third party to Lewis, Rice, would contradict one of the central precepts in "minimum contacts" jurisprudence:  "The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum state."  Hanson v. Denckla, 357 U.S. 235, 253 (1958); see also Garofalo v. Praiss, No. 90-1350, 1990 WL 97800, at *3 (E.D. Pa. July 10, 1990) ("In evaluating defendant's contacts with the forum state, we consider only those initiated by defendant.  'It would be unfair . . . to subject a defendant to suit not because of what it did but because of what someone else did.'") (quoting Schmidt v. Leader Dogs for the Blind, Inc., 544 F. Supp. 42, 46 (E.D. Pa. 1982).  Further, as Lewis, Rice pointed out in its Opening Brief, and Plaintiffs' Response did not contradict, merely accepting an out-of-state referral does not go beyond the scope of this rule, or otherwise indicate that a defendant purposefully avails itself of doing business in the forum state.  Nicholas v. Ashraf, 655 F. Supp. 1418, 1419 (W.D. Pa. 1987).

Plaintiffs attempt to bypass this tenet by asserting that Heritage was acting as the "agent" for Lewis, Rice when it allegedly "targeted" the Plaintiffs in Pennsylvania.  Response Brief at 21.  As Mr. Falk has averred, however, the Heritage Organization has never been the agent of Lewis, Rice for any purpose.  Falk Decl. ¶ 17 (attached as Exhibit 1 to Opening Brief).  Plaintiffs have not come forward with any evidence to contradict this testimony.[2]  In particular, while

---

[2] After being allowed a period of jurisdictional discovery, Plaintiffs may not simply rely on their allegations in order to defeat the instant motion.  Joint Stock Soc. Trade House of Descendants of Peter Smirnoff, Official Purveyor to the Imperial Court v. Heublein, Inc., 936 F. Supp. 177, 192 (D. Del. 1996) ("After discovery has begun, the nonmoving party cannot rely on (continued...)

Plaintiffs spend a great deal of effort trying to show that Heritage and Lewis, Rice worked together on the Penskes' tax transaction, none of the materials Plaintiffs presented establish that Lewis, Rice ever had any control over Heritage's actions, particularly in Heritage's alleged solicitation of the Penskes.   See, e.g., RESTATEMENT (SECOND) OF AGENCY § 1(1) (1958) ("Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.").   Plaintiffs clearly have not met their burden of establishing an agency relationship between Lewis, Rice and Heritage.[3]

---

(continued...)

the allegations of its complaint.") (citing Stranahan Gear Co. v. NL Indus., Inc., 800 F.2d 53, 58 (3d Cir. 1986) and Time Share Vacation Club v. Atlantic Resorts, Ltd., 735 F.2d 61, 66 n.9 (3d Cir. 1984)).   Rather, the Plaintiffs "must sustain [their] burden of proof in establishing jurisdictional facts through sworn affidavits or other competent evidence." Time Share Vacation Club, 735 F.2d at 66 n.9.   "In other words, the nonmoving party must base its *prima facie* showing of personal jurisdiction over the moving party on evidence of specific facts set out in the record." Joint Stock Soc., 936 F. Supp. at 192 (citation omitted); Stranahan, F.2d at 58-59 (holding that a "bare allegation" in the complaint was "not sufficient to meet" the plaintiff's "evidentiary burden"); see also Response Brief at 1-2 n.2 (stating that the Court may continue to take the allegations of the Complaint as true "where those allegations *have not been contested* or are otherwise *not related to the jurisdictional issue*") (emphasis added) (citing Brotherhood of Locomotive Engineers and Trainmen v. United Trans. Union, 2005 WL 1388937, at *2 (E.D. Pa. 2005)).

   [3] In an apparent attempt to show a "connection" between Heritage and Lewis, Rice, Plaintiffs refer to work that members of Lewis, Rice performed in mid-November 2000 to prepare in advance for their first meeting with Mr. Penske on November 27, 2000.   (Deposition of William J. Falk ("Falk Dep."), Ex K, at 61-62 (describing the work that Lewis, Rice performed in mid-November as "in anticipation of forming an attorney-client relationship" with Mr. Penske).   It is not clear how this furthers their agency argument, however, as nothing in the materials to which Plaintiffs cite shows that Lewis, Rice had any type of control over Heritage during this or any other time period.   Indeed, in mid-November, when Heritage was providing information to Lewis, Rice regarding the Penskes, the Plaintiffs had already signed up to be a client of Heritage and had paid it a fee.   See Ex. A, at Plaintiffs' 00426 & 00434; Penske Dep., Ex. I, 23-25.   Further, at least as of the November 27, 2000 meeting, Mr. Penske was well aware that Heritage shared information with Lewis, Rice concerning the details of the tax transaction

(continued...)

