# EXHIBIT F

```
         MODE = MEMORY TRANSMISSION          START=NOV-21 14:04   END=NOV-21 14:07

            FILE NO.=613

         STN NO.   COMM.   ABBR NO.   STATION NAME/TEL NO.    PAGES  DURATION

          001      OK      ✶          46661610365820I         006/006 00:02:40


                                                        -LEWIS RICE & FINGERSH  -

*********************************** -314 444 7666  - ****  -   314 444 7666- *********
```

# LEWIS, RICE & FINGERSH, L.C.

ATTORNEYS AT LAW

500 N. BROADWAY, SUITE 2000
ST. LOUIS, MISSOURI 63102-2147
WWW.LRF.COM
WFALK@LEWISRICE.COM

TEL (314) 444-7600
FAX (314) 612-7749

WILLIAM J. FALK
DIRECT (314) 444-7749

| TO: | FAX NUMBER: | TELEPHONE NUMBER: |
|---|---|---|
| Joseph D. McCarthy, IRS | 610-865-8201 | 610-865 6332, ext 103 |
| cc:  Lawrence H. Weltman | LRF/STL | |

| | |
|---|---|
| FROM: | William J. Falk |
| DATE | November 21, 2002 |
| TOTAL PAGES (WITH COVER): | 6 |
| CLIENT/MATTER NUMBER: | 110515.28994 |

**COMMENT:** Please see the attached letter.

PLEASE CALL 314-444-7785 IF A PROBLEM OCCURS IN THE TRANSMISSION OF THIS DOCUMENT.

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING THE MESSAGE TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE (COLLECT), AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.

ST. LOUIS, MISSOURI • KANSAS CITY, MISSOURI • ST. LOUIS COUNTY • WASHINGTON, MISSOURI • BELLEVILLE, ILLINOIS • LEAWOOD, KANSAS

Penske
006444

```
*************** -COMM. JOURNAL- ******************* DATE NOV-21-2002 ***** TIME 13:56 ********

        MODE = MEMORY TRANSMISSION            START=NOV-21 13:53    END=NOV-21 13:56
         FILE NO.=542

      STN NO.   COMM.   ABBR NO.    STATION NAME/TEL NO.    PAGES   DURATION

      001       OK      ⌧           96127777                006/006  00:02:00


                                                -LEWIS RICE & FINGERSH  -

***************************************** -314 444 7666  - ***** -    314 444 7666- *********
```

# LEWIS, RICE & FINGERSH, L.C.

**ATTORNEYS AT LAW**

500 N. BROADWAY, SUITE 2000
ST. LOUIS, MISSOURI 63102-2147
WWW.LRF.COM
WFALK@LEWISRICE.COM

WILLIAM J. FALK
DIRECT (314) 444-7749

TEL (314) 444-7600
FAX (314) 612-7749

| TO: | FAX NUMBER: | TELEPHONE NUMBER: |
|---|---|---|
| Joseph D. McCarthy, IRS | 610-865-8201 | 610-865-6332, ext I03 |
| cc:   Lawrence H. Weltman | LRF/STL | |

| FROM: | William J. Falk |
|---|---|
| DATE | November 21, 2002 |
| TOTAL PAGES (WITH COVER): | 6 |
| CLIENT/MATTER NUMBER: | 110515.28994 |

**COMMENT:** Please see the attached letter.

**PLEASE CALL 314-444-7785** IF A PROBLEM OCCURS IN THE TRANSMISSION OF THIS DOCUMENT.

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING THE MESSAGE TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE (COLLECT), AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.

ST. LOUIS, MISSOURI ● KANSAS CITY, MISSOURI ● ST. LOUIS COUNTY ● WASHINGTON, MISSOURI ● BELLEVILLE, ILLINOIS ● LEAWOOD, KANSAS

Penske
006445

# LEWIS, RICE & FINGERSH, L.C.

ATTORNEYS AT LAW

500 N. BROADWAY, SUITE 2000
ST. LOUIS, MISSOURI 63102-2147
WWW.LRF.COM
WFALK@LEWISRICE.COM

WILLIAM J. FALK
DIRECT (314) 444-7749

TEL (314) 444-7600
FAX (314) 612-7749

November 21, 2002

Mr. Joseph D. McCarthy
Internal Revenue Service
3 Bethlehem Plaza
Bethlehem, Pennsylvania 18018

**BY FAX**

> Re: Richard H. Penske and Patricia L. Penske
> Announcement 2002-97 penalty considerations

Dear Mr. McCarthy:

During our conversation on November 1, 2002, I requested a computation of what the tax consequences would be if Mr. and Mrs. Penske were to accept the settlement proposal under Announcement 2002-97. In addition, we discussed some of the facts and circumstances that lead us to the conclusion that Mr. and Mrs. Penske should not be subject to penalty in connection with the deficiencies, if any, that may result from this examination. You requested that we make a written submission on that subject, and later you supplied a set of nonexclusive criteria you have been instructed to consider in making your penalty determinations. Although much if not all of this information has been submitted earlier in responses to various information document requests, I will attempt in this letter to present the facts relevant to your determination.

In 1983, Mr. Penske, as President of Piercing Pagoda, Inc. ("Pagoda"), began to work with KPMG LLP ("KPMG") as the outside auditor of Pagoda. The audit review by KPMG was comprehensive, questioning every aspect of Pagoda's assets, liabilities, and activities, and Pagoda's accounting for them. In each instance, KPMG insisted that Pagoda adhere to the highest ethical and reporting standards for accounting and tax matters. Mr. Penske became the Chief Executive Officer of Pagoda in 1986.

The auditing process became even more strict and demanding as Pagoda prepared for and made its initial public offering in 1994. In 1996, KPMG began to provide estate planning, investment advisor selection, and asset allocation advice to Mr. Penske personally. As a result of 14 years of financial accounting audits of Pagoda by KPMG, Mr. Penske believed that any structure that could pass KPMG's due diligence process must, at a minimum, satisfy all relevant legal, tax, and accounting guidelines. Mr. Penske had absolute confidence in the judgment of KPMG on these matters and therefore felt comfortable considering just the investment or business aspects of anything KPMG might suggest. Despite Mr. Penske's background, independence, and confidence in general business matters, he felt that it was right and necessary that the advice of KPMG on matters of tax and accounting be given substantial weight in his decision-making process.

Penske
006446

Pagoda was and is in the retail jewelry business. In his capacity as Chief Executive Officer of Pagoda, Mr. Penske initiated a gold-consignment program the principal benefit of which was to allow Pagoda to finance its gold merchandise at rates that were less than its traditional bank borrowing rates. Although not a stock warrant investment per se, the gold-consignment program functioned using similar techniques.

Mr. Penske was a reasonably sophisticated investor whose holdings included a variety of ventures, some self-managed securities investment accounts, and some manager-advised securities investment accounts. Industry groups covered included banking and finance, biotech, health care, hardware and software, telecommunications, retail, and gaming. The portfolio investments included companies operating domestically, as well as companies with predominantly foreign operations, particularly in Europe and Asia. Portfolio investments took both long and short positions, depending on economic conditions and where his advisors, fund managers, and he saw opportunities for profit.

As a member of the board of directors of a banking institution, Mr. Penske was aware of other institutions, both domestic and foreign, engaged in the banking business and the potential attractiveness of investing in some of those institutions. Since the summer of 1996, Mr. Penske had had an interest in European banks. Mr. Penske also had been attending the Basel (Switzerland) Jewelry Shows for years on behalf of Pagoda and, as a consequence, had some first-hand experience with and knowledge of Swiss banks. By mid-1997, Mr. Penske believed that, due to anticipated European bank mergers in the third and fourth quarter of 1997 and more general business considerations, there was a substantial potential for investment profit in European banks, particularly Deutsche Bank and Union Bank of Switzerland ("UBS"). At that time, UBS was the largest bank in Switzerland, and its stock was traded on the Swiss stock exchange. Mr. Penske believed that such stocks were interesting both for their investment potential and also (as a result of their holdings of Swiss and other currencies) as a means of reducing the potential for loss in the value of his stock in Pagoda attributable to fluctuations in foreign currencies resulting from Pagoda's purchases abroad of gold used in its business. Mr. Penske's interest in UBS began substantially before he first learned about the potential investment in Pinegrove Capital, Inc. ("Pinegrove") or the use of Pinegrove or any other entity to acquire a position in UBS. At the time he first became interested in investing in UBS, Mr. Penske neither had nor received any information relating to potential tax benefits to be derived from an investment in UBS.

In August 1997, a KPMG representative made a presentation and recommendation to Mr. Penske with respect to a proposed investment strategy that involved an investment in one or more European bank stocks. That representative subsequently introduced Mr. Penske to QA Investments, LLC ("Quadra"), an investment advisor. Quadra was also enthusiastic about European bank stocks at this time, viewing them as having a promising potential for growth, with limited risk of decline in value. Quadra had designed the method—recommended by KPMG

# LEWIS, RICE & FINGERSH, L.C.

and ultimately utilized by Mr. Penske—of making leveraged investments in European bank stocks. Mr. Penske understood that, by purchasing the warrant issued by Pinegrove at that time of potentially-substantial growth, he was able to take a large, fully-leveraged position in UBS that was not otherwise available to him in the United States.

KPMG also provided information to Mr. Penske regarding potential income tax benefits and detriments of investing in the stock of UBS or Deutsche Bank and the warrant of Pinegrove, and how an investment in UBS would affect his overall asset allocation and tax planning.

Mr. Penske decided to pursue the plan recommended by KPMG and Quadra for investment in UBS directly and through Pinegrove. He commenced the plan in the fall of 1997 and disposed of the last of his holdings in UBS in 1999. Quadra executed the transactions, and provided advice with respect to the investment positions. Mr. Penske received tax opinions with respect to the consequences of the transactions from the national accounting firm KPMG (his regular tax advisors) and from the New York City law firm of Brown & Wood (now Sidley Austin Brown & Wood). The KPMG opinion is dated August 12, 1998, and the Brown & Wood opinion is dated August 28, 1998. Mr. and Mrs. Penske filed their 1997 Form 1040 on or about October 10, 1998.

Mr. Penske's tax returns included the following items related to the transactions under review:

| year | description | sale price | adjusted basis | gain (loss) |
|------|-------------|-----------|----------------|-------------|
| 1997 | UBS Options | 232,258 | 3,312,829 | (3,080,571) |
| 1997 | UBS Stock | 1,238,420 | 15,305,981 | (14,067,561) |
| 1997 | Pinegrove Warrant | 0 | 1,260,000 | (1,260,000) |
| 1997 | UBS Call Options (appears to be a duplicate entry) | 232,258 | 218,202 | 14,056 |
| 1998 | 100 shares USBAG | 31,191 | 369,511 | (338,320) |
| 1999 | 50 United Bk SW W/D/R | 13,822 | 184,755 | (170,934) |

Mr. Penske did not attempt to conceal or disguise the transactions or the items related to the transactions on his tax returns, listing these items in the usual manner, along with well over 100 other Schedule D items on each of his returns for 1997, 1998, and 1999.

Examination of the 1997 Form 1040 commenced in July 2001. Later, the examination expanded to include the 1998, 1999, and 2000 tax returns. Hundreds of pages of documents, together with narrative responses to questions, were submitted on September 13, 2001, October

12, 2001, December 7, 2001, February 22, 2002, and March 7, 2002. Responses to the most recently received information document requests are being prepared at this time.

Mr. and Mrs. Penske have cooperated fully with the Internal Revenue Service in this examination. They were not eligible to participate in the Disclosure Initiative under IRS Announcement 2002-2 (the "Announcement") because the transactions were already under examination when the Disclosure Initiative commenced upon the issuance of the Announcement on December 24, 2001. By that time, however, all or substantially all of the documents and information related to the transactions in controversy had been submitted to the IRS, so a disclosure under the Announcement would not have provided additional information to the IRS and was not authorized under the Announcement.

In summary, we submit that:

- Mr. Penske participated in the transactions at issue for bona fide investment purposes, with a realistic expectation that he could make a substantial profit, and with the belief that KPMG personnel would not have recommended the strategy if it did not meet the highest standards of legal, tax, and accounting propriety. Prior to receiving this recommendation, he had worked for 14 years with KPMG personnel in connection with both business and personal matters, and had come to believe deeply that they were difficult to satisfy but principled. As a result, he felt confident that the structure of the transaction was solid and correct.

- As an investor, a bank board member, and a regular business visitor to Switzerland, he was interested in the stock of UBS before hearing anything about the transactions in controversy. As he perceived the proposal, the transactions at issue appeared to combine an investment in UBS that he deemed to have substantial potential for profit with certain tax benefits. His extensive experience with KPMG—in which they insisted on conformity with the highest standards in legal, tax, and accounting matters—not only gave him confidence with the structure of the plan, as noted above, but reinforced his interest in UBS (or Deutsche Bank). In addition, KPMG introduced Mr. Penske to Quadra personnel who shared his enthusiasm for UBS and who executed the transactions. Thus, from an investment perspective, Mr. Penske approached the transaction confident in its potential for nontax investment profits.