The court's opinion in <u>Johnson v. Summa Corp.</u>, No. 84-2844, 1985 WL 2967 (E.D. Pa. Oct. 3, 1985) is instructive in this regard.  In <u>Johnson</u>, the plaintiff sued two defendants – a foundation and a hotel – for injuries he allegedly sustained attending an instructional seminar put on by the foundation and located at the hotel.  <u>Id.</u> at *1.  The hotel moved to dismiss the plaintiff's claim for want of personal jurisdiction.  <u>Id.</u>  In opposing the hotel's motion, the plaintiff argued that the fact that the foundation solicited him in Pennsylvania could be imputed to the hotel under an agency theory, pointing to a contract between the hotel and the foundation. <u>Id.</u> at *1-2.  Applying principles of agency, the court in <u>Johnson</u> flatly rejected this argument.  <u>Id.</u> at *2 ("In order to establish an agency, plaintiff would have to demonstrate the following:  'the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking.") (quoting <u>Scott v. Purcell</u>, 490 Pa. 109, 117 (1980)).  The court concluded that even though the agreement provided that reservations for the seminar were to be placed through the foundation, the hotel had no control to direct the foundation's "solicitation for the seminar."

_____

(continued...)

prior thereto.  Penske Dep., Ex. I, at 49-54 (stating that he understood that Heritage "pretty much brought [Lewis, Rice] up to speed as to the transaction and they were familiar with [the] transaction," that "more than likely, there was some type of correspondence and dialogue between Heritage and Lewis Rice," and that when he attended the November 27, 2000 meeting Lewis, Rice "seemed to know pretty well my situation as relates to the – the details of that transaction.").

Further, Plaintiffs' assertion that "[c]umulatively, LRF billed over six hundred and three hours of work on the Plan before anyone at LRF ever met or spoke with the Penskes and, for the most part, before the Penskes had even heard of LRF" is simply incorrect.  Response Brief at 3. To support this allegation, Plaintiffs cite to their Exhibit J 1.  However, a plain examination of Exhibit J 1 shows that Lewis, Rice billed fewer than **forty four hours** prior to November 27, 2000 – the date that Mr. Penske first met with Lewis, Rice.

- 6 -

Id. at *2.  Accordingly, "[a]s the element of control is the touchstone of a principal-agent relationship," the court could not "find that an actual agency relationship was created."  Id.  As in Johnson, the Plaintiffs here cannot point to any agreement between Lewis, Rice and Heritage in which Lewis, Rice had any sort of control of Heritage's alleged solicitation of the Plaintiffs, or for that matter, any of Heritage's other alleged actions with the Penskes.  Indeed, Plaintiffs have pointed to no evidence that members of Lewis, Rice had any idea how Heritage went about procuring its clients.  Deposition of Michael D. Mulligan ("Mulligan Dep."), Ex. J, at 25. Accordingly, Plaintiffs' agency argument must be rejected.[4]

    **B.**    **Plaintiffs Have Not Alleged Intentional Torts and Therefore the "Effects Test" Is Inapplicable to the Court's Inquiry Here.**

In its Opening Brief, Lewis, Rice cited various cases holding that an out-of-state law firm's "telephone calls and letter to the forum, even if transmitting negligent advice, do not suffice to confer jurisdiction" over that law firm.  Opening Brief at 6-8 (quoting Poole v. Sasson, 122 F. Supp. 2d 556, 559 (E.D. Pa. 2000).  Plaintiffs attempt to distinguish this case law under the rationale that they have alleged that Lewis, Rice sent "intentionally misleading representations" into Pennsylvania, as opposed to "negligent advice" or omissions, and therefore since Plaintiffs felt the harm or effect of this conduct in Pennsylvania, Lewis, Rice is subject to suit in the Commonwealth.  Response Brief at 22-23 (citing Resolution Trust Corp. v. Farmer,

---

[4] To the extent that anything in Plaintiffs' Response Brief could be construed as alleging an "apparent" agency relationship between Lewis, Rice and Heritage, this argument must likewise be rejected.  As stated in Johnson, the test for apparent agency is "whether 'a man of ordinary prudence, diligence and discretion would have a right to believe that the agent possessed the authority he purported to exercise.'"  Id. at *3 (quoting Universal Computer Sys, Inc. v. Med. Servs. Ass'n., 628 F.2d 820, 823 (3d Cir. 1980)).  As Mr. Penske unequivocally stated in his deposition, no member of Lewis, Rice (or Heritage) ever indicated that Heritage had the authority to act on Lewis, Rice's behalf.  Penske Dep., Ex. I, at 103-04.

836 F. Supp. 1123, 1128-29 (E.D. Pa. 1993)).  This rationale follows a similar vein as the "effects test," as set forth in <u>Calder v. Jones</u>, 465 U.S. 783 (1984), which the Plaintiffs also assert should be applied in this case.  Response Brief at 27-28.  The problem with these arguments is that the rationale of the "effects test" outlined in <u>Calder</u> – namely, that jurisdiction may be premised on the idea that the "effects" of the defendant's conduct will be felt in the forum state – may only be employed by the Court if Plaintiffs have alleged intentional tort claims.  <u>See, e.g.</u>, <u>IMO Indus., Inc. v. Kiekert AG</u>, 155 F.3d 254, 256, 263-64, 265 (3d Cir. 1998) (stating that "for <u>Calder</u> to apply, the plaintiff must allege facts sufficient to meet a three-prong test.  First the defendant must have committed an intentional tort.").  A plain examination of Plaintiffs' own Complaint, however, shows that Plaintiffs have not alleged intentional torts.