- Finally, the tax consequences of the transactions were supported by opinions not only of KPMG, but of a nationally recognized and respected law firm, Brown & Wood (now Sidley Austin Brown & Wood). He has cooperated fully with the examination and provided all of the information that would have been required under the Announcement even though he did not qualify for participation in the Disclosure Initiative.

# LEWIS, RICE & FINGERSH, L.C.

We respectfully submit that, based upon all of the relevant facts and circumstances, Mr. and Mrs. Penske should not be subjected to penalty with respect to their participation in the transactions at issue.

Very truly yours,

LEWIS, RICE & FINGERSH, L.C.

By

William J. Falk

Penske
006450

EXHIBIT G

```
*********** -COMM. JOURNAL- ********************* DATE DEC-04-2001 ***** TIME 09:42 ********

        MODE = MEMORY TRANSMISSION
                                                    START=DEC-04 09:38   END=DEC-04 09:42
         FILE NO. =110

        STN NO.   COMM.    ABBR NO.
                                       STATION NAME/TEL NO.   PAGES   DURATION
         001      OK        &
         002      OK        &          4788161006592&1        004/004  00:01:34
                                       4788140422276331       004/004  00:01:10

                                                    -LEWIS RICE & FINGERSH  -
*************************** -314 444 7788     - ***** -          314 444 7788- ********
```

# LEWIS, RICE & FINGERSH, L.C.

ATTORNEYS AT LAW

500 N. BROADWAY, SUITE 2000
ST. LOUIS, MISSOURI 63102-3147
WWW.LRF.COM
WFALK@LEWISRICE.COM

WILLIAM J. FALK
DIRECT (314) 444-7749

TEL (314) 444-7600
FAX (314) 612-7749

| TO: | FAX NUMBER: | TELEPHONE NUMBER: |
|---|---|---|
| Joseph D. McCarthy, IRS | 610-865-8201 | 610-865-6332, ext 103 |
| Sheldon Kay | 404-222-7633 | 404-614-8620 |
| cc: Lawrence H. Weltman | LRF/STL | |

| FROM: | William J. Falk |
|---|---|
| DATE | December 4, 2001 |
| TIME: | |
| TOTAL PAGES (WITH COVER): | 3 |
| CLIENT/MATTER NUMBER: | 110515.28994 |

**COMMENT:** Mr. McCarthy, I have attached a new Form 2848 (Power of Attorney and Declaration of Representative) for Mr. and Mrs. Penske. I will send a hard copy original to you by mail. As my partner Lawrence Weltman advised you yesterday, we now expect to respond to the remaining information document requests shortly.

PLEASE CALL 314-444-7785 IF A PROBLEM OCCURS IN THE TRANSMISSION OF THIS DOCUMENT.

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT OR THE EMPLOYER OR AGENT RESPONSIBLE FOR DELIVERING THIS MESSAGE TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE (COLLECT), AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.

Penske
005569

# LEWIS, RICE & FINGERSH, L.C.

ATTORNEYS AT LAW

500 N. BROADWAY, SUITE 2000
ST. LOUIS, MISSOURI 63102-2147
WWW.LRF.COM
WFALK@LEWISRICE.COM

WILLIAM J. FALK
DIRECT (314) 444-7749

TEL (314) 444-7600
FAX (314) 612-7749

December 4, 2001

Mr. Joseph D. McCarthy
Internal Revenue Agent
Internal Revenue Service
3 Bethlehem Plaza
Bethlehem, Pennsylvania 18018

Re:   Richard and Patricia L. Penske
      SSN 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 (RP), Tax Periods 1997, 1998, 1999, Form 1040
      Form 2848 (Power of Attorney and Declaration of Representative)

Dear Mr. McCarthy:

I have enclosed a new Form 2848 (Power of Attorney and Declaration of Representative), revoking and replacing the prior form. This is a duplicate of the form faxed to you on December 4, 2001. As I mentioned in my fax, we now expect to respond to the remaining information document requests shortly.

Very truly yours,

LEWIS, RICE & FINGERSH, L.C.

By _____
   William J. Falk

Enclosure

Penske
005570

ST. LOUIS, MISSOURI • KANSAS CITY, MISSOURI • ST. LOUIS COUNTY • WASHINGTON, MISSOURI • BELLEVILLE, ILLINOIS • LEAWOOD, KANSAS

Form **2848**
(Rev. December 1997)
Department of the Treasury
Internal Revenue Service

# Power of Attorney
## and Declaration of Representative

► See the separate instructions.

OMB No. 1545-0150

**For IRS Use Only**

Received by:

Name _____

Telephone _____

Function _____

Date ___/___/___

## Part I  Power of Attorney (Please type or print.)

**1  Taxpayer information** (Taxpayer(s) must sign and date this form on page 2, line 9.)

| Taxpayer name(s) and address | Social security number(s) | Employer identification number |
|---|---|---|
| Richard Penske and Patricia L. Penske<br>1851 Saucon Valley Road<br>Bethlehem, PA  18015 | 192 : 34 : 9695<br><br>208 : 38 : 7973 | |
| | Daytime telephone number | Plan number (if applicable) |

hereby appoint(s) the following representative(s) as attorney(s)-in-fact:

**2  Representative(s)** (Representative(s) must sign and date this form on page 2, Part II.)

| Name and address | |
|---|---|
| William J. Falk, Esq.<br>500 N. Broadway, Suite 2000<br>St. Louis, MO  63102-2147 | CAF No. 8000-16554R<br>Telephone No. (314) 444-7749<br>Fax No. (314) 612-7749<br>Check if new: Address ☐  Telephone No. ☐ |
| Lawrence H. Weltman, Esq.<br>500 N. Broadway, Suite 2000<br>St. Louis, MO  63102-2147 | CAF No. 8000-08918R<br>Telephone No. (314) 444-7777<br>Fax No. (314) 612-7777<br>Check if new: Address ☐  Telephone No. ☐ |
| Name and address | CAF No. ....................<br>Telephone No. ....................<br>Fax No. ....................<br>Check if new: Address ☐  Telephone No. ☐ |

to represent the taxpayer(s) before the Internal Revenue Service for the following tax matters:

**3  Tax matters**

| Type of Tax (Income, Employment, Excise, etc.) | Tax Form Number (1040, 941, 720, etc.) | Year(s) or Period(s) |
|---|---|---|
| Income Tax | 1040 | 1997, 1998, 1999 |
| | | |
| | | |

**4  Specific use not recorded on Centralized Authorization File (CAF).** If the power of attorney is for a specific use not recorded on CAF, check this box. (See instruction for Line 4—Specific uses not recorded on CAF.) . . . . . . . . . ► ☐

**5  Acts authorized.** The representatives are authorized to receive and inspect confidential tax information and to perform any and all acts that I (we) can perform with respect to the tax matters described on line 3, for example, the authority to sign any agreements, consents, or other documents. The authority does not include the power to receive refund checks (see line 6 below), the power to substitute another representative unless specifically added below, or the power to sign certain returns (see instruction for Line 5—Acts authorized).

List any specific additions or deletions to the acts otherwise authorized in this power of attorney: ..............................
.....................................................................................................................................................
.....................................................................................................................................................

**Note:** *In general, an unenrolled preparer of tax returns cannot sign any document for a taxpayer. See Revenue Procedure 81-38, printed as Pub. 470, for more information.*

**Note:** *The tax matters partner of a partnership is not permitted to authorize representatives to perform certain acts. See the instructions for more information.*

**6  Receipt of refund checks.** If you want to authorize a representative named on line 2 to receive, **BUT NOT TO ENDORSE OR CASH,** refund checks, initial here _____ and list the name of that representative below.

Name of representative to receive refund check(s) ►

For Paperwork Reduction and Privacy Act Notice, see the separate instructions.  Cat. No. 11980J  Form **2848** (Rev. 12-97)

Penske
005571

**7**   Notices and communications. Original notices and other written communications will be sent to you and a copy to the first representative listed on line 2 unless you check one or more of the boxes below.

**a**   If you want the first representative listed on line 2 to receive the original, and yourself a copy, of such notices or communications, check this box . . . . . . . . . . . . . . . . . . . . . . . . ► ☒

**b**   If you also want the second representative listed to receive a copy of such notices and communications, check this box . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ► ☒

**c**   If you do not want any notices or communications sent to your representative(s), check this box . . . . . . . ► ☐

**8**   Retention/revocation of prior power(s) of attorney. The filing of this power of attorney automatically revokes all earlier power(s) of attorney on file with the Internal Revenue Service for the same tax matters and years or periods covered by this document. If you do not want to revoke a prior power of attorney, check here. . . . . . . . . . . . ► ☐
**YOU MUST ATTACH A COPY OF ANY POWER OF ATTORNEY YOU WANT TO REMAIN IN EFFECT.**

**9**   Signature of taxpayer(s). If a tax matter concerns a joint return, both husband and wife must sign if joint representation is requested, otherwise, see the instructions. If signed by a corporate officer, partner, guardian, tax matters partner, executor, receiver, administrator, or trustee on behalf of the taxpayer, I certify that I have the authority to execute this form on behalf of the taxpayer.

   ► **IF NOT SIGNED AND DATED, THIS POWER OF ATTORNEY WILL BE RETURNED.**

| Signature | Date | Title (if applicable) |
|---|---|---|
| *Richard Penske* | 11/30/01 | |

Richard Penske
Print Name

| Signature | Date | Title (if applicable) |
|---|---|---|
| *Patricia L. Penske* | 11/30/01 | |

Patricia L. Penske
Print Name

**Part II.   Declaration of Representative**

Under penalties of perjury, I declare that:

- I am not currently under suspension or disbarment from practice before the Internal Revenue Service;
- I am aware of regulations contained in Treasury Department Circular No. 230 (31 CFR, Part 10), as amended, concerning the practice of attorneys, certified public accountants, enrolled agents, enrolled actuaries, and others;
- I am authorized to represent the taxpayer(s) identified in Part I for the tax matter(s) specified there; and
- I am one of the following:

   **a**   Attorney—a member in good standing of the bar of the highest court of the jurisdiction shown below.
   **b**   Certified Public Accountant—duly qualified to practice as a certified public accountant in the jurisdiction shown below.
   **c**   Enrolled Agent—enrolled as an agent under the requirements of Treasury Department Circular No. 230.
   **d**   Officer—a bona fide officer of the taxpayer's organization.
   **e**   Full-Time Employee—a full-time employee of the taxpayer.
   **f**   Family Member—a member of the taxpayer's immediate family (i.e., spouse, parent, child, brother, or sister).
   **g**   Enrolled Actuary—enrolled as an actuary by the Joint Board for the Enrollment of Actuaries under 29 U.S.C. 1242 (the authority to practice before the Service is limited by section 10.3(d)(1) of Treasury Department Circular No. 230).
   **h**   Unenrolled Return Preparer—an unenrolled return preparer under section 10.7(c)(viii) of Treasury Department Circular No. 230.

► **IF THIS DECLARATION OF REPRESENTATIVE IS NOT SIGNED AND DATED, THE POWER OF ATTORNEY WILL BE RETURNED.**

| Designation—Insert above letter (a–h) | Jurisdiction (state) or Enrollment Card No. | Signature | Date |
|---|---|---|---|
| a | MO | | 12-4-01 |
| a | MO | | 12/4/01 |
| | | | |

Penske
005572

# EXHIBIT H

# LEWIS, RICE & FINGERSH, L.C.

**ATTORNEYS AT LAW**

500 N. BROADWAY, SUITE 2000
ST. LOUIS, MISSOURI 63102-2147
WWW.LRF.COM
WFALK@LEWISRICE.COM

WILLIAM J. FALK
DIRECT (314) 444-7749

TEL (314) 444-7600
FAX (314) 612-7749

| TO: | FAX NUMBER: | TELEPHONE NUMBER: |
|---|---|---|
| Joseph D. McCarthy, IRS | 610-865-8201 | 610-865-6332, ext 103 |
| Sheldon Kay | 404-222-7633 | 404-614-8620 |
| cc:    Lawrence H. Weltman | LRF/STL | |
| | | |

| FROM: | William J. Falk |
|---|---|
| DATE | December 4, 2001 |
| TIME: | |
| TOTAL PAGES (WITH COVER): | 3 |
| CLIENT/MATTER NUMBER: | 110515.28994 |

**COMMENT:**  Mr. McCarthy, I have attached a new Form 2848 (Power of Attorney and Declaration of Representative) for Mr. and Mrs. Penske. I will send a hard copy original to you by mail.  As my partner Lawrence Weltman advised you yesterday, we now expect to respond to the remaining information document requests shortly.