In the Complaint, Plaintiffs allege three tort claims:  two claims of professional malpractice and one claim for negligent misrepresentation.[5]  These claims are simply not intentional torts under Pennsylvania law.  <u>See</u> <u>Ibn-Sadiika v. Riester</u>, 551 A.2d 1112, 1114-15 (Pa. Super. 1988) (describing a "suit for legal malpractice" as a "suit for professional negligence," and listing elements including "failure to exercise ordinary skill and knowledge"); <u>Bilt-Rite Contractors, Inc. v. The Architectural Studio</u>, 866 A.2d 270, 277 (Pa. 2005) ("The elements of negligent misrepresentation differ from intentional misrepresentation in that the . . . speaker need not know his or her words are untrue, but must have failed to make a reasonable

---

[5]  In their Response Brief, Plaintiffs mischaracterize their claim for negligent misrepresentation as one for intentional misrepresentation (<i>i.e.</i>, fraud).  <u>Compare</u> Response Brief at 22 (describing their fourth count as one for "Misrepresentation") <u>with</u> Complaint at p. 21 (describing their fourth count as one for "**Negligent** Misrepresentation") (emphasis added).  Moreover, the idea that Plaintiffs intended their misrepresentation claim to be one for intentional misrepresentation is belied by paragraph 73 of the Complaint, which plainly states:  "As a proximate result of LRF's <i>negligent misrepresentations</i>, Plaintiffs have been harmed and suffered substantial damages . . . ."  Complaint ¶ 73 (emphasis added).

investigation of the truth of these words.").[6]   Accordingly, the <u>Calder</u> "effects test," and its

rationale concerning intentional torts such as fraud, are inapplicable to the instant case.[7]

      **C.**      **Since the Legal Work in Question Was Performed Outside of the Forum, It Is Irrelevant that Lewis, Rice Engaged in Transactional Work as Opposed to Litigation on Behalf of the Plaintiffs.**

Plaintiffs also seek to distinguish the case law Lewis, Rice cited in its Opening Brief by

arguing that it pertains to "out of state litigation" performed by the attorneys in question, and not

to the transactional work performed by Lewis, Rice for the Plaintiffs.  Response Brief at 24-25.

A similar argument was made and rejected in <u>Porter v. Berall</u>, 142 F. Supp. 2d 1145 (W.D. Mo.

2001).   In <u>Porter</u>, Missouri plaintiffs alleged that Connecticut lawyers committed legal

malpractice in their estate planning services by failing to advise the plaintiffs that certain capital

gains would be taxable under Connecticut law.  <u>Id.</u> at 1146-47.  Citing "the clearly compelling

body of law regarding lawyer malpractice [that] confines personal jurisdiction to the situs of the

acts and omissions complained of," the court held that the out-of-state legal representation of the

plaintiffs was not enough to confer personal jurisdiction over the firm where the plaintiff resided.

<u>Id.</u> at 1147.  The plaintiffs attempted to distinguish that body of law by describing the cases to

---

[6] The same is true under Missouri law.  <u>See</u> <u>Patterson v. Checkett</u>, 43 S.W.3d 477, 481 (Mo. App. S.D. 2001) ("The elements of a claim for legal malpractice are: (1) an attorney-client relationship; (2) negligence or breach of contract by the defendant; (3) proximate causation of plaintiff's damages; (4) damages to the plaintiff.") (citation omitted); <u>Collins v. Missouri Bar Plan</u>, 157 S.W.3d 726, 734 (Mo. App. W.D. 2005) ("The elements of negligent misrepresentation are (1) the speaker supplied information in the course of his or her business because of some pecuniary interest, (2) that was false, (3) without exercising reasonable care or competence in obtaining or communicating this information, (4) for the guidance of a limited group of persons in a particular business transaction, (5) and the listener justifiably relied on the information, (6) and, as a result, suffered a pecuniary loss.").

[7] Moreover, as explained more fully at section I. D. 2. (b) <u>infra</u>, the allegedly negligent legal advice that caused Plaintiffs to enter into the tax transaction was delivered to Mr. Penske while he was in Missouri.  Accordingly, Lewis, Rice cannot be said to have "expressly aimed [its] tortious conduct at [Pennsylvania,] such that the forum can be said to be the focal point of the tortious activity."  <u>Imo Indus.</u>, 155 F.3d at 256.

which the court referred as all involving "litigation matter[s]" that were "conducted in another state." Id. at 1148.  The court responded that "[n]one of the cases . . . [made] such a distinction, and no rationale for the distinction" was apparent to the court.  Id.  Indeed, the court went on to cite Poole v. Sasson, 122 F. Supp. 2d 556 (E.D. Pa. 2000), which was cited in Lewis, Rice's Opening Brief at 6, since "*Poole* seems to deal with accountant services similar to estate planning services and the court used out-of-state litigation cases for controlling principles."  Id.  The Court should similarly reject Plaintiffs' argument here.

> ### D.     The Communications Sent Into Pennsylvania That Relate to Plaintiffs' Claims Are Insufficient to Establish Personal Jurisdiction Over Lewis, Rice.