**PLEASE CALL 314-444-7785 IF A PROBLEM OCCURS IN THE TRANSMISSION OF THIS DOCUMENT.**

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING THE MESSAGE TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE (COLLECT), AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.

Penske
005431

# LEWIS, RICE & FINGERSH, L.C.

ATTORNEYS AT LAW

500 N. BROADWAY, SUITE 2000
ST. LOUIS, MISSOURI 63102-2147
WWW.LRF.COM
WFALK@LEWISRICE.COM

WILLIAM J. FALK
DIRECT (314) 444-7749

TEL (314) 444-7600
FAX (314) 612-7749

December 4, 2001

Mr. Joseph D. McCarthy
Internal Revenue Agent
Internal Revenue Service
3 Bethlehem Plaza
Bethlehem, Pennsylvania 18018

Re:   Richard and Patricia L. Penske
      SSN 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 (RP), Tax Periods 1997, 1998, 1999, Form 1040
      Form 2848 (Power of Attorney and Declaration of Representative)

Dear Mr. McCarthy:

I have enclosed a new Form 2848 (Power of Attorney and Declaration of Representative), revoking and replacing the prior form. This is a duplicate of the form faxed to you on December 4, 2001. As I mentioned in my fax, we now expect to respond to the remaining information document requests shortly.

Very truly yours,

LEWIS, RICE & FINGERSH, L.C.

By
    William J. Falk

Enclosure

Penske
005432

# Power of Attorney
## and Declaration of Representative

► See the separate instructions.

OMB No. 1545-0150

For IRS Use Only

Received by:

Name _____

Telephone _____

Function _____

Date ____ / ____ / ____

| **Part I** | Power of Attorney (Please type or print.) |
|---|---|

**1   Taxpayer information** (Taxpayer(s) must sign and date this form on page 2, line 9.)

| Taxpayer name(s) and address | Social security number(s) | Employer identification number |
|---|---|---|
| Richard Penske and Patricia L. Penske<br>1851 Saucon Valley Road<br>Bethlehem, PA 18015 | 192 : 34 : 9695<br><br>208 : 38 : 7973 | |
| | Daytime telephone number | Plan number (if applicable) |

hereby appoint(s) the following representative(s) as attorney(s)-in-fact:

**2   Representative(s)** (Representative(s) must sign and date this form on page 2, Part II.)

| Name and address | |
|---|---|
| William J. Falk, Esq.<br>500 N. Broadway, Suite 2000<br>St. Louis, MO 63102-2147 | CAF No. ....8000-16554R<br>Telephone No. (314) 444-7749<br>Fax No. ......... (314) 612-7749<br>Check if new: Address ☐     Telephone No. ☐ |
| Name and address<br>Lawrence H. Weltman, Esq.<br>500 N. Broadway, Suite 2000<br>St. Louis, MO 63102-2147 | CAF No. ....8000-08918R<br>Telephone No. (314) 444-7777<br>Fax No. ......... (314) 612-7777<br>Check if new: Address ☐     Telephone No. ☐ |
| Name and address | CAF No. ..................................<br>Telephone No. ...........................<br>Fax No. ..................................<br>Check if new: Address ☐     Telephone No. ☐ |

to represent the taxpayer(s) before the Internal Revenue Service for the following tax matters:

**3   Tax matters**

| Type of Tax (Income, Employment, Excise, etc.) | Tax Form Number (1040, 941, 720, etc.) | Year(s) or Period(s) |
|---|---|---|
| Income Tax | 1040 | 1997, 1998, 1999 |
| | | |
| | | |

**4   Specific use not recorded on Centralized Authorization File (CAF).** If the power of attorney is for a specific use not recorded on CAF, check this box. (See instruction for Line 4—Specific uses not recorded on CAF.) . . . . . . . . . ►☐

**5   Acts authorized.** The representatives are authorized to receive and inspect confidential tax information and to perform any and all acts that I (we) can perform with respect to the tax matters described on line 3, for example, the authority to sign any agreements, consents, or other documents. The authority does not include the power to receive refund checks (see line 6 below), the power to substitute another representative unless specifically added below, or the power to sign certain returns (see instruction for Line 5—Acts authorized).

List any specific additions or deletions to the acts otherwise authorized in this power of attorney: ...........................

.....................................................................................................................................

**Note:** *In general, an unenrolled preparer of tax returns cannot sign any document for a taxpayer. See Revenue Procedure 81-38, printed as Pub. 470, for more information.*

**Note:** *The tax matters partner of a partnership is not permitted to authorize representatives to perform certain acts. See the instructions for more information.*

**6   Receipt of refund checks.** If you want to authorize a representative named on line 2 to receive, **BUT NOT TO ENDORSE OR CASH**, refund checks, initial here _____ and list the name of that representative below.

Name of representative to receive refund check(s) ►

For Paperwork Reduction and Privacy Act Notice, see the separate instructions.      Cat. No. 11980J      Form **2848** (Rev. 12-97)

7   **Notices and communications.** Original notices and other written communications will be sent to you and a copy to the
    first representative listed on line 2 unless you check one or more of the boxes below.

a   If you want the first representative listed on line 2 to receive the original, and yourself a copy, of such notices or
    communications, check this box . . . . . . . . . . . . . . . . . . . . . . ▶ ☒

b   If you also want the second representative listed to receive a copy of such notices and communications, check this
    box . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☒

c   If you do **not** want any notices or communications sent to your representative(s), check this box . . . . . . . . ▶ ☐

8   **Retention/revocation of prior power(s) of attorney.** The filing of this power of attorney automatically revokes all earlier
    power(s) of attorney on file with the Internal Revenue Service for the same tax matters and years or periods covered by
    this document. If you do **not** want to revoke a prior power of attorney, check here. . . . . . . . . . . ▶ ☐
    **YOU MUST ATTACH A COPY OF ANY POWER OF ATTORNEY YOU WANT TO REMAIN IN EFFECT.**

9   **Signature of taxpayer(s).** If a tax matter concerns a joint return, **both** husband and wife must sign if joint representation is
    requested, otherwise, see the instructions. If signed by a corporate officer, partner, guardian, tax matters partner, executor,
    receiver, administrator, or trustee on behalf of the taxpayer, I certify that I have the authority to execute this form on behalf
    of the taxpayer.

    ▶ **IF NOT SIGNED AND DATED, THIS POWER OF ATTORNEY WILL BE RETURNED.**

| _Richard Penske_ (signature) | 11/30/01 | |
|---|---|---|
| Signature | Date | Title (if applicable) |

Richard Penske
Print Name

| _Patricia L. Penske_ (signature) | 11/30/01 | |
|---|---|---|
| Signature | Date | Title (if applicable) |

Patricia L. Penske
Print Name

**Part II**   **Declaration of Representative**

Under penalties of perjury, I declare that:
* I am not currently under suspension or disbarment from practice before the Internal Revenue Service;
* I am aware of regulations contained in Treasury Department Circular No. 230 (31 CFR, Part 10), as amended, concerning
  the practice of attorneys, certified public accountants, enrolled agents, enrolled actuaries, and others;
* I am authorized to represent the taxpayer(s) identified in Part I for the tax matter(s) specified there; and
* I am one of the following:

  a   Attorney—a member in good standing of the bar of the highest court of the jurisdiction shown below.
  b   Certified Public Accountant—duly qualified to practice as a certified public accountant in the jurisdiction shown below.
  c   Enrolled Agent—enrolled as an agent under the requirements of Treasury Department Circular No. 230.
  d   Officer—a bona fide officer of the taxpayer's organization.
  e   Full-Time Employee—a full-time employee of the taxpayer.
  f   Family Member—a member of the taxpayer's immediate family (i.e., spouse, parent, child, brother, or sister).
  g   Enrolled Actuary—enrolled as an actuary by the Joint Board for the Enrollment of Actuaries under 29 U.S.C. 1242 (the
      authority to practice before the Service is limited by section 10.3(d)(1) of Treasury Department Circular No. 230).
  h   Unenrolled Return Preparer—an unenrolled return preparer under section 10.7(c)(viii) of Treasury Department Circular
      No. 230.

▶ **IF THIS DECLARATION OF REPRESENTATIVE IS NOT SIGNED AND DATED, THE POWER OF ATTORNEY WILL
  BE RETURNED.**

| Designation—Insert above letter (a–h) | Jurisdiction (state) or Enrollment Card No. | Signature | Date |
|---|---|---|---|
| a | MO | _(signature)_ | 12-4-01 |
| a | MO | _(signature)_ | 12/4/01 |

Penske
005434

# EXHIBIT I

# CONDENSED TRANSCRIPT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

RICHARD H. PENSKE          CIVIL ACTION
and PATRICIA L. PENSKE,

      Plaintiffs,

  vs.

LEWIS, RICE & FINGERSH,
L.C.,

     Defendant.          NO. 05-CV-4436


        Oral deposition of RICHARD HERMAN PENSKE, taken at the law offices of KOHN, SWIFT & GRAF, P.C., One South Broad Street, Suite 2100, Philadelphia, Pennsylvania, on Friday, March 17, 2006, at approximately 12:35 p.m., before Rosemary Locklear, Registered Professional Reporter, Certified Shorthand Reporter (NJ), Certified Realtime Reporter and Notary Public, pursuant to notice.

## James DeCrescenzo Reporting, LLC
INNOVATING LITIGATION
1880 JFK Blvd., 6th Floor • Philadelphia, PA 19103
www.jdreporting.com

215.564.3905
PHONE

215.751.0581
FAX

---

**22**

1 about the -- the capital gains and
2 the impact of that transaction on
3 capital gains and the impact of that
4 transaction to estate planning.
5 They -- they indicated that
6 they had an office of professional --
7 professionals in Dallas that
8 specialized in high-end estate
9 planning and tax transactions and
10 that they -- they could save me
11 significant dollars.
12 Q. Do you know if the -- Mr.
13 Van Borys and the other person from
14 Heritage traveled from Dallas to
15 Pennsylvania for purposes of this
16 meeting?
17 A. I have no idea.
18 Q. Was there anyone from
19 Lewis, Rice & Fingersh, L.C. -- I'll
20 just call them Lewis Rice throughout
21 the remainder of this deposition.
22 Was there anyone from Lewis Rice at
23 that meeting?
24 A. No, there wasn't.

---

**23**

1 Q. Were you given any
2 materials at that meeting?
3 A. I don't recall.
4 Q. Did any members of
5 Heritage -- strike that.
6 How did that meeting wind
7 up?
8 A. Their pitch was, as I asked
9 questions, they weren't able to give
10 me more information unless I was
11 willing to give them a -- sign a
12 Confidentiality Agreement and give
13 them a -- a -- like a fee, which was
14 either 22,000 or 22,500.
15 Q. Okay.
16 A. So it was -- it was
17 based -- I had to do that in order to
18 take -- to find out what their exact
19 plan was.
20 Q. So they only discussed
21 generalities with you at the October
22 25th, 2000, meeting?
23 A. That is correct.
24 Q. And they didn't give you

---

**24**

1 any specifics with regard to the tax
2 transaction which you would later go
3 forward with in 2000; is that
4 correct?
5 A. That is correct.
6 Q. Did you go on to sign a
7 Confidentiality Agreement with
8 Heritage?
9 A. Yes, I did.
10 Q. Do you recall when you
11 signed that agreement?
12 A. I don't recall.
13 Q. Well, let me ask you this:
14 Did you sign it before you had any
15 further meetings with people from
16 Heritage?
17 A. After that meeting, in
18 order to get to the next step,
19 somewhere in there I signed a
20 confidential -- Confidentiality
21 Agreement and wrote a check to them
22 for either the 22,000 or 22,500.
23 Q. Do you recall when the next
24 meeting was?