Shutting their eyes to the case law cited in Lewis, Rice's Opening Brief, Plaintiffs assert that specific jurisdiction may be predicated on communications that Lewis, Rice – while located outside of the Commonwealth – had with individuals located in the Commonwealth.  To make matters worse, Plaintiffs, in their Exhibits G 1 and G 2, Plaintiffs have lumped together all of the supposed communications between Lewis, Rice and Pennsylvania into a chart – and in doing so count multiple copies of the same document as different "contacts"[8] – in an attempt to show that

---

[8] To name a few examples, compare Ex. B (Penske 017764-017773, draft of May 24, 2002 letter to Joseph D. McCarthy, listed as contact 39 on Plaintiffs' Exhibit G 1) with Ex. C (Penske 014242-014248, May 24, 2002 letter to Joseph D. McCarthy, listed as contact 40 on Plaintiffs' Exhibit G 1) and Ex. D (Penske 008257-008263, May 24, 2002 letter to Joseph D. McCarthy, listed as contact 41 on Plaintiffs' Exhibit G 1); compare Ex. E (Penske 009631-009636, November 21, 2002 fax to Joseph D. McCarthy, listed as contact 49 on Plaintiffs' Exhibit G 1) with Ex. F (Penske 006444-6450, November 21, 2002 fax to Joseph D. McCarthy, listed as contact 50 on Plaintiffs' Exhibit G 1); compare Ex. G (Penske 005569-005572, December 4, 2001 fax to Joseph D. McCarthy, listed as contact 20 on Plaintiffs' Exhibit G 1) with Ex. H (Penske 005431-005434, December 4, 2001 fax to Joseph D. McCarthy, listed as contact 21 on Plaintiffs' Exhibit G 1).  Moreover, in the Declaration of Hilary Cohen Stolzenberg, Ms. Cohen Stolzenberg does not indicate how she would have personal knowledge of any of the communications listed in Plaintiffs' Exhibits G 1 and 2 actually being sent into Pennsylvania.

this case presents a more compelling argument for finding personal jurisdiction than the cases cited by Lewis, Rice.

As demonstrated in the Opening Brief, however, "courts often point to additional factors" besides communications sent into the forum, "such as visits to [the forum state]" "when finding jurisdiction."  GMAC Real Estate, LLC v. Gate City Real Estate Co., No. Civ. 05-2253 (AET), 2005 WL 2656678, at *3 (D.N.J. Oct., 18, 2005); Vetrotex CertainTeed Corp. v. Consol. Fiber Glass Prods., 75 F.3d 147, 152 (3d Cir. 1995) (stating that "informational communications in furtherance of a contract between a resident and a nonresident [do] not establish the purposeful activity necessary for valid assertion of personal jurisdiction over the nonresident defendant.") (citation omitted); Triad ML Marketing, Inc. v. Clark & Trevithick, P.C., No. 0900 Feb. Term 2005, 050962, 2005 WL 2267068 (Pa. Com Pl. Sept. 1, 2005) (declining to find jurisdiction where "dozens of phone calls," "approximately 100 email messages and dozens of pieces of correspondence, including invoices" were sent to a Pennsylvania resident in connection with a law firm's representation of it in California litigation); see also Austad Co. v. Pennie & Edmonds, 823 F.2d 223, 226 (8th Cir. 1987) (holding that "numerous phone calls" between the defendant law firm and the forum state, "use of courier services" and "monthly billings mailed" into the forum state were not sufficient to establish personal jurisdiction over an out-of-state law firm that did not solicit the plaintiff).  Further, all of the "contacts" proffered by Plaintiffs in their Exhibit G cannot defeat the instant motion for two additional, interrelated reasons:  (1) a large portion of the communications identified by the Plaintiffs in Exhibit G are not communications sent by Lewis, Rice into the forum at all, and (2) the majority of communications identified in Exhibit G are irrelevant to the claims alleged in this case.

1.      **Communications Directed to Lewis, Rice in Missouri From the Plaintiffs or Third Parties in Pennsylvania Do Not Establish Purposeful Availment.**

As is abundantly clear in Plaintiffs' Exhibit G, the Penskes assert that every time Lewis, Rice received a letter or phone call from an individual in Pennsylvania, Lewis, Rice was purposefully directing its activities *toward* the Commonwealth.  Indeed, in Exhibit G 2 alone, there are 122 such "contacts" listed.   Plaintiffs have not cited any legal authority for this proposition, because the law is to the contrary.  See, e.g., Reliance Steel Prods Co. v. Watson, Ess, Marshall & Enggas, 675 F.2d 587, 589 (3d Cir. 1982) (holding that "negligently delivered legal advice *into Pennsylvania*" was not enough for the court to exercise jurisdiction over an out-of-state law firm) (emphasis added); Poole v. Sasson, 122 F. Supp. 2d 556, 559 (E.D. Pa. 2000) (looking to "*Defendant's* telephone calls and letters to the forum") (emphasis added); Rotenberg v. King and Everhard, P.C., No. Civ. A. 00-1452, 2000 WL 1705787 (E.D. Pa. Nov. 6, 2000) ("It is true that mail and telephone communications sent by a *defendant* into a forum may count toward the minimum contacts that support jurisdiction.") (emphasis added).