---

**25**

1 A. I believe it was the first
2 week in November.
3 Q. November 3rd sound correct
4 to you?
5 A. That sounds correct.
6 Q. Now, you described the
7 Agreement as a Confidentiality
8 Agreement.
9 Who were the parties to
10 that Agreement?
11 A. I know that I -- I signed
12 the Agreement. I'm not sure who else
13 signed it. Tom Reed might have been
14 asked to sign it also, because he was
15 at that meeting with me. And who
16 signed it from Heritage, I have no
17 idea.
18 Q. So according to your
19 recollection, Tom Reed, you, and
20 members of Heritage signed that
21 Agreement.
22 Did Mrs. Penske, your wife,
23 sign that Agreement?
24 A. I don't remember. She was

---



**James DeCrescenzo Reporting**, LLC

215.564.3905     Innovating Litigation     FAX 215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

## 38

1  myself, and subsequently the Heritage
2  corporate jet returned Tom Reed and
3  myself from St. Louis back to
4  Bethlehem.
5      Q.  Okay.  What I'm trying to
6  understand is, if you recall whether
7  or not it was your idea to go to
8  Dallas on November 27th or not.
9      A.  I don't recall.
10     Q.  Was it your idea to go to
11 St. Louis on November 27th?
12     A.  I wanted -- it was my idea
13 to meet Lewis Rice.
14     Q.  Okay.
15     A.  Not necessarily the 27th,
16 but it was -- it was my desire to
17 meet Lewis Rice.
18     Q.  It was your desire to go to
19 St. Louis to meet with Lewis Rice.
20     A.  Correct.
21     Q.  When was the first time you
22 heard the name of the law firm Lewis
23 Rice?
24     A.  In one of my meetings with

## 39

1  Heritage.
2      Q.  Can we narrow that down or
3  do you know if it was --
4      A.  I don't know if it was
5  the -- the 3rd or the 17th.  I'm not
6  certain.
7      Q.  But it wasn't the one in
8  October.
9      A.  Not to my knowledge.  I
10 would say that that's correct.
11     Q.  Who told you about Lewis
12 Rice?
13     A.  Heritage.
14     Q.  Do you recall which member
15 of Heritage, whether or not it was
16 Mr. Van Borys or whether or not it
17 was Mr. Kornman?
18     A.  It came up in a meeting.
19 Who mentioned the name, I'm not
20 certain.
21     Q.  What did they say with
22 regard to Lewis Rice?
23     A.  We were talking about the
24 transaction and the subject came up

## 40

1  that a legal opinion was appropriate
2  and business prudent to do a -- the
3  transaction they were talking about,
4  that it would -- made -- you needed
5  a -- it made sense to have a legal
6  opinion.
7      Q.  Do you recall why it made
8  sense to have a legal opinion?
9      A.  Because it was a
10 complicated tax transaction.
11     MR. CRONER:  Go ahead.
12 BY MR. WEEDE:
13     Q.  So someone at Heritage
14 mentioned the name of Lewis Rice.
15 Did they mention where they were
16 located?
17     A.  What -- what I recall is I
18 asked for a recommendation.  They
19 recommended Lewis Rice and somewhere
20 in the conversation, whether I asked
21 specifically or they told me, that
22 they were a St. Louis law firm.
23     Q.  Was Lewis Rice the only law
24 firm that Heritage recommended to

## 41

1  you?
2      A.  That's correct, that they
3  were the only law firm that was
4  mentioned.
5      Q.  You didn't ask for names of
6  any other law firms?
7      A.  I think with the -- the
8  question came up as to, are you aware
9  of law firms that do legal opinions
10 for these type of transactions and
11 they said that they were aware of a
12 number of them or were aware of a
13 firm or firms that could do it.
14     And I said you have a
15 recommend -- it went on the order,
16 well, is there a recommendation or a
17 name you could give me.
18     And the name that they gave
19 me was Lewis Rice.  That's the only
20 name that was given me or that I
21 recall giving me.
22     Q.  So there could have been
23 others.
24     A.  I don't believe so.  The



**James DeCrescenzo Reporting**, LLC

### 42

1  only one I remember is Lewis Rice.
2  And the reason I say that, if there
3  were multiple -- I'm pretty
4  investigatory and --
5      Q.  I'm sorry.  You're pretty
6  invested to who?
7          MR. CRONER:  Investigatory.
8          MR. WEEDE:  Investigatory.
9  Sorry.
10         THE WITNESS:  In other
11  words, if there would have been more
12  than one name, I would have
13  remembered.  So I only remember the
14  one name, Lewis Rice.
15 BY MR. WEEDE:
16     Q.  You didn't think about
17  using a Pennsylvania law firm?
18     A.  I did not.
19     Q.  You didn't ask Heritage if
20  there were any Pennsylvania law firms
21  that did this type of transaction or
22  that offered opinions on this type of
23  tax transaction?
24     A.  I didn't.

### 43

1      Q.  What was the first contact
2  you had with any members of Lewis
3  Rice?
4      A.  When we arrived in St.
5  Louis on the -- on the 27th.
6      Q.  So you didn't receive any
7  phone calls from them.
8      A.  No, it was arranged by
9  Heritage.
10     Q.  So on November 27th, first
11  you traveled to Dallas.
12     A.  Correct.
13     Q.  You met with people from
14  Heritage.
15     A.  Correct.
16     Q.  And then you went to St.
17  Louis to meet with members of Lewis
18  Rice.
19     A.  Correct.
20     Q.  Were members -- so about
21  what time -- did you show up in St.
22  Louis in the afternoon?
23     A.  Yeah.  It must have been,
24  say -- yeah, afternoon.

### 44

1      Q.  How long did you meet with
2  members of Lewis Rice that afternoon
3  of November 27th, 2000?
4      A.  I'm not sure.  Perhaps two,
5  three hours.
6      Q.  Were members of Heritage
7  present with you at that meeting with
8  the Lewis Rice attorneys?
9      A.  No.
10     Q.  So did any of the Heritage
11  members accompany you to St. Louis on
12  the Heritage jet?
13     A.  What -- maybe you need to
14  rephrase it.  The -- the people
15  flying the airplane were -- were
16  employees of the Heritage.
17     Q.  Sure.  Good point.
18     A.  It was -- it was a Heritage
19  airplane.
20     Q.  All right.  Did either of
21  the members -- or any of the members
22  of Heritage that you had the meeting
23  with on October 25th, November 3rd,
24  November 17th of 2000 that were

### 45

1  presenting you with the tax
2  transaction and their strategies, did
3  any of those individuals accompany
4  you to St. Louis on November 27th,
5  2000?
6      A.  I believe that that is
7  correct, meaning that I don't believe
8  any of the presenters of Heritage
9  made that trip with me.  They
10  weren't -- they certainly were not in
11  the meeting in -- they were not in
12  the meeting in St. Louis.
13         And I don't believe any of
14  the presenters were on the plane that
15  went from Dallas to St. Louis, just
16  the employees operating the aircraft
17  itself.
18     Q.  Okay.  Now, what was your
19  reason for visiting Lewis Rice on
20  November 27th?
21     A.  To ask them about the
22  transaction, to ask them whether in
23  their legal opinion, because Heritage
24  had mentioned that they had done a

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905
InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com
FAX  215.751.0581

## 46

1  number of opinions on this
2  transaction, I wanted to ask them
3  whether they thought it was a
4  legitimate transaction.
5      They were supposed to be
6  experts in -- in writing tax opinions
7  and tax law, and I didn't want to do
8  a transaction or make a commitment to
9  do a transaction without meeting
10 them, seeing the size of their law
11 firm, were they of substance, would
12 they -- is this a transaction that I
13 should or shouldn't do.
14     I went into St. Louis and
15 Heritage was fully aware of that,
16 that I wasn't going to make a
17 commitment to do a transaction until
18 I had met Lewis Rice and had a chance
19 to interview Lewis Rice and ask them
20 about whether or not this was a
21 legitimate transaction.
22     Was this a transaction if
23 they wrote an opinion it would -- it
24 would hold up under scrutiny if it

## 47

1  was contested by the IRS.
2      Because it was a complex
3  tax transaction and that's the reason
4  you -- you -- you went to firms of
5  the size of Lewis Rice and the
6  substance of Lewis Rice because they
7  had the wherewithal and -- and were
8  represented as doing these type --
9  type of things.
10     So I wanted to know the
11 legitimacy of this transaction.
12 Q.  So you wanted to see them
13 in their offices.  That's part of it.
14 A.  Yes, but I also wanted to
15 ask them questions about the
16 transaction.
17 Q.  Of course.
18     Was Mrs. -- you were at
19 that meeting on November 27th in St.
20 Louis with members of Lewis Rice;
21 correct?
22 A.  And as was Tom Reed.
23 Q.  Tom Reed was there.
24     Was Mrs. Penske there?

## 48

1  A.  I don't believe.  I believe
2  she was not.
3  Q.  What individuals at Lewis
4  Rice did you meet with on that day?
5  A.  I met -- I clearly met with
6  Gary Kornman.  And normally in
7  meetings with Heritage, you've got to
8  remember, there were maybe --
9      MR. CRONER:  He asked about
10 Lewis Rice.  He asked who you met
11 with at Lewis Rice.
12     THE WITNESS:  Oh, I'm
13 sorry.  Would you please repeat it.
14     MR. WEEDE:  I'm sorry.
15 BY MR. WEEDE:
16 Q.  At the November 27th, 2000,
17 meeting that you had in St. Louis
18 with members of Lewis Rice, which
19 members of Lewis Rice did you meet
20 with on that day?
21 A.  Okay.  The -- Mike
22 Mulligan, Bill Falk, Jaime Mendez,
23 and Larry Weltman.  And Tom Reed and
24 myself.

## 49

1  Q.  And at that meeting you
2  discussed the tax strategies that
3  Heritage had presented to you in
4  these meetings in November with the
5  members of Lewis Rice; is that
6  correct?
7  A.  It was probably more
8  correct to say that I asked them if
9  they were familiar with the details
10 of the Heritage transaction and they
11 indicated they had.
12     So I don't remember
13 spending much time whereby I asked
14 them to give me the details of the
15 transaction, because Heritage had
16 done that.
17     What I -- so to answer your
18 question, more time was spent talking
19 about the ability to write an opinion
20 concerning the transaction as opposed
21 to all the details of the
22 transaction.
23     Because they -- they --
24 they seemed to be, you know, they --

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905      InnovatingLitigation      FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

### 50

1  well prepared and that this was
2  something that they had a great
3  amount of knowledge about and seemed
4  to be very well prepared.
5      Even though this was my
6  first meeting, meaning that I --
7  since Heritage set up the meeting,
8  my -- my belief is that, you know,
9  Heritage pretty much brought them up
10  to speed as to the transaction and
11  they were familiar with this
12  transaction.
13      So when I showed up, they
14  were -- they were pretty
15  knowledgeable and well prepared for
16  that meeting.
17      Q.  So you knew that Heritage
18  was giving them information about the
19  tax transaction prior to you meeting
20  with them?
21      MR. CRONER:  Objection.  No
22  foundation.  He didn't say that.
23      THE WITNESS:  Yeah.  The
24  answer is I -- I have no basis for

### 51

1  that other than they were very well
2  prepared when I was at that meeting.
3  BY MR. WEEDE:
4      Q.  I guess let me step back
5  and make sure I understand your
6  testimony.
7      When you left Dallas to go
8  to St. Louis to meet with people from
9  Lewis Rice, were you prepared to
10  explain the Heritage tax transaction
11  to the members of Lewis Rice at that
12  meeting?
13      A.  I don't recall that -- that
14  I was prepared to give them the --
15  all the details of that transaction.
16      I -- I -- I was under the
17  understanding that Lewis Rice was --
18  was aware and knew of the Heritage
19  tax transaction.  So when I -- when I
20  went there, we didn't discuss much as
21  related to the details of the tax
22  transaction itself.
23      Q.  Was that because you
24  understood that the people at Lewis

### 52

1  Rice had been given information from
2  Heritage already about the tax
3  transaction?
4      A.  It's hard for me to say
5  that.  You have to remember, they
6  recommended Lewis Rice.  They set up
7  the meeting with Lewis Rice.
8      So I -- with that, I mean,
9  I didn't think much about it.  I went
10  to St. Louis and they -- you know, we
11  had this meeting and I didn't get
12  into the details of the transaction.
13      So there -- there was some
14  type of -- their -- more than likely,
15  there was some type of correspondence
16  and dialogue between Heritage and
17  Lewis Rice.
18      Q.  Did you assume that going
19  into the November 27th, 2000, meeting
20  with Lewis Rice, that there would be
21  some communication between Heritage
22  and --
23      A.  I really didn't think much
24  about it.  I mean, it was more of a

### 53

1  process of me going to Dallas, then
2  going up to St. Louis.  Because you
3  have to remember, I -- I had not made
4  a decision to do the Heritage
5  transaction when we went to St.
6  Louis.
7      I was going to St. Louis
8  to -- with Tom with the idea of --
9  of -- of meeting Lewis Rice, talking
10  to them about the legalistic issues
11  around the transaction, about whether
12  or not they -- they -- they -- they
13  could write an opinion and what the
14  opinion, you know, was about.
15      And whether this was a
16  good -- was -- was a tax transaction
17  that -- that I could do and they
18  had -- and they could give me comfort
19  that I wasn't doing anything that
20  wasn't legitimate.
21      Q.  Okay.  I guess where I'm
22  trying to go with this is just that
23  if they're going to opine about
24  whether or not this is a quote,