The rationale for examining only the contacts sent *into* the Commonwealth by Lewis, Rice as evidence of purposeful availment is not difficult to understand.  For example, in LAK, Inc. v. Deer Creek Enters., 885 F.2d 1293 (6th Cir. 1989), the court considered whether certain phone calls and letters between a lawyer for the defendant (located outside the forum) and a lawyer for the plaintiff (located inside the forum) were sufficient to establish personal jurisdiction over the defendant.  After pointing out that the "numerical count of the calls and letters has no talismanic significance," the court went on to observe that "the majority of the lawyers' telephone calls" were originated by the plaintiff's lawyer from inside of the forum.  Id. at 1301.  The Court stated that it was "not prepared to hold that when" an agent for the plaintiff made phone calls to the defendant's agent from inside the forum state, "the latter was required to

hang up the phone if he wished to protect his client against a subsequent finding of 'purposeful availment' of the benefits of the law of whatever state or states the calls happened to come from."  Id.  The "[m]ere awareness that [the defendant] and its legal counsel were from [the forum state] clearly was not enough" to make those phone calls weigh in favor of a finding of personal jurisdiction.  Id.  The court's conclusion in LAK, Inc. comports with the more general principle discussed in section I. A supra, that:  "The unilateral activity of those who claim some relationship with a non-resident defendant cannot satisfy the requirement of contact with the forum State."  Denckla, 357 U.S. at 253 (cited in LAK, Inc., 885 F.2d at 1301).  Accordingly, many of the "contacts" that Plaintiffs have listed in their Exhibit G are simply beside the point.

### 2.   Most of the Communications Listed in Exhibit G Are Irrelevant to the Claims Asserted Here.

In analyzing the contacts for each claim under a theory of specific jurisdiction, the Court should only consider the contacts identified that arise from or relate to those specific claims. Vetrotex CertainTeed Corp., 75 F.3d at 153; Reliance Steel Prods. Co., 675 F.2d at 588 ("If the claim pursued arises from forum related activity, the court must determine whether there are enough contacts with the forum arising out of that transaction in order to justify the assertion of jurisdiction over the out-of-state defendant.") (emphasis added).  For example, in Vetrotex CertainTeed Corp., the court performed a jurisdictional analysis based on a breach of contract claim.  In affirming that the defendant was not subject to jurisdiction, the court limited the scope of the events considered to the particular contract being sued upon – not prior contracts that the parties had together.  Id. at 153.  In so doing, the court stated that the specific personal jurisdiction analysis "clearly contemplates dealings *between the parties in regard to the disputed contract*, not dealings unrelated to the cause of action."  Id.

In the present case, Plaintiffs seek to have virtually every single piece of correspondence sent to and from Lewis, Rice weighed in this analysis, despite the fact that the majority of such correspondence is unrelated to Plaintiffs' claims.  In particular Plaintiffs would have the Court look to communications that are connected with other matters handled for the Penskes by Lewis, Rice[9] – namely, a separate engagement in which Lewis, Rice agreed to perform estate planning work for the Plaintiffs, and another in which Lewis, Rice represented the Plaintiffs in connection with an IRS audit of certain of their income tax returns.[10]   Response Brief at 17-18.   As

---

[9] Plaintiffs' contention here is particularly ironic in light of their own assertions with regard to what is relevant to the Court's inquiry here.  As Plaintiffs acknowledge, in connection with its initial representation of the Penskes, Lewis, Rice created a number of Missouri entities to support the tax transaction.  Response Brief at 18.  Plaintiffs assert in their Response Brief, however, that Lewis, Rice's work in setting up these Missouri entities is either "tangential" or "completely irrelevant" to Plaintiffs claims in this case, and should not be considered.  See Response Brief at 18-19 (arguing that Lewis, Rice's "work on the [Missouri entities created for the Penskes] was tangential to LRF's work evaluating the legality of the financial plan" and thus not relevant to Plaintiffs first claim for malpractice and claim for negligent misrepresentation, and also that "work on the entities is completely irrelevant to Plaintiffs' second [sic] and fourth [sic] claims:  LRF's breach of its professional and contractual duty to Plaintiffs as a result of failing to inform Plaintiffs about the amnesty period . . . .").

[10] The Penskes' engagement of Lewis, Rice to perform estate planning work on their behalf was confirmed in a separate engagement letter dated February 22, 2001 – almost three months after Plaintiffs' initial engagement for Lewis, Rice's services related to the tax transaction.  Falk Decl. ¶ 18 (attached as Exhibit 1 to Opening Brief); Falk Dep., Ex. K, at 149-150 (affirming that the engagement for estate planning services was for a "different set of services than was contemplated by the original retention letter executed in December of 2000").  Mr. Penske recalls that he signed this engagement letter in Dallas, Texas.  Penske Dep., Ex. I, at 78-79.  This work was "basically completed" by August 31, 2001.  Id. at 83-84 (stating that although the estate planning work was not "completely finished" by that point, "the main part of it was done.").

Lewis, Rice's representation of the Plaintiffs in connection with IRS audits began a number of months after the Penskes retained Lewis, Rice's services in connection with the tax transaction, shortly after Mr. Penske "received notice from the IRS in the summer of '01" that his 1997 return was going to be audited.  Id. at 89-90.  After receiving the notice, Mr. Penske "made a decision to ask Lewis Rice if they would . . . represent [him] in [his] tax audit" and "[p]icked up the phone and gave them a call."  Id. at 90.  Thereafter, Mr. Penske and his accountant, Tom Reed, traveled to St. Louis to meet with Lewis, Rice on at least two separate
(continued...)

demonstrated more fully below, once the correspondence to which the Plaintiffs cite is distilled to contacts that actually relate to claims alleged in this action, it is much more limited than the Plaintiffs assert and plainly does not support personal jurisdiction.