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

FAX  215.751.0581

---

**54**

1  unquote, tax transaction you can do,
2  presumably, someone had to explain
3  the tax transaction to them.
4  　　　MR. CRONER: Objection.
5  Objection to form.
6  　　　THE WITNESS: As I say,
7  there was not -- I don't remember
8  giving them any real details of that
9  tax transaction. When I went to that
10 meeting, they seemed to know pretty
11 well my situation as relates to
12 the -- the details of that
13 transaction.
14 　　　MR. WEEDE: Right.
15 BY MR. WEEDE:
16 　　Q. And so I guess what I'm
17 saying is, you were not prepared to
18 explain the tax transaction to them
19 at that meeting; is that correct?
20 　　A. Well, I can't say I wasn't
21 prepared to discuss details because,
22 obviously, I had some information
23 about the transaction.
24 　　　Because I'd had a number of

---

**55**

1  meetings with Heritage and we had
2  signed a Confidentiality Agreement
3  and they had presented, you know, the
4  tax plan. So I can't say I wasn't
5  prepared.
6  　　　But Heritage didn't say to
7  me, when you go to St. Louis, be
8  prepared to present, you know, our
9  tax strategy. I -- if they would
10 have asked me more detailed
11 questions, I would have responded as
12 I best knew it at that meeting.
13 　　　But the main content of
14 that meeting was questions about
15 could they do the opinion, had they
16 done, you know, other opinions, did
17 they have, you know, what -- tell me
18 a little bit about your law firm.
19 　　　You know, tell me, you
20 know, the reason I should have
21 comfort in you writing the opinion
22 and writing an opinion on this tax
23 transaction.
24 　　Q. So then going into that

---

**56**

1  meeting, you did or did not have any
2  assumptions? Or were you told by
3  anyone from Heritage that --
4  　　　Well, let me ask you this:
5  If you explained the details of the
6  tax transaction to members of Lewis
7  Rice, was it your understanding that
8  you would be violating your
9  Confidentiality Agreement with
10 Heritage?
11 　　A. I -- I don't think --
12 　　　MR. CRONER: Objection.
13 　　　THE WITNESS: I don't think
14 I ever thought about it.
15 　　　MR. CRONER: Calls for a
16 legal conclusion to some extent.
17 　　　I'll let you answer the
18 question.
19 BY MR. WEEDE:
20 　　Q. I'm purely asking about
21 what your understanding is.
22 　　A. I never thought about it.
23 So I -- in other words, I didn't go
24 in there with an understanding that

---

**57**

1  .there was a -- if -- that I -- I
2  didn't go in there with an
3  understanding that I couldn't say
4  anything about the transaction
5  because of a Confidentiality
6  Agreement.
7  　　Q. So it was your
8  understanding at the time, as far as
9  your obligations under the
10 Confidentiality Agreement, that you
11 could share the particulars of the
12 tax transaction with Lewis Rice at
13 that meeting.
14 　　　MR. CRONER: Objection.
15 　　　I think he said he didn't
16 think about it.
17 　　　THE WITNESS: Yeah. I
18 never thought about it. Because
19 Heritage referred me to Lewis Rice so
20 I -- I thought if they referred me,
21 they were familiar with the
22 transaction.
23 　　　And when I -- when I got to
24 St. Louis in the meeting, it seemed

---

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905　　　InnovatingLitigation　　　FAX 215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

## 58

1 that they were familiar with the
2 transaction.
3     MR. WEEDE: Okay.
4 BY MR. WEEDE:
5     Q. So going into the meeting
6 on November 27th, 2000, with the
7 members of Lewis Rice, you assumed
8 they would be familiar with the tax
9 transaction which you were seeking
10 their advice on.
11     MR. CRONER: Objection;
12 asked and answered.
13     THE WITNESS: Again, I
14 can't say that.
15     I – I clearly went to St.
16 Louis because I wanted to meet the
17 members of the law firm and ask them
18 about writing a legal opinion and
19 could they write an opinion and what
20 was their assessment on whether it
21 was a good transaction or a bad
22 transaction.
23     Or – because I, at that
24 point, had not made any decision

## 59

1 whatsoever as to whether I was going
2 to do the transaction or not.
3     And I went to St. Louis to
4 try to get clarification and comfort
5 as to whether this firm should be –
6 be hired and whether the Heritage
7 transaction should be done.
8 BY MR. WEEDE:
9     Q. I'm not going to belabor
10 the point much longer. I'm really
11 just trying to figure out, if they're
12 going to opine on the tax
13 transaction, which is your point for
14 going to St. Louis and meeting with
15 them on November 27th; is that
16 correct?
17     MR. CRONER: They being
18 Lewis Rice.
19     MR. WEEDE: Correct.
20     MR. CRONER: All right.
21 BY MR. WEEDE:
22     Q. Presumably, they would have
23 to know what the tax transaction was.
24 Would you agree with me on that?

## 60

1     A. Correct. Yes. I would
2 agree -- yes, I would agree.
3     Q. So for them to know what
4 the tax transaction is, either you
5 would have had to tell them what the
6 tax transaction is or Heritage would
7 have had to tell them what the tax
8 transaction is.
9     Would you agree with that?
10     A. I – I – you're – you're
11 making an assumption and I – I
12 believe it's probably correct, but I
13 can't – in other words, it's not for
14 me to acknowledge.
15     All I know is when I went
16 in to St. Louis, we didn't spend a
17 lot of time talking about the details
18 of the transaction and they seemed to
19 be up to date with the information.
20     So if you're – if you're
21 saying assumptions, your assumption
22 could be correct but I can't confirm.
23     Q. I'm just asking what you
24 thought, assumed.

## 61

1     A. Well, I mean, once I got
2 there –
3     MR. CRONER: I'll object.
4 I think he's answered that already,
5 that he didn't think about it.
6     MR. WEEDE: All right. You
7 just didn't think about it.
8     THE WITNESS: Yeah.
9     MR. WEEDE: Okay. All
10 right.
11 BY MR. WEEDE:
12     Q. Now, did you think that
13 Lewis Rice were Heritage's attorneys?
14     A. I – maybe you should
15 clarify that.
16     Q. Sure.
17     A. What I will say is that
18 Lewis -- Heritage recommended Lewis
19 Rice. Whether there was – I – I
20 never thought at the time, was there
21 a relationship between the two.
22     Q. Okay. So up until November
23 27th, you had no understanding
24 whether or not there was a

**James DeCrescenzo Reporting**, LLC

215.564.3905      InnovatingLitigation      FAX 215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

**62**

1  relationship between -- there was an
2  attorney-client relationship between
3  Heritage and Lewis Rice.
4      A.  I wouldn't know that.
5      Q.  Okay.  Didn't think about
6  it?
7      A.  I didn't think about it.
8      Q.  Did you know if Lewis Rice
9  had signed any Agreements with
10  Heritage as of that date, that
11  meeting?
12     A.  I did not know that.
13     Q.  After you left the meeting
14  with the members of Lewis Rice on
15  November 27th, were they your
16  lawyers?
17         MR. CRONER:  Objection;
18  vague.
19         Answer it, if you can.
20         THE WITNESS:  I -- I think
21  we left the table feeling
22  comfortable, but I don't think I made
23  the decision at that moment.
24         I think it was subsequent,

**63**

1  a day or two or afterward, that we --
2  we finally -- I think the engagement
3  letter was signed December 1.  So I
4  would say officially you're talking
5  December 1.
6  BY MR. WEEDE:
7      Q.  Okay.  So --
8      A.  In other words, I didn't
9  sign an engagement letter or indicate
10  to them that they were being hired.
11         I might have given the --
12  from a comfort standpoint, did I --
13  did I -- I felt good about the
14  meeting, but I hadn't -- we hadn't
15  confirmed a relationship on the 27th.
16     Q.  So there was no oral
17  agreement between you and members of
18  Lewis Rice that occurred at that
19  November 27th, 2000, meeting.
20     A.  That is correct.
21     Q.  After leaving that meeting
22  on November 27th, had you determined
23  that you were going to go forward
24  with the tax transaction?

**64**

1      A.  Correct.
2         Whether it was, you know,
3  the next day or the day after, but
4  within a day or two, we started to
5  put in place, evidently, the
6  documents and what was necessary,
7  because on December 1 is when the --
8  the engagement letter was signed.
9  And -- and -- and that was December 1
10  that it was signed.
11     Q.  I guess what I'm asking you
12  is, had you decided from your end
13  that you wanted to go forward with
14  the tax transaction after you met
15  with Lewis Rice in St. Louis on
16  November 27th, 2000?
17     A.  In my own mind, the answer
18  is yes.
19     Q.  So I take it you liked what
20  you saw when you met with members of
21  Lewis Rice.
22     A.  Yeah.  It was clearly a
23  favorable meeting or we wouldn't have
24  gone forward.

**65**

1      Q.  But at that moment you did
2  not let them know that you wanted
3  them to be your attorneys.
4         MR. CRONER:  At which
5  moment?
6         MR. WEEDE:  Good point.
7  BY MR. WEEDE:
8      Q.  At that meeting on November
9  27th, 2000, when you met with members
10  of Lewis Rice, you did not let them
11  know that you wanted them to be your
12  attorneys.
13     A.  That's my recollection,
14  that I did not confirm at that
15  meeting that I wanted them to be my
16  attorneys.
17     Q.  Did you say maybe?  How did
18  you leave it with them?
19     A.  I think I just said, it was
20  a good meeting.  I feel comfortable
21  after meeting with you and we'll get
22  back to you.
23     Q.  When do you remember
24  receiving a letter from Lewis Rice

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

---

78

1    A.  I -- I -- I believe so,
2  yes.
3    Q.  But at that time they were
4  not -- strike that.
5      Do you recall the specific
6  events that led up to the -- your
7  receipt of this letter on February
8  22nd -- let me step back.
9      Did you receive this letter
10  on or around February 22nd of 2001?
11    A.  It's dated the 22nd and
12  there was a meeting in Dallas at the
13  Heritage office on February 22nd.
14  And I know that somewhere in this
15  estate planning process in one of the
16  meetings in Dallas, Mike Mulligan
17  from Lewis Rice was at the meeting.
18      This is dated and
19  corresponds to the date that I had a
20  meeting with Heritage in Dallas.  And
21  I recall a meeting with Heritage in
22  Dallas that Mike Mulligan was present
23  and we discussed the PASTrust.
24      My recollection was it was

---

79

1  at this meeting on this date in the
2  Heritage office in Dallas that this
3  letter more than likely was -- was
4  signed and executed.
5    Q.  By you?
6    A.  Yeah, there's my signature
7  on it.
8    Q.  Was Mrs. Penske at this
9  meeting?
10    A.  I believe so.
11    Q.  I'm done with that one.
12      (Defendant's Exhibit 5 was
13  marked for identification.)
14  BY MR. WEEDE:
15    Q.  Mr. Penske, have you had a
16  chance to familiarize yourself with
17  what's been marked as Defendant's-5?
18    A.  Yes.
19    Q.  Do you recall receiving
20  this letter?
21    A.  That is my writing, Charge
22  to RHP Investments.
23    Q.  Do you recall receiving
24  this letter, Mr. Penske?