### (a)   Claim One (Professional Malpractice) and Claim Three (Breach of Contract)

In their first claim of legal malpractice, Plaintiffs allege that Lewis, Rice breached a duty[11] to them by failing to inform the Penskes of "IRS Announcement 2002-2 which provided 'amnesty' from certain accuracy-related penalties" if certain transactions were disclosed to the IRS under the "terms of that Announcement."  Complaint ¶ 55.  Plaintiffs also allege in this claim that the failure to disclose this announcement reflected a hidden "conflict of interest" that Lewis, Rice failed to disclose to them.  Id. at ¶ 56.  Similarly, in their third claim for breach of contract,[12] the allegation is that "LRF breached its contractual obligation to represent Plaintiffs' interests and provide legal services by failing to inform Plaintiffs of the existence or terms of the

_____

(continued...)

occasions – once in August of 2001, and the other in October of 2001 – to discuss audit matters with Lewis, Rice.  Falk Decl. ¶ 20 (attached as Exhibit 1 to Opening Brief); Penske Dep., Ex. I, at 91-92, 96-97.

[11]  Plaintiffs ground this duty in an allegation that "LRF and Plaintiffs entered into an attorney-client relationship in or about October 2000 during a meeting between Plaintiff Penske and representatives of LRF."  Complaint ¶ 51.  Although Mr. Penske now conveniently denies that he entered into an attorney-client relationship with Lewis, Rice on that date, discovery has made clear that the "meeting" that the Complaint was referring to actually was the initial meeting between Mr. Penske and Lewis, Rice that took place on November 27, 2000, in St. Louis, Missouri.  Penske Dep., Ex. I, at 112-15.

[12]  In their Response Brief and in the Complaint, Plaintiffs attempt to lump together all of the separate engagements that Lewis, Rice undertook on behalf of the Penskes under one amorphous, ever-evolving agreement.  Response Brief at 19-20; Complaint at ¶¶ 64-65.  However, the facts show that these were separate engagements, entered into at separate times at different locations all outside the Commonwealth.  See notes 10 and 11 supra.

IRS Announcement 2002-02."   Complaint ¶ 67.   With these claims in mind, much of the correspondence outlined in their Exhibits G 1 and 2 is irrelevant.   First, these two claims do not "arise from" any communications sent into Pennsylvania at all.   Rather, they concern *a failure to communicate* – an omission allegedly made by Lewis, Rice while performing legal services in Missouri.   Second, as Plaintiffs allege in the Complaint, the amnesty period provided in IRS Announcement 2002-2 was announced on December 22, 2001 and closed on April 23, 2002.   Id. ¶ 38, 44.   Accordingly, Plaintiffs' claims certainly cannot be said to relate to correspondence sent into the forum before, much less after this time period.   Third, correspondence that Lewis, Rice sent to third parties, such as the IRS, cannot relate to a claim where Lewis, Rice purportedly withheld certain information from the *Plaintiffs*.[13]   Truly, the vast majority of communications set forth in Plaintiffs' Exhibits G 1 and 2 are simply not relevant here.

### (b)     Claim Two (Professional Malpractice) and Claim Four (Negligent Misrepresentation)

Plaintiffs' second and fourth claims arise only from activity that allegedly took place prior to the end of December 2000.   Communications sent into Pennsylvania after that date are simply irrelevant to these claims.   Plaintiffs allege that Lewis, Rice breached its duty to them by making certain assurances during the Missouri meeting regarding the legality and viability of a

---

[13] In connection with their contract claim, Plaintiffs also assert that Lewis, Rice "reached out beyond Missouri and created continuing relationships and obligations" with the Penskes and therefore the case of Burger King Corp. v. Rudzewicz, 471 U.S. 462 (1985) is controlling. Response Brief at 19.   In making this argument, Plaintiffs ignore that *they* continually reached out to Lewis, Rice to solicit its services.   Penske Dep., Ex. I, at 38-40, 43 (describing how Mr. Penske went to St. Louis to meet with Lewis, Rice in St. Louis for their first meeting); id. at 89-92, 96-97 (describing how Mr. Penske solicited the services of Lewis, Rice in connection with audit matters and traveled to St. Louis in connection therewith).   Further, the relationship between the parties and the contacts at issue in Burger King were much more extensive than the facts presented here.   Burger King, 471 U.S. at 480 (affirming a finding of jurisdiction where the defendant "entered into a carefully structured 20-year relationship that envisioned continuing and wide-reaching contacts with Burger King" in the forum state).

tax transaction, and as a result of these assurances, that Plaintiffs entered into the tax transaction in December 2000.  Complaint ¶¶ 59, 72; id. ¶ 23 ("In reliance upon the assurances provided by LRF regarding the legality of the Tax Transaction and the financial soundness of the Plan, Plaintiffs agreed to initiate the Tax Transaction in December of 2000 so that it would be effective with respect to Plaintiffs' federal tax liability for the 2000 tax year.").  Indeed, as is clear from Mr. Penske's testimony, the supposedly misleading assurances that Lewis, Rice provided to him prior to December 31, 2000 were made at their initial meeting on November 27, 2000 in St. Louis, Missouri.  Penske Dep., Ex. I, at 58 (stating that "I clearly went to St. Louis because I wanted to meet the members of the law firm and ask them about writing a legal opinion and could they write an opinion and *what was their assessment on whether it was a good transaction or a bad transaction.*") (emphasis added); id. at 63-64 (stating that after he left the November 27, 2000 meeting he had determined to go forward with the tax transaction).