---

80

1    A.  I -- I'm -- it's -- it's
2  certainly in my possession, so I
3  don't know if I remember opening up
4  the envelope but -- but, you know, I
5  did -- I did see this letter and I
6  did okay it for payment.
7    Q.  And you stated that that
8  was your handwriting in the lower
9  left-hand corner which reads, Charge
10  to RHP Invest, or I-N-V, period?
11    A.  Yes.
12    Q.  Is it also your
13  handwriting, the numbers on the right
14  side, nine and ten?
15    A.  Yes.
16    Q.  Could you tell me what
17  those two numbers mean?
18    A.  I was -- from the -- we --
19  we got a copy of Lewis Rice billings
20  and I was going through the Lewis
21  Rice billings and our billings and I
22  was just numbering them to see
23  that -- that things matched up.
24    Q.  At what time were you doing

---

81

1  this?  About what -- what year?  Was
2  it around August 31st, 2001, that you
3  were making those notations?
4    A.  No.  It's within the last,
5  say, six months.
6    Q.  Okay.  So the numbers on
7  the right were created by you within
8  the last six months --
9    A.  Yes.
10    Q.  -- in reference to the
11  billing by Lewis Rice to you?
12    A.  Correct.
13    Q.  Do you know when the
14  handwriting on the left-hand corner,
15  left side, which says Charge to RHP
16  I-N-V, period, was made?
17    A.  I mean, I -- I -- at the --
18  at the time I paid the bills my --
19  when I -- when I write Charge RHP
20  Investments, it's normally at the
21  time I'm paying the bill.  So I would
22  assume that at the time I paid this
23  bill, that's how I noted it.
24    Q.  Okay.  What I just wanted

---

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905          InnovatingLitigation          FAX  215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

## 82

1 to clarify was that the numbers on
2 the right side were written at a
3 different time than the handwriting
4 on the left side.
5    A. That's correct.
6    Q. Does RHP Investments or
7 does RHP INV, period, refer to RHP
8 Investments, L.P.?
9    A. Yes.
10    Q. So was this bill charged to
11 that entity?
12    A. Was this bill -- I -- I --
13 I -- I paid this bill from my RHP
14 Investments account.
15    Q. Do you know if RHP
16 Investments, L.P., is a Missouri
17 limited partnership?
18    A. It is.
19    Q. Do you know where its
20 principal place of business is?
21    A. I'm not sure technically.
22 I'm really not.
23    Q. Well, let me ask you this:
24 Do you know what the Partnership

## 83

1 Agreement says its principal place of
2 business is?
3    A. I'm not certain.
4    Q. Would it surprise you that
5 its principal place of business,
6 according to the Partnership
7 Agreement, was St. Louis, Missouri?
8    A. It wouldn't surprise me.
9    Q. Does that sound accurate to
10 you?
11    A. I don't know. I'd have to
12 look at the document.
13    Q. All right. Let me ask you
14 this: Before I move on to that, do
15 you still have Defendant's-5 in front
16 of you? I'm sorry to make you put
17 that back in front of you.
18    A. Okay.
19    Q. The first sentence there of
20 that letter says, Since we have
21 basically completed the estate
22 planning transaction.
23    Was it true that as of
24 August 31st, 2001, that Lewis Rice

## 84

1 had basically completed the estate
2 planning transaction for you?
3    A. I paid the bill, so it -- I
4 would -- I would literally say that
5 that -- it was basically completed.
6 Now, does that mean it's entirely
7 completed? It was an ongoing
8 process, but the -- I would say
9 basically --
10    Q. As of that time, it was
11 basically completed.
12    A. That's fair.
13    Q. Thanks.
14    A. Was it completely finished?
15 I can't 100 percent.
16    Q. You don't know 100 percent
17 if it was completely finished, but
18 the terms of the letter say it was
19 basically --
20    A. It was essentially -- the
21 main part of it was done.
22    Q. Thanks.
23    (Defendant's Exhibit 6 was
24 marked for identification.)

## 85

1 BY MR. WEEDE:
2    Q. Mr. Penske, before you --
3 I'm going to be focusing on Pages 645
4 to 676. You'll find that it's the
5 Agreement of Limited Partnership of
6 RHP Investment, L.P., dated as of
7 December 4th, 2000.
8    A. Okay.
9    Q. So if you wouldn't mind
10 turning to Page Plaintiffs 00645.
11 It's in the lower right-hand corner.
12    MR. CRONER: The problem
13 is, it got chopped a little in the
14 copying.
15    MR. WEEDE: Oh, I'm sorry.
16    MR. CRONER: No. No. No.
17 That's fine. We can find it. Which
18 pages do you want?
19    MR. WEEDE: Just start at
20 00645.
21 BY MR. WEEDE:
22    Q. Do you recognize this
23 document, Mr. Penske?
24    A. I -- I -- I have seen a RHP



## 86

1 Investments agreement. Whether I've
2 seen this specific -- I mean, I'm --
3 I -- probably, yes. I can't -- I
4 don't know every page of the -- of
5 the document, but I know I -- I did
6 form RHP Investments.
7    Q. If you wouldn't mind --
8    A. And this looks like a legal
9 document and probably --
10    Q. Let me see if I can help
11 you out a little bit. Can you turn
12 to Page 22, going by the numbers in
13 the middle of the document.
14      MR. WEEDE: That's
15 essentially -- George, that's Page
16 Plaintiffs 00668.
17      MR. CRONER: Got it.
18 BY MR. WEEDE:
19    Q. Is that your signature
20 there, Mr. Penske?
21    A. Yes.
22    Q. Could you turn to the next
23 page, please. Is that your signature
24 there?

## 87

1    A. Yes.
2    Q. Do you recall where you
3 were when you signed this Agreement?
4    A. When was this signed?
5      MR. CRONER: Well,
6 that's -- that's the problem.
7      THE WITNESS: Pardon me?
8      MR. CRONER: I'll object to
9 the form because -- if you can answer
10 it. If you remember when and where
11 you were when you signed, you can
12 answer the question.
13      THE WITNESS: I don't see
14 anything on here that indicates the
15 date.
16 BY MR. WEEDE:
17    Q. If you'd go to the
18 Plaintiffs 00645, I'm sorry to keep
19 flipping you back and forth here. I
20 wish I had a better copy.
21      Does that read dated as of
22 December 4th, 2000?
23    A. That's correct.
24    Q. Okay.

## 88

1      MR. CRONER: Objection.
2 But I -- to the extent that that --
3 you're suggesting by that that means
4 he signed it that date, I don't think
5 those dates have any correlation at
6 all.
7      MR. WEEDE: Okay.
8      THE WITNESS: And I would
9 say I -- the partnership I guess is
10 dated the 4th, because this is a copy
11 of the document.
12 BY MR. WEEDE:
13    Q. But you don't know when you
14 signed it.
15    A. That's correct.
16    Q. And you don't know where
17 you were when you signed it.
18    A. Correct.
19    Q. Could you turn to Page 6 of
20 the Agreement, please. That's to the
21 extent mine is chopped off, too, so
22 I'm --
23    A. You're talking about the
24 big Number 6?

## 89

1    Q. On the bottom, yeah, in the
2 middle right here.
3    A. Okay. Okay. Number 6.
4 Okay.
5    Q. Do you see Clause 2.4 there
6 where it says, Principal place of
7 business of the partnership?
8    A. Correct.
9    Q. Is it listed as St. Louis,
10 Missouri?
11    A. In this document I'm
12 looking at, that's correct.
13    Q. All right. I'm done with
14 that.
15      Now, Mr. Penske, outside of
16 the tax transaction and the estate
17 planning, did Lewis Rice represent
18 you in any other capacities?
19    A. There were a number of
20 times on a lot of different general
21 tax questions that we -- we called --
22 we talked to Lewis Rice.
23    Q. Okay. Did Lewis Rice
24 represent you in connection with the

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905       InnovatingLitigation       FAX 215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

90

1  audit of your 1997, 1998, and 1999
2  tax returns?
3      A. Yes, they did.
4      Q. Okay. How did that come
5  about?
6      A. I -- I received notice from
7  the IRS in the summer of '01 that I
8  was -- my 1997 tax return was going
9  to be audited.
10     Q. Okay. And then what
11 happened?
12     A. I at that point made a
13 decision to ask Lewis Rice if they
14 would -- if this is -- if they -- if
15 they would represent me in my tax
16 audit.
17     Q. How did you ask Lewis Rice
18 to represent you in connection with
19 your tax audit?
20     A. Picked up the phone and
21 gave them a call.
22     Q. Who did you call?
23     A. I'm not certain. The
24 two -- the two people that I had the

91

1  most contact was Falk and Weltman.
2  So more than likely it was one of
3  those two, but it could have been
4  Mulligan.
5      Q. Okay. Now, did you ever
6  travel to St. Louis to visit Lewis
7  Rice in connection with the audit of
8  your 1997 federal income tax returns?
9      A. Yes.
10     Q. When was that?
11     A. I believe it was August of
12 '01. Might have been September, but
13 I believe it was August of '01.
14     Q. August 14th, 2001, sound
15 right?
16     A. I'm not certain.
17     Q. Did anyone accompany you on
18 that trip to St. Louis?
19     A. Tom Reed.
20     Q. Mrs. Penske go with you?
21     A. I -- I don't know.
22     Q. Why did you go to visit St.
23 Louis -- excuse me. Strike that.
24        Why did you go to visit

92

1  Lewis Rice in St. Louis on August
2  2001 with regard to your 1997
3  audit -- the audit of your 1997
4  federal income tax returns?
5      A. To talk about the audit and
6  the -- you know, the -- the IDRs that
7  the IRS was requesting.
8      Q. Did you ask Lewis Rice to
9  come to you in Pennsylvania?
10     A. No, I didn't. But I
11 might add that with their fees being
12 what -- what -- what they are, it
13 made a lot more sense for me to go to
14 St. Louis.
15     Q. Is that pretty much your
16 philosophy generally with regard to
17 your dealings with Lewis Rice?
18     A. Pretty much in total. The
19 people here will tell you that I
20 normally come to Philadelphia for
21 meetings. I understand the -- the --
22 the bills keep cranking.
23     Q. Sure.
24     A. And I have sold my

93

1  business, so it was just more -- more
2  convenient.
3      Q. And --
4      A. And it made sense.
5      Q. It made sense. It was your
6  practice to go to St. Louis to visit
7  Lewis Rice.
8      A. Yes. Yes.
9      Q. What was generally
10 discussed in that August 2001
11 meeting? You said the IDRs.
12     A. Yeah. I think we --
13 whatever the document --
14 documentation that the IRS had
15 presented to us to start the audit
16 was what was -- what we were -- what
17 we discussed.
18     Q. Did you sign any documents
19 while you were in St. Louis at the
20 August 2001 meeting?
21     A. I don't remember signing
22 any -- any documents.
23     Q. Did you visit --
24     A. At some point I signed a



**James DeCrescenzo Reporting**, LLC

215.564.3905  InnovatingLitigation  FAX 215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

## 94

1  Power of Attorney.
2     Q.  Okay.
3     A.  But I don't — don't know
4  when. I believe it was signed
5  somewhere in order for them to
6  represent me in the audit.
7     Q.  Okay. So it could have
8  been signed in St. Louis; is that
9  correct?
10    A.  I — I don't know.
11    Q.  You don't know? You have
12 no recollection?
13    A.  No.
14    Q.  Did you travel again to St.
15 Louis in October of 2001?
16    A.  I don't recall. You might
17 have a record of it. I just don't
18 recall. I made — I know I made a
19 trip in August and I might have made
20 another trip that fall.
21    Q.  Let me ask you this: Do
22 you recall making another trip to St.
23 Louis after that August 2001 trip,
24 you just don't recall the date, or

## 95

1  you're not sure if you made a trip at
2  all?
3     A.  I think I made another
4  trip, but I'm not certain. My
5  recollection is I believe I did make
6  another trip. I don't have a
7  recollection of the date. It's —
8  I'm sure there's a record of it.
9     Q.  I'll see if I can find
10 that.
11    A.  I'm going to excuse myself
12 for one minute.
13    MR. CRONER: Do you need a
14 break?
15    (Recess, 2:07-2:11 p.m.)
16    MR. WEEDE: Back on.
17    MR. CRONER: Sure.
18    (Defendant's Exhibit 7 was
19 marked for identification.)
20    THE WITNESS: This is what?
21 October?
22    MR. WEEDE: Yes. Sorry.
23 It's cut off in the upper right-hand
24 corner. I believe it's October of

## 96

1  2001.
2     THE WITNESS: Okay.
3  BY MR. WEEDE:
4     Q.  Mr. Penske, do you
5  recognize this calendar month? Let
6  me strike that.
7        Do you recognize this
8  document?
9     A.  It's — it's the daily
10 planner of Tom Reed.
11    Q.  Directing your attention to
12 the 7th, 8th, and 9th, those all say
13 St. Louis on them.
14    A.  Correct.
15    Q.  Does that refresh your
16 recollection whether or not you were
17 in St. Louis in October 7th, 8th, and
18 9th along with Mr. Reed?
19    A.  This is his record and if
20 he was in St. Louis on these dates, I
21 was in St. Louis on these dates.
22    Q.  Okay. Do you recall on
23 those dates you'd be meeting with
24 Lewis Rice?

## 97

1     A.  I — I — there was — I
2  think we did go another time in the
3  fall.
4     Q.  Okay.
5     A.  And so those dates, yeah,
6  that's probably correct.
7     Q.  Okay. And again, do you
8  recall the purpose of that visit?
9     A.  This was for the 1997 IRS
10 audit. I'm certain that's what it
11 was for. And this is '01, isn't it?
12 October of '01?
13    Q.  That's correct.
14       Did anyone not affiliated
15 with — let me step back.
16       Did Mr. Reed also assist
17 you with your 1997 federal income tax
18 audit?
19    A.  Did he assist me?
20    MR. CRONER: Objection;
21 vague.
22       You can answer.
23    THE WITNESS: Did he assist
24 me in doing the '97 audit? I mean,

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905    InnovatingLitigation    FAX 215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

## 102

1  Q. So Heritage did not
2  represent to you that they were in
3  any way affiliated.
4  A. Right. They did not
5  represent that they were affiliated.
6  Q. Did Lewis Rice represent to
7  you that it was affiliated with --
8  did any members of Lewis Rice in any
9  way represent that they were related
10  with Heritage to you when they met
11  with you on November 27th, 2000?
12  A. They did not.
13  Q. Since that time did anyone
14  at Lewis Rice represent to you that
15  Heritage was in any way affiliated
16  with Lewis Rice?
17  A. They did not.
18  Q. Did Lewis Rice ever tell
19  you that Heritage had the power to
20  act on its behalf?
21  A. That Lewis Rice had the
22  authority to act on the behalf of
23  Heritage? Is that the question?
24  Q. We can start with that.