Further, the only piece of allegedly negligent legal advice that Plaintiffs have identified in their Exhibit G as being sent to the Plaintiffs in Pennsylvania in connection with the tax transaction is the March 1, 2001 Opinion Letter, which was obviously sent into Pennsylvania after the Plaintiffs had effected the transaction at issue.  Even assuming that the other correspondence Plaintiffs list in their Exhibits G 1 and 2 could be construed as furthering the alleged misrepresentations described above, Plaintiffs list only eleven pieces of such correspondence that Lewis, Rice sent to the Penskes in Pennsylvania prior to the time period when the tax transaction was consummated.

## III.   PLAINTIFFS HAVE NOT MET THEIR BURDEN TO DEMONSTRATE THAT THE COURT HAS GENERAL JURISDICTION OVER LEWIS, RICE.

As articulated in Defendant's Opening Brief, for a finding of general jurisdiction, the Court must conclude that Lewis, Rice "carried on a 'continuous and substantial part' of [its]

business in Pennsylvania." Gehling v. St. George's School of Medicine, Ltd., 773 F.2d 539, 541
(3d Cir. 1985).  Stated recently by the court in Snyder v. Dolphin Encounters Ltd., 235 F. Supp.
2d 433 (E.D. Pa. 2002), this requires a "very high showing" of "extensive and pervasive"
contacts.  Id. at 437 (citations omitted).  Plaintiffs have not made this requisite showing here.

In their assertion that Lewis, Rice is subject to general jurisdiction, Plaintiffs rely on their
Exhibit V 2 (Lewis, Rice's Revised Supplemental Objections and Responses to Plaintiffs' First
Set of Interrogatories Relating to Jurisdictional Discovery).  Virtually all of the work performed
in connection with the representations listed in this exhibit, however, was performed out of
state.[14]  Indeed, attorneys from Lewis, Rice only visited Pennsylvania in connection with two of
the matters listed in Plaintiffs' Exhibit V 2,[15] with those visits either (1) being social in nature,[16]
or (2) making up a mere fraction of the work involved on the particular case.[17]  Further, the only
matter in which Lewis, Rice represented a client in a litigation-type proceeding in Pennsylvania
involved **three** administrative filings – two of which were entries of appearance – and no visits
to the Commonwealth.[18]  In light of the fact that Lewis, Rice performed only a fraction of its
actual legal work in Pennsylvania, coupled with the fact that Lewis, Rice does not specifically

---

[14] Additionally, as is evident from a cursory examination of Plaintiffs Exhibit V 2, many
of these representations concerned litigation matters that took place outside the forum.  As
Plaintiffs themselves state in their Response Brief:  "Not surprisingly, courts find that letters or
email directed to Pennsylvania and relating to *that out of state litigation* are not sufficient to
confer jurisdiction in Pennsylvania where 'the operative facts that brought the parties together'
and that underlie the claims alleged occurred in another state."  Response Brief at 24-25
(emphasis in original) (quoting Roetenberg, 2000 WL 1705787, at *5).

[15] Id. at p. 2-3.

[16] Id. at Ex. A attached thereto, No. 13.

[17] Id. at Ex. A attached thereto, No. 3.

[18] Id. at Ex. A attached thereto, No. 53.

target Pennsylvania residents in any of its firm advertising, Falk Decl. ¶ 12 (attached as Exhibit 1 to Opening Brief), these contacts can hardly be said to comprise the type of "continual and systematic" activity in which general jurisdiction is typically found.[19]  E.g., Crown Cork & Seal Co, v. Montgomery, McCracken, Walker & Rhoads, LLP, No. 03185 Dec. Term 2002, 2004 WL 1088752, at *2 (Pa. Com. Pl. April 24, 2004) (declining to find jurisdiction over a law firm with 200 attorneys where 2 were admitted to practice in Pennsylvania, 4 were admitted to practice before the Third Circuit, 5 were admitted pro hac vice to appear in Pennsylvania Courts with regard to *7 different cases*, 5 were involved in transactions involving or *occurring in Pennsylvania*, and 25 appeared in Pennsylvania on business, often to meet with clients).

---

[19] Further, many of the matters listed in Plaintiffs' Exhibit V 2 were not even for Pennsylvania clients.  Although Plaintiffs assert that Lewis, Rice "established attorney-client relationships with 14 individuals and families who were Pennsylvania residents and approximately 45 other entities," Response Brief at 13, Plaintiffs fail to tell the Court that with regard to many of these representations, the clients were not Pennsylvania residents at all.  Rather, for a number of these matters, Lewis, Rice sent correspondence or billing information into Pennsylvania merely because:  (1) the client's outside counsel was based in Pennsylvania, (2) bills were mailed to a third party that was not the client, or (3) the client's insurance carrier was based in Pennsylvania.  See Plaintiffs' Exhibit V 2, at p. 3 (listing 7 situations where outside counsel was based in Pennsylvania); id. at pp. 3-4 (listing 10 situations where bills were mailed to a third party that was not the client); id at p. 2 (listing 2 situations where the client's insurance carrier was based in Pennsylvania).  Further, in the totals listed above, Plaintiffs have included situations where Lewis, Rice opened a matter for a client that had a Pennsylvania mailing address (either for the client itself or for its law firm), but no time was recorded or billed by Lewis, Rice and the matter did not proceed.  See id. at p.3 (listing 7 such situations).    Subtracting these matters from Plaintiffs' proffered list of Lewis, Rice's "Pennsylvania" clients, the Court is left with a total of 33 individuals and entities.  Lewis, Rice is a law firm with over 163 attorneys that, as of August 2005, had approximately 6,331 active clients and 9,934 open matters.  Supplemental Falk Declaration ("Supp. Falk Decl."), Ex. L, ¶¶ 3-4.  Therefore, and particularly so in view of the fact that virtually all of the legal work associated with the matters listed in Plaintiffs' Exhibit V 2 was performed outside of Pennsylvania, these 33 representations can hardly be considered to be a "substantial" portion of Lewis, Rice's business.