## 103

1  That's fine. I'm going to ask you
2  both questions. I'm going to ask you
3  whether or not Lewis Rice --
4  MR. CRONER: I want to know
5  which one he's responding to.
6  MR. WEEDE: That's fair.
7  That's fair.
8  BY MR. WEEDE:
9  Q. Did Lewis Rice ever inform
10  you that Heritage had the power to
11  act on behalf of Lewis Rice?
12  A. No. I said that right;
13  right?
14  MR. CRONER: You answered
15  the question.
16  THE WITNESS: Yeah. Yeah.
17  Yeah. Yeah. No. I'm just -- okay.
18  BY MR. WEEDE:
19  Q. Did Heritage ever inform
20  you that Lewis Rice had the power to
21  act on Heritage's behalf?
22  A. No.
23  Q. Did Heritage ever inform
24  you that Heritage had the power to

## 104

1  act on Lewis Rice's behalf?
2  A. No.
3  Q. Did Lewis Rice ever inform
4  you that it had the power to act on
5  Heritage's behalf?.
6  A. No.
7  Q. Did Lewis Rice ever take
8  any action which led you to believe
9  that Heritage could act on Lewis
10  Rice's behalf?
11  A. No.
12  Q. Was Heritage ever a party
13  to any agreement between you and
14  Lewis Rice?
15  A. I don't believe so.
16  Q. So you have no
17  recollection?
18  A. I have no recollection.
19  (Defendant's Exhibit 8 was
20  marked for identification.)
21  BY MR. WEEDE:
22  Q. Mr. Penske, if you could
23  take a minute to leaf through this
24  document, familiarize yourself with

## 105

1  it.
2  MR. CRONER: To what level
3  of familiarity?
4  MR. WEEDE: Generally. I
5  will give him more time to...
6  THE WITNESS: Okay.
7  BY MR. WEEDE:
8  Q. Do you recognize this
9  document?
10  MR. CRONER: Now, there's
11  actually two documents, so which one
12  are you asking about?
13  MR. WEEDE: Sorry. Let
14  me -- I'm sorry. So this -- George,
15  when you say two documents...?
16  MR. CRONER: Well, there's
17  a fax cover page that has a
18  completely different date than the
19  underlying document. So when you ask
20  that, I don't know whether you're
21  asking him about the cover page or
22  the --
23  MR. WEEDE: I should
24  probably ask you this. I was

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905

InnovatingLitigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

FAX 215.751.0581

---

110

1     Q. So you signed more than one
2 Confidentiality Agreement?
3     A. I believe they would be
4 classified as Confidentiality
5 Agreements.
6     Q. How many Confidentiality
7 Agreements do you remember signing?
8     A. I don't recall.
9     Q. Do you recall when you
10 signed this one? If I could direct
11 you to --
12     A. I mean, it's dated.
13     Q. 434.
14     A. 434. It's dated 10/25.
15     Q. Was that at a meeting that
16 you had with the Heritage group?
17     A. I did have a meeting on
18 10/25 with the Heritage group.
19     Q. Do you recall signing that
20 at this meeting? Sorry. Excuse me.
21     Do you recall signing this
22 Agreement at that meeting?
23     A. I don't remember.
24     Q. The other --

---

111

1     A. I mean --
2     Q. Sorry?
3     A. I mean, there are three
4 dates on this. There's 10/25,
5 November 3, and 10/31. There's a
6 number of dates on here.
7     Q. But your signature and Tom
8 Reed's signature are both on 10/25;
9 is that correct? 10/25/2000?
10     A. Right. But my signature
11 also appears at November 3 under
12 Patrick Capital, so I'm not sure if
13 we -- if it was backdated or -- I
14 mean, I can't --
15     Q. Okay.
16     A. I mean, you've got --
17 because if I -- as I say, there's my
18 signature twice with two different
19 dates on it.
20     Q. Now, the other
21 Confidentiality Agreements you said
22 that you signed with Heritage, would
23 they have come after or before this
24 Agreement?

---

112

1     A. I'm not certain. I mean,
2 there is documents somewhere that
3 would confirm that. There would be a
4 record of the dating.
5     Q. But you don't know from
6 personal knowledge?
7     A. I can't recall.
8     Q. That's all I have for that
9 one.
10     (Defendant's Exhibit 9 was
11 marked for identification.)
12 BY MR. WEEDE:
13     Q. Mr. Penske, the court
14 reporter has handed you Defendant's
15 Exhibit 9, which is the Complaint in
16 this action.
17     Have you seen this document
18 before?
19     A. I've seen the Complaint,
20 yes.
21     Q. Could you turn with me,
22 please, to Paragraph 51. The first
23 sentence there reads, LRF -- and I'll
24 represent to you that LRF refers to

---

113

1 Lewis Rice -- and Plaintiffs entered
2 into an attorney-client relationship
3 in or about October 2000 during a
4 meeting between Plaintiff Penske and
5 representatives of LRF.
6     Do you know what meeting
7 that paragraph is referring to?
8     A. The first I met Lewis Rice
9 was the 27th of October.
10     Q. Of November or October?
11     A. Excuse me. 27th of
12 November.
13     Q. So is it your understanding
14 that this should read LRF and
15 Plaintiffs entered into an
16 attorney-client relationship in or
17 about November of 2000 during a
18 meeting between Plaintiff Penske and
19 representatives of LRF?
20     MR. CRONER: Objection to
21 the form.
22     THE WITNESS: The word in
23 or about, I would --
24     MR. WEEDE: Did --

**JDR**

**James DeCrescenzo Reporting, LLC**

215.564.3905      InnovatingLitigation      FAX 215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

### 114

1      THE WITNESS: You know, we
2 signed an engagement letter December
3 1 and I met them November 27th.
4 BY MR. WEEDE:
5    Q. Did you enter into an
6 attorney-client relationship with
7 members of Lewis Rice on November
8 27th, 2000?
9      MR. CRONER: Objection;
10 asked and answered.
11      THE WITNESS: I mean, I'm
12 not -- I mean, December 1 is the
13 engagement letter and I think I've
14 answered that question.
15      MR. WEEDE: Okay.
16 BY MR. WEEDE:
17    Q. So you're -- just to make
18 sure I have your testimony, you did
19 not enter into an attorney-client
20 relationship on November 27th, 2000,
21 with members of Lewis Rice; is that
22 correct?
23      MR. CRONER: Objection to
24 the extent you're asking him to call

### 115

1 for some sort of legal conclusion.
2      THE WITNESS: Yeah.
3      MR. CRONER: Whether he
4 entered into one, whether he could
5 have asserted one.
6      You can answer as best you
7 understood it.
8 BY MR. WEEDE:
9    Q. What was your
10 understanding? Let's put it this
11 way: What was your understanding?
12 Did you understand that you had
13 entered into an attorney-client
14 relationship with members of Lewis
15 Rice on November 27th, 2000?
16    A. I -- I -- I -- I believe
17 that the -- it was entered into
18 December 1, but I don't -- I don't
19 believe it was entered into on the
20 27th.
21    Q. Please turn to Paragraph
22 64, please.
23    A. As I say -- okay. 64.
24    Q. I'll read you the first

### 116

1 sentence of Paragraph 64.
2      LRF, again, that's
3 referring to Lewis Rice, and
4 Plaintiffs entered into an
5 attorney-client relationship and an
6 oral contract for the provision of
7 legal services in or about October
8 2000 during a meeting between
9 Plaintiff Penske and representatives
10 of Lewis Rice -- or LRF, referring to
11 Lewis Rice.
12      Is that an accurate
13 statement?
14    A. Again, if you're using the
15 word in or about, I signed a -- I
16 executed a document December 1. I
17 guess that's a legal definition, what
18 you mean by in or about. It's an
19 approximate time period.
20    Q. Okay. But what you signed
21 on December 1st, 2000, was not an
22 oral contract; is that correct?
23    A. Yeah, it was a written
24 engagement letter.

### 117

1    Q. So to the extent that this
2 paragraph says that Lewis Rice and
3 Plaintiffs entered into an
4 attorney-client relationship and an
5 oral contract for the provision of
6 legal services in or about October
7 2000, during a meeting between
8 Plaintiff Penske and representatives
9 of LRF, that's not a true statement.
10      Is that what you're telling
11 me?
12    A. Yeah. I met with them
13 December 1. I mean, excuse me,
14 November 27th was the first meeting I
15 had with them.
16    Q. Did you enter into an oral
17 contract for the provision of legal
18 services on November 27th, 2000, with
19 members of Lewis Rice?
20      MR. CRONER: Objection;
21 calls for a legal conclusion.
22      You can answer to the best
23 you can.
24      THE WITNESS: I -- I -- as

**JDR**

**James DeCrescenzo Reporting**, LLC

215.564.3905      InnovatingLitigation      FAX 215.751.0581
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

# EXHIBIT J

IN THE MATTER OF:

# Richard H. Penske, et al
## vs.
# Lewis, Rice & Fingersh, L.C.

*Cause No. 05-CV-4436*

*Deposition of Michael D. Mulligan*
*3/3/2006*

*Gore Perry Gateway & Lipa Reporting*
*515 Olive Street*
*Suite 700*
*St. Louis, MO 63101*

*Full GLOSSARY included with this DepoScript*

DepoScript

Richard H. Penske, et al  vs.
Lewis, Rice & Fingersh, L.C.

Deposition of Michael D. Mulligan
3/3/2006

**Page 25**

[1]  attracted its clients?

[2]       A:  No.

[3]       Q:  Did anyone ever explain to you how Heritage

[4]  went about procuring clients?

[5]       A:  No.

[6]       Q:  Did you ever ask?

[7]       A:  No, that I can -- I don't remember that I

[8]  ever asked.

[9]       Q:  I take it Mr. Penske, for example, was not

[10]  an existing client of Lewis, Rice's at the time that

[11]  Mr. Kornman or Mr. Canada first contacted you about

[12]  him?

[13]       A:  He was not.

[14]       Q:  Now, after you first had this call from

[15]  Kornman or Canada about Mr. Penske, what did you do

[16]  within the firm?

[17]       A:  What I did was to organize -- organize

[18]  people who would attend the meeting.

[19]       Q:  This was the meeting with Mr. Penske?

[20]       A:  Yes, sir.

[21]       Q:  Do you remember when that meeting took

[22]  place?

[23]       A:  Not the precise date, no.

[24]       Q:  I'll represent to you that Mr. Falk

[25]  testified yesterday, and there are some exhibits

**Page 26**

[1]  that I certainly can show you that indicate, that

[2]  the meeting took place on November 27th of 2000.

[3]       Would you have a recollection that it was

[4]  any different than that?

[5]       A:  No, sir.

[6]       Q:  And I take it that your contact by

[7]  Mr. Kornman or Mr. Canada took place at some point

[8]  prior to that?

[9]       A:  The telephone communication, yes, sir.

[10]       Q:  And do you know whether Lewis, Rice did any

[11]  work in connection with Mr. Penske prior to the

[12]  first meeting with Mr. Penske?

[13]       A:  I don't remember that we did, personally.

[14]       Q:  I'd like to show him Exhibit No. 4.

[15]       Exhibit No. 4 was marked yesterday,

[16]  Mr. Mulligan, and I'll ask you, have you seen this

[17]  document before?

[18]       A:  No, sir.

[19]       Q:  Do you know what it is?  Do you recognize

[20]  what it is?

[21]       A:  It appears to be a receipt -- a Federal

[22]  Express receipt.

[23]       Q:  It's an Airbill; correct?

[24]       A:  Yes.

[25]       Q:  And the sender's name is listed as your

**Page 27**

[1]  name.  Do you see that?

[2]       A:  Yes, sir.

[3]       Q:  And it's dated November 16th, 2000; correct?

[4]  Top, left hand.

[5]       A:  Yes.

[6]       Q:  And the recipient is indicated to be a

[7]  Mr. Brian Czerwinski?

[8]       A:  Czerwinski, yes.

[9]       Q:  Who is Mr. Brian Czerwinski; do you know?

[10]       A:  Brian Czerwinski was an employee of The

[11]  Heritage Organization.

[12]       Q:  And according to the Airbill, at least you

[13]  were sending him a package by first overnight

[14]  delivery, Federal Express, on November 16th, and he

[15]  was located in Bethlehem, Pennsylvania.