Plaintiffs' nevertheless assert that the present case is distinguishable from cases such as Crown Cork & Seal for two principal reasons, both of which are unavailing.  First, Plaintiffs argue that the revenue Lewis, Rice received from Pennsylvania clients was greater than that discussed in Crown Cork & Seal and, therefore, general jurisdiction is appropriate here.[20] However, "[i]n analyzing the contacts between a defendant and the forum state, the size of any income or percentage of sales derived from Pennsylvania is 'irrelevant.'"  Brown v. AST Sports Science, Inc., No. Civ. A. 02-1682, 2002 WL 32345935, at *7 (E.D. Pa. June 28, 2002) (quoting Gehling, 773 F.2d at 543 (declining to find jurisdiction where school drew six percent of its students from Pennsylvania and entered into a long-term "feeder program" with a school in Pennsylvania)).  This is particularly so when the revenue received is "not a result of in-state activities," but rather from services provided outside of the forum, as is the vast majority of Lewis, Rice's legal services at issue here.  Gehling, 773 F.2d at 543.

Second, Plaintiffs assert that since Lewis, Rice had "2520" communications with individuals or entities in the Commonwealth over a five-year period (in the form of faxes, letters, emails and telephone conversations) in connection with the representation of other clients,[21] this makes a finding of general jurisdiction appropriate in this case.  However, in making this

---

[20] Notably, while Plaintiffs assert that "Defendant has earned more than $800,000" from its representation of other Heritage-referred Pennsylvania residents, Plaintiffs offer no proof for this assertion.  Indeed, Plaintiffs cite to the declaration of a plaintiff in another case, who indicated that Lewis, Rice charged him "75,000.00" for legal services performed on his behalf.  Response Brief at 12 (quoting Plaintiffs' Exhibit W).  Even assuming that this amount was likewise paid by the other three Pennsylvania residents to whom Plaintiffs refer, the total amount paid by these four individuals would only be $300,000.

[21] Notably, 645 of these communications (tabulated according to Plaintiffs' method of calculation) were sent into Pennsylvania on behalf of clients who were not even residents of Pennsylvania.  See Plaintiffs' Exhibit V 2 at Ex. A attached thereto, at Nos. 2, 15, 16, 21, 24, 26, 29, 32, 33, 34, 37, 39, 43, 48, 50, 52, 56, 57, and 59.

argument, Plaintiffs overlook one of the major jurisdictional tenets they cite in their own brief: namely, that in analyzing whether a party is subject to general jurisdiction, "a court engages in a factual analysis *that focuses on the overall nature of the activity, rather than its quantitative character.*"   Response Brief at 15 (emphasis added) (quoting Crown Cork & Seal, 2004 WL 1088752, at *1).   As discussed above, the legal services for the clients in question were performed almost entirely outside of the Commonwealth, and revolved around transactions or litigation also located outside of Pennsylvania.   As Lewis, Rice detailed in its Opening Brief at 6-8, as well as in sections I. C. & D supra, when the locus of the legal services performed is not in the forum state, Courts have routinely held that informational communications that are "normal incidents" of an attorney-client relationship are not sufficient to establish that an out-of-state law firm purposefully availed itself of doing business in the forum.   Sher, 911 F.2d at 1362.[22]

---

[22] The court's decision in Remick v. Manfredy, 52 F. Supp. 2d 452 (E.D. Pa. 1999) is not controlling here.  In Remick, the court concluded that general jurisdiction was proper over a 100-attorney law firm that "serviced 54 clients in Pennsylvania."  Id. at 459.  In addition to the fact that there were more Pennsylvania-clients at issue in Remick than there are here, it is unclear how many times the defendant law firm in that case actually entered Pennsylvania, made filings in Pennsylvania, or otherwise represented Pennsylvania clients in Pennsylvania in connection with those 54 representations.

## CONCLUSION

For the reasons stated above and those articulated in its Opening Brief, Lewis, Rice's motion to dismiss should be granted.

Respectfully submitted,


HANGLEY ARONCHICK SEGAL & PUDLIN


By: _____/s/_____
William T. Hangley (I.D. No. 03533)
Shawn A. Weede (I.D. No. 90402)
One Logan Square, 27th Floor
Philadelphia, Pennsylvania  19103

*Attorneys for Defendant*
*Lewis, Rice & Fingersh, L.C.*

OF COUNSEL:

VINSON & ELKINS L.L.P.
George M. Kryder
3700 Trammell Crow Center
2001 Ross Avenue
Dallas, TX 75201-2975
(214) 220-7700
Fax:  (214) 220-7716