[16]       Do you see that?

[17]       A:  Yes, sir.

[18]       Q:  Do you remember doing that, Mr. Mulligan?

[19]       A:  No.

[20]       Q:  Do you have any idea what was in a package

[21]  that you would have been sending Mr. Czerwinski at

[22]  this time?

[23]       A:  I don't have any firm knowledge, no.

[24]       Q:  Do you know -- well, let me back up for a

[25]  minute.  Other than knowing that Mr. Czerwinski was

**Page 28**

[1]  an employee for Heritage, did you ever have any

[2]  direct contact with him?

[3]       A:  Oh, frequently.

[4]       Q:  Frequently?  Okay.  So you spoke with him?

[5]       A:  Yes, sir.

[6]       Q:  Do you have any knowledge as to why he might

[7]  have been in Bethlehem, Pennsylvania on or about

[8]  November 16th?

[9]       A:  I have no knowledge as to why he was there.

[10]       Q:  You don't remember him telling you that or

[11]  anything like that?

[12]       A:  No, sir.

[13]       Q:  You'll see there is a -- there is an

[14]  internal billing reference, item No. 2, sort of

[15]  right in the middle of the left-hand side of the

[16]  Airbill?

[17]       A:  Yes.

[18]       Q:  The number is 109210.23077?

[19]       A:  Yes.

[20]       Q:  From what I understand now from Mr. Falk

[21]  yesterday, that apparently appears to be a client

[22]  matter number used by Lewis, Rice; is that correct?

[23]       A:  Yes, sir.

[24]       Q:  Do you know what that client matter number

[25]  is?

# EXHIBIT K

IN THE MATTER OF:

# Richard H. Penske, et al
## vs.
# Lewis, Rice & Fingersh, L.C.

Cause No. 05-CV-4436

*Deposition of William J. Falk*
*3/2/2006*

Gore Perry Gateway & Lipa Reporting
515 Olive Street
Suite 700
St. Louis, MO 63101

Full GLOSSARY included with this DepoScript

**Deposition of William J. Falk**
3/2/2006

Richard H. Penske, et al vs.
Lewis, Rice & Fingersh, L.C.

## Page 61

[1]  Q: Was he a lawyer; do you know?

[2]  A: I do not know.

[3]  Q: Do you have any idea why Mr. Czerwinski was

[4]  in Bethlehem on November 16th of 2000?

[5]  A: I have no information about that, no.

[6]  Q: Were you personally working on anything

[7]  relating to Richard Penske at this point in time?

[8]  A: I'd have to look at my time entries to tell

[9]  you for certain. I said earlier that I began

[10]  working on Mr. Penske's matters several days before

[11]  the meeting. I don't know whether we began as

[12]  early — or whether I began, I should say, as early

[13]  as November 16th.

[14]  Q: Would you understand, from the fact that

[15]  Mr. Mulligan was sending Mr. Czerwinski a package on

[16]  November 16th, that someone at Lewis, Rice was doing

[17]  some sort of work for Richard Penske?

[18]  A: I do not — I can't say that for sure. That

[19]  would be reflected in the time entries, and I

[20]  believe those have been provided.

[21]  Q: Do you know whether, as of November 16th,

[22]  2000, Lewis, Rice had received authorization from

[23]  Mr. Penske to do any work on his behalf?

[24]  A: I do not know.

[25]  Q: Do you know whether, in fact, Lewis, Rice

## Page 62

[1]  was receiving whatever instructions it was receiving

[2]  with regard to Mr. Penske strictly from Heritage?

[3]  A: I think instructions is probably a strong

[4]  word. My understanding was that Mr. Penske had been

[5]  referred as a potential client to Lewis, Rice, and

[6]  to the extent that Lewis, Rice was beginning work,

[7]  it would have been in anticipation of forming an

[8]  attorney-client relationship.

[9]  Q: But to the extent that Lewis, Rice was doing

[10]  any work, as you described it, who had authorized

[11]  Lewis, Rice to do that work?

[12]  A: The authorization, to the extent that there

[13]  was any authorization given, would have been from

[14]  Mr. Mulligan.

[15]  Q: To do the work?

[16]  A: (Nods head.)

[17]  Q: You have to say yes or no.

[18]  A: What was the question? Before I say it, I

[19]  want to know what the question was.

[20]  (Record read.)

[21]  THE WITNESS: That would be a yes.

[22]  Q: (By Mr. Croner) And do you know whether

[23]  Mr. Mulligan had had any direct contact of any kind

[24]  with Mr. Penske at that point?

[25]  A: I do not know.

## Page 63

[1]  Q: And so you can't tell me, I take it,

[2]  whether, in fact, Mr. Penske had authorized

[3]  Mr. Mulligan to have Lewis, Rice undertake any work

[4]  on his behalf; fair to say?

[5]  A: That's correct. I cannot say. I cannot say

[6]  that Mr. Penske authorized Mr. Mulligan.

[7]  Q: In the middle — actually, they are sort of

[8]  numbered items on this FedEx Airbill. Item No. 2

[9]  says, "Your internal billing reference."

[10]  Do you see that?

[11]  A: I see that.

[12]  Q: Is that essentially an internal Lewis, Rice

[13]  client matter number?

[14]  A: It has the structure of one, yes.

[15]  Q: And if that is in fact the case, I take it

[16]  the first series of digits represents the client

[17]  number; am I right?

[18]  A: That's how we generally use them, yes.

[19]  Q: And the second set of digits after the

[20]  decimal point represents the matter number; correct?

[21]  A: That's how we use them, yes.

[22]  Q: Do you recognize that particular client

[23]  matter number?

[24]  A: I can't say I do.

[25]  Q: Do you recognize the client number?

## Page 64

[1]  A: I do not.

[2]  Q: Do you know whether in fact a client number

[3]  had been opened for Mr. Penske at this point in

[4]  time?

[5]  A: I do not.

[6]  Q: During the time that you have been working

[7]  or did work in connection with clients relating to

[8]  Heritage, did Lewis, Rice have a separate client

[9]  number for Heritage?

[10]  A: Yes, we did, because at one point the firm

[11]  had done some work for Heritage.

[12]  Q: And do you recognize whether this particular

[13]  number, 109210, is the Heritage client number?

[14]  A: I don't recognize it one way or another.

[15]  Q: So you can't tell me it's also — I take it,

[16]  that it's not a Heritage client number; correct?

[17]  A: It is correct that I cannot tell you it is

[18]  not the Heritage number.

[19]  Q: Okay.

[20]  A: Did I just say something? I'm not sure what

[21]  that meant.

[22]  MR. CRONER: This is Plaintiffs' No. 5, I

[23]  think.

[24]  (Plaintiffs' Exhibit 5 was marked for

[25]  identification.)

Deposition of William J. Falk
3/2/2006

Richard H. Penske, et al vs.
Lewis, Rice & Fingersh, L.C.

Page 149

[1] the scope of the relationship between Penske and
[2] Lewis, Rice?
[3]     A:  I didn't check on whether an engagement
[4] letter existed for each of those, no, I didn't.
[5]     Q:  And the first one I think that you
[6] described, which related to the furnishing of the
[7] original opinion, is that Plaintiffs' No. 16, the
[8] December 1st, 2000 letter?
[9]     A:  It's the first of the engagement letters
[10] relating to what we'd call the Heritage transaction
[11] or the one with the -- the one that's at issue here
[12] is the December 1, 2000, Exhibit 16.
[13]     MR. CRONER:  Mark this as 25, Nancy.
[14]     (Plaintiffs' Exhibit 25 was marked for
[15] identification.)
[16]     Q:  (By Mr. Croner) I'm going to show you,
[17] Mr. Falk, what the reporter has marked as
[18] Plaintiffs' Deposition Exhibit No. 25, a letter, two
[19] pages, bearing Bates Nos. Penske 000874 and 875,
[20] purporting to be on the letterhead of Lewis, Rice &
[21] Fingersh, dated February 22nd, 2001.
[22]     I'll ask you, have you ever seen this
[23] document before?
[24]     A:  Yes, I have.
[25]     Q:  And when did you last see this document?

Page 150

[1]     A:  Yesterday.
[2]     Q:  It appears, up in the top left-hand corner,
[3] Mr. Mulligan's name, so I take it you didn't prepare
[4] this; is that fair to say?
[5]     A:  That's correct.
[6]     Q:  And what is your understanding of what this
[7] is?
[8]     A:  This is an engagement letter for estate
[9] planning services that were to be provided by Lewis,
[10] Rice for Mr. Penske and his family.
[11]     Q:  And is this a different set of services than
[12] was contemplated by the original retention letter
[13] executed in December of 2000?
[14]     A:  Yes.
[15]     Q:  And when Lewis, Rice has different pieces of
[16] work that it's working on for a particular client,
[17] do those separate pieces of work get assigned
[18] different matter numbers?
[19]     A:  Sometimes.
[20]     Q:  Do you know whether separate matter numbers
[21] were assigned for the work done for Mr. Penske?
[22]     A:  It's my understanding that there were not
[23] or -- let's be clear about it.
[24]     It's my understanding that there were not
[25] separate matter numbers assigned to distinguish

Page 151

[1] these estate planning services that are described in
[2] Exhibit 25 from the initial services that were
[3] provided pursuant to whatever that earlier
[4] engagement letter was.
[5]     Q:  December 1st, 2000?
[6]     A:  December 1, right.  I know that there was a
[7] separate matter number assigned, for example, to
[8] distinguish the services on the income tax audit.
[9]     Q:  Okay.  But can you tell me whether there was
[10] a separate engagement letter executed for the
[11] matters related to the audit?
[12]     A:  And that goes back to my earlier answer.  I
[13] don't know.
[14]     MR. CRONER:  Make that 26.
[15]     (Plaintiffs' Exhibit 26 was marked for
[16] identification.)
[17]     Q:  (By Mr. Croner) Let me show you what I have
[18] marked as Deposition Exhibit No. 26, Mr. Falk, a
[19] single-page document purporting to be on the
[20] letterhead of Lewis, Rice & Fingersh, single Bates
[21] No. 21756, Penske number.  What is this, Mr. Falk?
[22]     A:  It appears to be a bill.
[23]     Q:  Prepared by Lewis, Rice, I take it?
[24]     A:  Yes.
[25]     Q:  Sent to Mr. Penske in Pennsylvania?

Page 152

[1]     A:  Yes.
[2]     Q:  Now, it says, "Our Matter Number."  Do you
[3] see that?
[4]     A:  It's addressed to Mr. Penske in
[5] Pennsylvania.  I don't know if it was sent or hand
[6] delivered or exactly what.
[7]     Q:  Do you have any reason to believe it didn't
[8] end up in Pennsylvania?
[9]     A:  I don't know whether Mr. Penske was here,
[10] for example.
[11]     Q:  Do you have -- well, let me ask you:  Other
[12] than November 27th of 2000, was Mr. Penske ever at
[13] Lewis, Rice's offices again?
[14]     A:  Tell me again, what was the date you
[15] referred to?
[16]     Q:  Other than the initial meeting that we've
[17] talked about that occurred on November 27th of 2000,
[18] did Mr. Penske ever come to Lewis, Rice's office in
[19] St. Louis again?
[20]     A:  Yes.
[21]     Q:  And when was that?
[22]     A:  I know that he was here in 2001, once,
[23] perhaps twice, in connection with the income tax
[24] examination.  I do not know whether he visited our
[25] offices in connection with any of the estate

# EXHIBIT L

## SUPPLEMENTAL DECLARATION OF WILLIAM J. FALK

1.     My name is William J. Falk.  I am over the age of 18 years and am fully competent to make this declaration.

2.     I am a member of Lewis, Rice & Fingersh, L.C. ("Lewis, Rice"), defendant in this action, and am authorized to make this declaration on its behalf.  I have personal knowledge of the facts contained in ¶ 3 of this declaration, which are all true and correct.  The facts set forth in ¶ 4 of this declaration are true and correct approximations, based upon information compiled from documents and information provided by accounting staff and other knowledgeable persons at Lewis, Rice & Fingersh, L.C.

3.     Lewis, Rice currently has 163 attorneys who are members, of counsel, or associates.

4.     In the agreed upon discovery period between January 1, 2000 and August 18, 2005, matters with a connection to Pennsylvania were not significant compared to Lewis, Rice's overall client base.  As of February 1, 2003, when Lewis, Rice converted to its current time and billing software, the firm had approximately 3,996 active clients for which there were approximately 7,876 open matters.  By August 2005, Lewis, Rice had approximately 6,331 active clients for which attorneys handled approximately 9,934 open matters.

5.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this ⟨13ᵗʰ⟩ day of April 2006.

LEWIS, RICE & FINGERSH, L.C.

By: _____

WILLIAM F. FALK

Its:  Member