## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

RICHARD H. PENSKE AND
PATRICIA L. PENSKE,

               Plaintiffs,

      v.

LEWIS, RICE & FINGERSH, L.C.

               Defendant.

CIVIL ACTION NO.  05-cv-4436
[FILED ELECTRONICALLY]

**JURY TRIAL DEMANDED**

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
## MOTION FOR PARTIAL SUMMARY JUDGMENT

George W. Croner, Esquire
Christina Donato Saler, Esquire
KOHN, SWIFT, & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA  19107-3304
(215) 238-1700

*Attorneys for Plaintiffs*

35734_2

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

I.    INTRODUCTION ............................................................................................1

II.   MATERIAL FACTS PERTINENT TO PLAINTIFFS' CLAIMS ...................1

III.  STANDARD FOR SUMMARY JUDGMENT .................................................8

IV.   SUMMARY OF THE ARGUMENT ...............................................................9

V.    ARGUMENT..................................................................................................11

   A.   Defendant Committed Legal Malpractice By Failing To Advise
       Plaintiffs Of the Amnesty Initiative in IRS Announcement 2002-2. ...............11

     1.   The Parties Had A Continuous Attorney-Client Relationship From
        December 1, 2000 Through October 2003. ................................................11

     2.   Defendant's Deliberate Decision Not to Disclose the Amnesty
        Announcement to Plaintiffs Breached the Duty of Care LRF
        Owed to Plaintiffs as Their Legal Counsel.................................................16

     3.   Defendant's Failure To Advise Plaintiffs' Of the Amnesty Announcement
        Was The Proximate Cause Of Damage To Plaintiffs. ..................................18

   B.   Defendant Breached Its Engagement Agreement With Plaintiffs By
       Failing To Advise Plaintiffs of the Amnesty Announcement. ..........................19

   C.   The Tax Transaction Lacks Economic Substance and the Tax Treatment
       of the Short Sale of U.S. Treasury Notes in Defendant's Tax Opinion
       Does Not Comply With Federal Tax Law...........................................................21

     1.   The obligation to close the short sale is a liability under § 752. ...................22

     2.   The Tax Transaction lacks economic substance.........................................24

VI.   CONCLUSION ..............................................................................................25

## TABLE OF AUTHORITIES

### FEDERAL CASES

*ACM Partnership v. C.I.R.*,
  157 F.3d 231 (3d Cir. 1998) ............................................................................... 1, 10, 24

*Alf Atochem North America v. U.S.*,
  866 F. Supp. 868 (E.D. Pa. 1994) ...................................................................... 9

*Anderson v. Liberty Lobby*,
  477 U.S. at 242 (1986) ........................................................................................ 9

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ......................................................................................... 9, 16

*Colm Producer, Inc. v. U.S.*,
  460 F. Supp. 2d 713 (N.D. Tex. 2006) .......................................................... 10, 21, 22, 23

*Connelly v. Wolf, Block, Schorr & Solis-Cohen*,
  463 F. Supp. 914 (E.D. Pa.1978) ...................................................................... 12

*Healy v. Axelrod Const. Co. Defense Ben. Pension Plan & Trust*,
  155 F.R.D. 615 (N.D. Ill. 1994) ........................................................................ 15

*International Brotherhood of Electric Workers, AFL-CIO, Local 1522 v. AT&T*
  *Microelectronics, Inc.*,
  909 F. Supp. 294 (E.D. Pa. 1994) ...................................................................... 9

*Klamath Strategic Growth Investment Fund, LLC v. U.S.*,
  440 F. Supp. 2d 608 (E.D. Tex. 2006) ............................................................ 23

*Klamath Strategic Investment Fund, LLC v. U.S.*,
  472 F. Supp. 2d 885 (E.D. Tex. 2007) .......................................................... 10, 23

*Loughman v. Consolidated-PA Coal Co.*,
  6 F.3d 88 (3d Cir. 1993) .................................................................................... 19

*Matsushita Electric Industrial Co., Ltd. v. Zenith*,
  475 U.S. 574 (1986) ............................................................................................ 9

*Salina Partnership LP v. Comm'r*, T.C. Memo 2000-352, 2000 WL. 1700928, at 12
  (2000) ............................................................................................................... 10, 22

*Sheinkopf v. Stone,*
   927 F.2d 1259 (1st Cir. 1991) (emphasis added ........................................... 12

## STATE CASES

*Althaus by Althaus v. Cohen,*
   710 A.2d 1147 (Pa. Super. 1998) ............................................................. 13

*Atkinson v. Haug,*
   622 A.2d 983 (Pa. Super. 1993) .............................................................. 12

*Bailey v. Tucker,*
   621 A.2d 108 (Pa. 1993) .................................................................. 12, 20

*Fiorentino v. Rapoport,*
   693 A.2d 208 (Pa. Super. 1997) ........................................................ 19, 20

*Gorski v. Smith,*
   812 A.2d 683 (Pa. Super. 2003) ............................................................. 19

*Guy v. Liederbach,*
   459 A.2d 744 (Pa. 1983) ..................................................................... 12

*Jones v. Bresset,*
   No. 94-CV-1103, 2000 WL. 33116007 (Pa. Com. Pl. April 19, 2000) ........... 12, 13, 14, 15

*Kituskie v. Corbman,*
   714 A.2d 1027 (Pa. 1998) ................................................................ 11, 18

*Krauss v. Claar,*
   879 A.2d 302 (Pa. Super. 2005) ............................................................. 12

*Oliver v. Bernstein, No. Civ. A. 96-4471,*
   1996 WL. 654054 (E.D. Pa. Nov. 6, 1996) ................................................. 12

*Rizzo v. Haines,*
   555 A.2d 58 (Pa. 1989) ...................................................................... 18

*Scaramuzza v. Sciolla, No. Civ.A.04-1270,*
   2006 WL. 557716 (E.D. Pa. Mar. 3, 2006) ................................................. 11

*Thompson v. Glenmeade Trust Co., No. Civ. A. 92-5233,*
   1996 WL. 635682 (E.D. Pa. Oct. 31, 1996) ............................................ 16, 17

## DOCKETED CASES

*Romy v. Burke*, No. 1236
    *May Term 2002*,
    2004 WL 3050866 (Pa. Com. Pl. Dec. 28, 2004).........................................................17, 19

## FEDERAL STATUTES

Fed. R. Civ. P. 56...........................................................................................................1, 8, 9

IRS Notice 2000-44 ..........................................................................................................8, 23

26 U.S.C. § 752 ...................................................................................................................21

## I.    **INTRODUCTION**

Pursuant to Fed. R. Civ. P. 56 and for the reasons set forth fully herein, Plaintiffs move for partial summary judgment as follows:

1.    Plaintiffs move for summary judgment with respect to Counts 1 and 3 of their Complaint arising from defendant Lewis Rice & Fingersh, L.C.'s ("Defendant" or "LRF") deliberate decision to withhold from Plaintiffs the terms and conditions of IRS Announcement 2002-2 issued in December 2001; and

2.    Plaintiffs move for partial summary judgment with respect to Counts 2 and 4 of their Complaint insofar as relates to the purely legal determination that (a) the obligation to close the short sale of U.S. Treasury Notes that plaintiff Richard H. Penske ("RHP") executed on December 11, 2000 as part of a tax transaction constituted a partnership liability under § 752 of the Internal Revenue Code ("Code"), and (b) that the tax transaction executed by Plaintiffs in December 2000 lacked economic substance under the Code and prevailing tax law.

## II.    **MATERIAL FACTS PERTINENT TO PLAINTIFFS' CLAIMS**

By the fall of 2000, Richard Penske ("RHP") had reached the culmination of a long and successful career during which he had built Piercing Pagoda, Inc. ("Piercing Pagoda") into a ubiquitous retail presence in shopping malls all across America.  In September 2000, RHP and his wife, Patricia, (collectively, "Plaintiffs" or the "Penskes") sold (directly or through partnerships and trusts in which they participated) all of their remaining shares in Piercing Pagoda in connection with a cash tender offer transaction with the Zale Corporation that produced approximately $70 million for the Penskes.  Plaintiffs' Statement of Undisputed Facts in Support of Their Motion for Partial Summary Judgment ("Stmt. of Facts") at No. 4.[1]

---

[1] Where applicable, Plaintiffs cite directly to the particular numbered facts set forth in Plaintiffs' Statement of Undisputed Material Facts in Support of Their Motion for Partial Summary Judgment.  To avoid unnecessary

The Piercing Pagoda-Zale transaction appeared in the contemporaneous financial press and, in October 2000, RHP was contacted by representatives of The Heritage Organization, Inc. ("Heritage"). Stmt. of Facts at No. 6. Heritage proposed to secure Plaintiffs as clients to participate in a "financial plan" that could assist Plaintiffs in dealing with the financial and tax implications arising by virtue of the gain realized by Plaintiffs from the sale of their Piercing Pagoda stock a part of the Zale transaction. Stmt. of Facts at No. 7.

Heritage purported to have developed certain financial and tax "strategies" ostensibly designed to assist individuals, like Plaintiffs, facing tax consequences associated with large financial gains; however, Heritage would only disclose its "strategies" to Plaintiffs upon payment of an initial fee and Plaintiffs' (and Thomas Reed's -- RHP's personal advisor) execution of a confidentiality agreement prepared by Heritage. Stmt. of Facts at Nos. 8-10. On October 25, 2000, at a meeting with Heritage representatives at RHP's Bethlehem, PA home, RHP and Thomas Reed ("Reed")[2] signed the Heritage confidentiality agreement[3] and, the next day, RHP sent Heritage a check for the initial $22,500 payment required by Heritage. Stmt. of Facts at Nos. 8-10. Heritage's representatives then returned to Bethlehem to meet with Reed and RHP on November 3, 2000, and revealed Heritage's "strategies" for the Penskes in the form of a graphical depiction of a tax transaction (the "Tax Transaction") orchestrated by funneling a short sale of U.S. Treasury Notes through a series of partnerships created specifically for that purpose. Stmt. of Facts at No. 11.

---

duplication, these citations are intended to embrace both the identified Statements of Fact and the references to the evidentiary record supporting those Statements of Fact which are included in the Appendix of Exhibits in Support of Plaintiffs' Motion for Partial Summary Judgment ("Appendix").

[2] Other than between the years of 1992 through 1995, Reed prepared Plaintiffs' individual tax returns from 1986 through 2004. Plaintiffs' Exhibit ("P/X") 3 at 16:3-17:10.

[3] Plaintiff Patricia Penske signed the Heritage confidentiality agreement on November 3, 2000. P/X 7 at Plaintiffs. 00434.

RHP understood that the Heritage "strategy" was a transaction to generate a tax loss, P/X 2 at 204:19-205:4, and he was interested in participating only if the transaction was a "good transaction" where there was a legal opinion that left RHP "secure and safe" so that, if challenged, "I'm not going to get a penalty." *Id.* at 205:18-206:11.[4]  In fact, Heritage would not complete a Tax Transaction unless the client obtained a legal opinion from counsel addressing the tax consequences of the Tax Transaction; but Heritage did not generate such opinions in-house.  Stmt. of Facts at Nos. 15-16.  When RHP inquired regarding a law firm from which he could seek such a tax opinion, Heritage recommended the St. Louis-based law firm of Lewis, Rice & Fingersh, L.C.  Stmt. of Facts at No. 17.

Unbeknownst to Plaintiffs, Heritage and LRF already had an established and ongoing relationship.  In February 2000, a number of LRF attorneys had signed non-disclosure agreements virtually identical to the one executed by Plaintiffs in order to receive a presentation of the Tax Transaction for purposes of evaluation whether Defendant would supply favorable tax opinions to clients referred by Heritage.  Stmt. of Facts at Nos. 18-20.[5]  Although Heritage's disclosure was limited to a PowerPoint presentation unaccompanied by any written materials, LRF's lawyers, principally Falk and Weltman, concluded that Defendant would provide, to any individual client referred by Heritage, a favorable tax opinion endorsing the tax treatment of the Heritage Tax Transaction.[6]  Stmt. of Facts at Nos. 30-32.  Heritage proceeded to send approximately 20 individual clients to Defendant for tax opinions (with Plaintiffs falling

---

[4] The Penskes had participated in an earlier "transaction to generate a tax loss" in 1997 when the sale of Piercing Pagoda stock in a secondary offering had left them with a substantial realized gain.  Stmt. of Facts at No. 2.  At that time, upon the recommendation of KPMG, which had long served as Piercing Pagoda's outside accountants and as a personal advisor to RHP, the Penskes had executed a "FLIP" transaction through KPMG.  Stmt. of Facts at No. 3.
[5] The LRF attorneys signing the Heritage non-disclosure agreement included William Falk ("Falk"), Lawrence Weltman, and Michael Mulligan, all of whom eventually had some level of involvement with Plaintiffs' Tax Transaction.  Stmt. of Facts at No. 20.
[6] Although Falk professes to have made some notes of his analytical review, they were not located or produced in this litigation.  Stmt. of Facts at Nos. 25-26.

"somewhere in the middle" of this group) – and Defendant issued favorable tax opinions to every one of these individual clients.  Stmt. of Facts at Nos. 34, 37-38.[7]

By November 2000, Defendant's relationship with Heritage was so entrenched that Defendant began the transactional work on Plaintiffs' Tax Transaction before Plaintiffs had met or retained Defendant or provided LRF with any authorization to act.  Stmt. of Facts at Nos. 40-43.  By the time RHP and Reed had their initial meeting with LRF lawyers, on November 27, 2000, Defendant already had incorporated two companies in Missouri for use in the Tax Transaction.  Stmt. of Facts at Nos. 40-41.  RHP left this initial meeting with Defendant with the belief that LRF would provide a favorable tax opinion for the Tax Transaction and, on November 30, 2000, just three days after first meeting RHP and Reed, Defendant dispatched a package to RHP (via Heritage representatives Kornman and Czerwinski who were in Bethlehem to meet with RHP) that included 28 separate transactional documents relating to the Tax Transaction along with an engagement agreement with Defendant stating, *inter alia,* that LRF would render "advice concerning the tax and legal consequences of the transactions in which you engage" along with "a written legal opinion as to the tax consequences of these transactions."  Stmt. of Facts at Nos. 46-48.[8]

Defendant knew that the Tax Transaction required completion by year end to produce the tax consequences promoted by Heritage, Stmt. of Facts at No. 51, and, throughout the remainder of December 2000, Defendant performed all the transactional work required for the Tax Transaction while Falk worked on drafting Plaintiffs' tax opinion ("Tax Opinion").

---

[7] Once Defendant began providing favorable tax opinions to Heritage-referred clients, Heritage referred those clients engaging in a Tax Transaction solely to Defendant.  Stmt. of Facts at No. 35.
[8] The memorandum from LRF attorney Mulligan to Kornman and Czerwinski (dated December 1, 2000) instructs that, upon delivering Defendant's engagement letter to RHP, they are to obtain RHP's signature "in his individual capacity" and "[o]btain a check in the amount of $75,000 made payable to Lewis, Rice & Fingersh."  *See* P/X 22 at Penske 016494 (emphasis in original).

Stmt. of Facts at Nos. 64-65.  By the end of December 2000, Plaintiffs had executed all the steps required to consummate the Tax Transaction – and had heard nothing further from Falk regarding the Tax Opinion.  Stmt. of Facts at Nos. 52-65, 68.

In early January 2001, RHP and Reed met with LRF attorneys (including Mulligan) in Florida to discuss LRF providing estate planning services to Plaintiffs.  Stmt. of Facts at No. 74.  These discussions culminated in the expansion of Plaintiffs' relationship with Defendant and produced a second written engagement letter on February 22, 2001.  Stmt. of Facts at No. 75.

While Falk was working on the Tax Opinion, he was also crafting another document – a "representations" letter – that was not required by Heritage as part of the Tax Transaction and had never been discussed with Plaintiffs.  Stmt. of Facts at Nos. 69-71.  Although Falk wrote the content of the "representations" letter, he grafted the body of the letter onto a document that he created to reflect RHP's letterhead and, without explanation or comment, sent the letter to RHP for signature in late January 2001 – nearly a month *after* Plaintiffs had completed the Tax Transaction.  Stmt. of Facts at 69-73.  No one at LRF had any communication with RHP regarding the content of Falk's "representations" letter.  P/X 2 at 367:13-16.

In March 2001, Defendant sent Plaintiffs the Tax Opinion, Stmt. of Facts at No. 77, and then continued to provide legal services to Plaintiffs throughout March, April, May, June and July 2001.  Stmt. of Facts at Nos. 78.[9]  In August 2001, LRF undertook the representation of Plaintiffs in connection with a federal income tax audit initiated by the Internal Revenue Service ("IRS") in connection with the "FLIP" transaction Plaintiffs had executed through KPMG in

---

[9] Defendant's internal time and billing records show LRF attorneys charged time for legal services to Plaintiffs on no fewer than 18 separate days each month from March through July 2001.  *See* P/X 19 at Plaintiffs 21869-21882.

1997.  Stmt. of Facts at No. 79; *see* Note 4, *supra*.  Defendant proffered no new or revised

engagement agreement to Plaintiffs documenting any specific terms or conditions of LRF's

services and LRF promptly provided the IRS with notification[10] that LRF attorneys Falk and

Weltman would serve as Plaintiffs' authorized representatives regarding the audit of Plaintiffs'

individual federal income tax returns.  Stmt. of Facts at Nos. 80-81.

As Plaintiffs' designated representatives, Defendant responded to an IRS

information document request ("IDR") in October 2001 and confirmed LRF's understanding that

the IRS was seeking Plaintiffs' 2000 individual federal income tax return – the return that

reflects the tax consequences and tax treatment of the Tax Transaction.  Stmt. of Facts at Nos.

83-85.  Later, in December 2001, Defendant provided the IRS with another Form 2848

confirming LRF attorneys Falk and Weltman as Plaintiffs' sole designated representatives in

connection with the ongoing IRS audit.  Stmt. of Facts at No. 91.  At this point in time, Plaintiffs

were Defendant's only clients under audit by the IRS in connection with a "FLIP" transaction

(Stmt. of Facts at Nos. 82, 93) and, at Plaintiffs' expense, LRF was participating in a "Joint

Defense Group" consisting of counsel similarly representing clients who had engaged in "FLIP"-

type transactions.  Stmt. of Facts at Nos. 92-94.

On December 21, 2001, the IRS issued IRS Announcement 2002-2 (the "Amnesty

Announcement") which encouraged taxpayers to disclose their tax treatment of tax shelters and

offered a waiver of accuracy-related penalties relating to any tax item not already under IRS

audit disclosed by a taxpayer between December 21, 2001 and April 23, 2002.  Stmt. of Facts at

95.  Defendant immediately received notice of the Amnesty Announcement via an email from

the Joint Defense Group, the same organization for which Plaintiffs were paying all of

Defendant's participation expenses.  Stmt. of Facts at Nos. 94-95.  LRF attorneys Falk, Weltman

---

[10] *See* P/X 35 (IRS Form 2848 – "Power of Attorney and Declaration of Representative").

and Mulligan met to discuss whether Defendant would inform Plaintiffs, and the other Heritage-referred clients for whom LRF had provided favorable tax opinions, about the terms and conditions of the Amnesty Announcement which, as one condition of participation, required taxpayers to provide the IRS with "[a]ll opinions and memoranda that provide a legal analysis of the [disclosed] item, whether prepared by the taxpayer or a tax professional on behalf of the taxpayer." Stmt. of Facts at No. 95-96; P/X 46 at Penske 020804.

Defendant deliberately chose not to inform Plaintiffs of the existence, terms, or conditions of the Amnesty Announcement; electing, instead, to put the email Defendant had received from the Joint Defense Group in Plaintiffs' file[11] and remain mute on the subject of the Amnesty Announcement during the entire amnesty period and beyond while to continuing to: (1) serve as Plaintiffs' sole designated representatives with respect to the ongoing IRS audit; (2) provide estate planning service and advice to Plaintiffs; and (3) commence preparation of Plaintiffs' 2001 federal gift tax return that reflected the same tax treatment produced by the Tax Transaction that Plaintiffs had the opportunity to disclose under the Amnesty Announcement. Stmt. of Facts at Nos. 96-99; P/X 19 at Plaintiffs 21885-21887, P/X 45, P/X 48.[12]

Left blind by their counsel, Plaintiffs never availed themselves of the opportunity to disclose their participation in the Tax Transaction and avoid the imposition of accuracy-related penalties. Stmt. of Facts at No. 100. Given the travails associated with the audit of the

---

[11] The Joint Defense Group email is found in the Appendix at P/X 46 and was produced by Defendant in this litigation with Bates numbers "Penske 020800-020811" signifying it was part of the "Penske" file maintained by Defendant.

[12] At their depositions, LRF attorneys Falk, Weltman, and Mulligan, testified that their decision to remain silent was predicated on a statement that Falk had included on the penultimate page of the Tax Opinion (p. 57) that "The opinions set forth above are based upon our understanding and interpretation of the Code, the Regulations, administrative rulings, and published court decisions as of the date of this letter. We assume no obligation to advise you of any subsequent changes." P/X 34 at Penske 013772; *see* P/X 10 (Falk) at 198:20-204:8; P/X 11 (Mulligan) at 62:1-63:2; P/X 14 (Weltman) at 98:16-101:15. However, as the tax lawyers, Falk and Weltman, conceded, nothing in the Amnesty Announcement constituted a "subsequent change" to any of the sources of authority cited on page 57 of the Tax Opinion. P/X 10 at 200:21-203:24; P/X 14 at 103:11-104:18. For his part, Mr. Penske did not recall reading the "reservations" on page 57 of the Tax Opinion and did not view them as a limiting condition on his attorney-client relationship with Defendant. P/X 2 at 148:12-153:15.

"FLIP" transaction where Defendant was serving as Plaintiffs' sole designated representative in

dealing with the IRS, Plaintiffs would have taken advantage of the amnesty initiative and

disclosed the Tax Transaction "in a minute" if only Defendant had felt constrained to inform

them of its existence. Stmt. of Facts at No. 101. The amnesty offered by the Amnesty

Announcement expired, by its terms, on April 23, 2002, even as Defendant continued to serve as

Plaintiffs' sole representative to the IRS and provided ongoing estate planning and tax services

(*e.g.,* preparation of Plaintiffs' 2001 federal gift tax return). Stmt. of Facts at Nos. 99-102.

More than a year after the Amnesty Announcement expired, upon learning that

Defendant had not brought the amnesty opportunity to his attention in connection with the Tax

Transaction, Plaintiffs replaced Defendant with new tax counsel. Stmt. of Facts at No. 103. In

May of 2004, Heritage filed for bankruptcy protection and the IRS issued IRS Announcement

2004-46 offering taxpayers the opportunity to settle tax issues associated with transactions that

generate artificial tax losses as described in IRS Notice 2000-44. Stmt. of Facts at Nos. 104-105.

The IRS considers the Tax Transaction to be within the purview of IRS Notice 2000-44 and,

pursuant to the settlement initiative offered in IRS Announcement 2004-46, Plaintiffs signed a

closing agreement with the IRS in March 2005 agreeing to pay $2,615,469.40 in accuracy-

related penalties (plus $302,821.91 in penalty-related interest) for a total of $2,918,291.31 in

penalties and related interest associated with the underpayment of federal income tax for

calendar years 2000 and 2001 attributable to the tax treatment on which Defendant had favorably

opined in the Tax Opinion. Stmt. of Facts at No. 106.

III.    **STANDARD FOR SUMMARY JUDGMENT**

Summary judgment is proper where "there is no genuine issue as to any material

fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In

seeking a grant of summary judgment, the moving party must identify "those portions of 'the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

   Once the movant has met this burden, the non-moving party cannot simply rest on

the allegations in the pleadings but "must set forth specific facts showing that there is a genuine

issue for trial." Fed. R. Civ. P. 56(c). A "genuine issue" in the context of a motion for summary

judgment is not simply a "metaphysical doubt as to the material facts." *Matsushita Elec. Indus.*

*Co., Ltd. v. Zenith*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists only

when "the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson v. Liberty Lobby*, 477 U.S. 242 (1986). Moreover, where there is no dispute as

to the underlying facts, the resolution solely of questions of law is uniquely suited to summary

judgment. *Int'l Brotherhood of Elec. Workers, AFL-CIO, Local 1522 v. AT&T Microelectronics,*

*Inc.,* 909 F. Supp. 294, 296 (E.D. Pa. 1994); *Alf Atochem North America v. U.S.,* 866 F. Supp.

868, 870 (E.D. Pa. 1994).

   Measured by these standards, Plaintiffs are entitled to summary judgment on

Counts 1 and 3 of their Complaint, and partial summary judgment, as outlined above, on Courts

2 and 4.

## IV. **SUMMARY OF THE ARGUMENT**

   There is no material dispute regarding the factual predicate for Plaintiffs' legal

malpractice and breach of contract claims relating to the Amnesty Announcement. The only

question is whether Defendant can successfully manipulate its indisputably continuous

representation of Plaintiffs into discrete segments to shield themselves from the consequences of

their admittedly deliberate decision ***not*** to tell Plaintiffs about the Amnesty Announcement. No

reasonable juror could conclude from the undisputed facts that Defendant was absolved from

informing Plaintiffs about the Amnesty Announcement and no tortured legal interpretation of those facts can mask LRF's legal misfeasance. Whether predicated upon an express or implied agreement, Defendant had an attorney-client relationship with Plaintiffs that embraced the duty to inform Plaintiffs of the existence, terms and conditions of the Amnesty Announcement. Defendant elected not to do so and, accordingly, Plaintiffs are entitled to summary judgment on Counts 1 and 3 of their Complaint.

Similarly, the factual issues surrounding the tax treatment of Plaintiffs' short sale of U.S. Treasury Notes in December 2000 is indisputable – leaving solely the legal questions of (i) whether the obligation to close that short sale was a partnership liability under § 752 of the Code; and/or (ii) whether the Tax Transaction lacked economic substance under prevailing tax law. On these questions of law, the jurisprudence overwhelming concludes that the Tax Transaction was a "Son of BOSS" transaction structured to create artificially high tax losses that did not comply with prevailing federal income tax law. *See, e.g., Colm Producer, Inc. v. U.S.,* 460 F. Supp. 2d 713, 715-717 (N.D. Tex. 2006); *Salina Partnership LP v. Comm'r,* T.C. Memo. 2000-352, 2000 WL 1700928, at *12 (2000); Rev. Rule 95-26, 1995-14 I.R.B. 6. Consequently, for purposes of the claims set forth in Counts 2 and 4 of their Complaint relating to the Tax Transaction, Plaintiffs are entitled to partial summary judgment on the legal questions of (i) whether the obligation to close the short sale of U.S. Treasury Notes in the Tax Transaction was a partnership liability under § 752 of the Code, and (ii) whether the Tax Transaction lacked economic substance under prevailing precepts of federal tax law. *See, e.g., ACM Partnership v. C.I.R.,* 157 F.3d 231, 246-248 (3d Cir. 1998); *Klamath Strategic Investment Fund, LLC v. U.S.,* 472 F.Supp.2d 885, 895-898 (E.D. Tex. 2007).

## V.    ARGUMENT

### A.    Defendant Committed Legal Malpractice By Failing To Advise Plaintiffs Of the Amnesty Initiative in IRS Announcement 2002-2.

The Pennsylvania Supreme Court has held that to recover for legal malpractice in negligence, a plaintiff must prove by a preponderance of the evidence the following elements: "(1) the employment of the attorney or other basis for a duty; (2) the failure of the attorney to exercise ordinary skill and knowledge; and (3) that such negligence was the proximate cause of damage to the plaintiff."[13] *Kituskie v. Corbman*, 714 A.2d 1027, 1029-30 (1998).  Given that there is no genuine dispute regarding the material facts surrounding Defendant's deliberate decision ***not*** to tell Plaintiffs of the existence, terms or conditions of the Amnesty Announcement at a time when Defendant's were: (i) serving as Plaintiffs' designated legal representatives to the IRS, and (ii) performing a multitude of tax and estate planning services for Plaintiffs, there is no reasonable basis for a jury verdict other than that Defendant's premeditated conduct breached the standard of ordinary skill and knowledge required of an attorney and proximately caused Plaintiffs' loss.  Accordingly, the Court is positioned to decide all material issues related to Count 1 of Plaintiffs' Complaint as a matter of law.

### 1.    The Parties Had A Continuous Attorney-Client Relationship From December 1, 2000 Through October 2003.

"In order for a plaintiff to recover against a defendant law firm in a legal malpractice case, it is generally essential that an attorney-client relationship has existed between

---

[13] In essence, plaintiff must "prove that he had a viable cause of action against the party he wished to sue in the underlying case and that the attorney he hired was negligent in prosecuting or defending that underlying case (often referred to as proving a 'case within a case')." *Kituskie v. Corbman*, 714 A.2d 1027, 1030 (Pa. 1998).  *See Scaramuzza v. Sciolla*, No. Civ.A.04-1270, 2006 WL 557716, *7 (E.D. Pa. Mar. 3, 2006) ("A legal malpractice lawsuit arising out of the conduct of underlying litigation involves a 'case within a case.'").  Although there is no "underlying case" in this matter *per se*, the Amnesty Announcement afforded Plaintiffs a clear and viable means of avoiding the imposition of any accuracy-related penalties (and the concomitant interest on those penalties) by virtue of their participation in the Tax Transaction.  Defendant's negligent failure to advise Plaintiffs of the existence, terms and conditions of the Amnesty Announcement directly compromised Plaintiffs' rights under the Amnesty Announcement.

the parties." *Connelly v. Wolf, Block, Schorr & Solis-Cohen*, 463 F. Supp. 914, 918 (E.D. Pa.1978). *See also Krauss v. Claar*, 879 A.2d 302, 309 (Pa. Super. 2005) (same). The attorney-client relationship is either formed by an express contract or by implication, both of which create a duty owed by the attorney to the client and, therefore, standing in a legal malpractice action.[14] *Oliver v. Bernstein*, No. Civ. A. 96-4471, 1996 WL 654054, *3 (E.D. Pa. Nov. 6, 1996). *See, e.g., Connelly*, 463 F. Supp. at 919 (finding law firms filing of papers, performance of various legal services, and fee demands evidenced an implied attorney-client relationship). Second to a contract, "the payment of a fee is the most usual and weighty item of evidence to establish the relationship of client and attorney. . . ." *Guy v. Liederbach*, 459 A.2d 744, 749 (Pa. 1983) (retaining requirement that client plaintiff must show an attorney-client relationship as a prerequisite to bringing a malpractice action in trespass) (internal quotations and citations omitted).

Generally, "the primary issue in a legal malpractice suit is not the existence of a duty but the extent of that duty," and "[t]he extent of the duty derives from the circumstances, being the subject matter of the retention and the parties' agreement." Mallen, R.E., Smith, J.M., Legal Malpractice, §8.2, p. 558 (4th ed. West Publishing 1996). Thus, the parties' agreement "may limit the objectives of the representation if the client consents after a full disclosure of the circumstances and consultation." Pa. R. Prof. Conduct, Rule 1.2(c); *see Jones v. Bresset*, No. 94-

---

[14] "Absent an express contract, an implied attorney/client relationship will be found if (1) the purported client sought advice or assistance from the attorney; (2) the advice sought was within the attorney's professional competence; (3) the attorney expressly or *impliedly* agreed to render such assistance; and (4) it is reasonable for the putative client to believe the attorney was representing him." *Atkinson v. Haug*, 622 A.2d 983, 986 (Pa. Super. 1993) (*citing Bailey v. Tucker*, 621 A.2d 108 (Pa. 1993) and *Sheinkopf v. Stone*, 927 F.2d 1259 (1st Cir. 1991) (emphasis added). Aside from the express engagement agreements between Plaintiffs and Defendant, LRF provided, and billed Plaintiffs for, substantial legal services that were furnished continuously between December 2000 and October 2003, and that are not described in specific engagement agreements. *See, e.g.*, P/X 19 (LRF "Billed and Unbilled Recap of Time Detail" for the Penskes). Taken together, the written engagement agreements and the parties' mutual conduct throughout this time period support no reasonable conclusion other than the existence of an implied attorney-client relationship that extended to any matters affecting Plaintiffs' federal tax obligations. *See* Stmt. of Facts at Nos. 78-84, 91-94.

CV-1103, 2000 WL 33116007, *71-72 (Pa. Com. Pl. April 19, 2000) ("In the absence of a written understanding to the contrary, a lawyer may assume by operation of law an implied duty to represent or advise a client regarding collateral matters."). Moreover, in a legal malpractice action, "[w]hether a legal duty exists under a particular set of facts is usually a question of law for the court to decide." *Jones v. Bresset*, No. 94-CV-1103, 2000 WL 33116007, *70 (Pa. Com. Pl. April 19, 2000) (citing *Althaus by Althaus v. Cohen*, 710 A.2d 1147, 1152 (Pa. Super. 1998)).

Here, the parties executed a written contract in December 2000, drafted by Defendant, which initiated the attorney-client relationship and, thereafter, Plaintiffs continuously paid fees to LRF from December 2000 through October 2003. P/X 23; P/X 19; P/X 53. This initial engagement agreement detailed the scope of services that LRF was to provide, including *both* "advice concerning the tax and legal consequences of the transactions in which you engage" and "a written legal opinion as to the tax consequences of those transactions." P/X 23 at Penske 000872.[15] Notably, the engagement letter contained *no time limitation* regarding the services to be performed by LRF relating to the Tax Transaction. P/X 23 at Penske 000872; P/X 11 at 39:9-40:18; P/X 15 at 28-29.

Defendant's Tax Opinion was intended to provide the necessary legal guidance for the tax treatment used by the tax preparers who would prepare both the individual and entity federal tax returns reflecting the Tax Transaction. P/X 3 at 24:20 - 25:7, 201:21 - 205:16; P/X 38 at 61:16 - 63:8, 71-76, 116:10 - 118:17; P/X 44. This tax preparation work extended throughout 2001 and continued into 2002 as Defendant prepared Plaintiffs' 2001 federal gift tax return which also reflected tax consequences associated with the Tax Transaction. P/X 19 at Plaintiffs' 21885-21886. Given the express terms of the December 1, 2000 engagement letter, with no

---

[15] As agreed upon in the engagement letter, the Penskes paid LRF $75,000 upon execution of the engagement letter on December 1, 2000 and after LRF implemented the Tax Transaction and submitted the Opinion Letter (on March 1, 2001), the Penskes paid LRF the remaining $75,000 on April 1, 2001. P/X 52.

temporal limitation regarding Defendant's services relating to the Tax Transaction, the attorney-client relationship between Plaintiffs and Defendant was still very much intact when the Amnesty Announcement was published in December 2001 *within nine months* of Defendant having furnished Plaintiffs with the written Tax Opinion.  Indeed, at that time, LRF attorneys Falk and Weltman were functioning as Plaintiffs' sole designated representatives to the IRS, Stmt. of Facts at No. 91, and Plaintiffs were fully funding Defendant's participation in the "Joint Defense Group" of law firms representing clients under audit by the IRS relating to transactions like Plaintiffs' 1997 "FLIP" transaction.  *Id.* at Nos. 92-95.  As the facts show, the Joint Defense Group specifically notified Falk and Weltman, via email, of the existence, terms and conditions of the Amnesty Announcement, an email that LRF stuck in their internal file for Plaintiffs – but never brought to the Penskes' attention.  *See* discussion *supra* note 11.

Defendant's position is that the Tax Opinion disclaimed responsibility to notify the Penskes of the Amnesty Announcement based on the following language buried on page 57:

> The opinions set forth above are based upon our understanding and interpretation of the Code, the Regulations, administrative rulings, and published court decisions as of the date of this letter.  We assume no obligation to advise you of any subsequent changes.

P/X 34 at Penske 013772.  This argument simply does not comport with the law governing the attorney-client relationship.  First, the December 1, 2000 engagement letter and Defendant's subsequent conduct in representing Plaintiffs continuously over the next twelve months defined the scope of representation, *not* a cryptic disclaimer gratuitously inserted into the Tax Opinion well *after* Plaintiffs had completed the Tax Transaction.  *See Jones v. Bresset*, No. 94-CV-1103, 2000 WL 33116007, *71-72 (Pa. Com. Pl. April 19, 2000).  If Defendant intended for the "disclaimer" language in its Tax Opinion to modify the engagement letter's expression of the scope of representation, LRF was duty bound based upon professional conduct standards to

discuss the limitations in their services and secure the Penskes approval.[16] Pa. R. Prof. Conduct

1.2(c); *see, e.g., Jones v. Bresset*, 2000 WL 33116007 at *71-72 (holding as a held as a matter of

law that defendant-attorney owed no legal duty to advise client on "tax matters or explore any

potential cases" because representation letters expressly limited services to securing an

accounting for client and the client admitted that it understood these limitations).  "Disclosure"

in the context of Rule 1.2(c) "denotes communication of information reasonably sufficient to

permit the client to appreciate the significance of the matter in question." *Healy v. Axelrod*

*Const. Co. Def. Ben. Pension Plan & Trust,* 155 F.R.D. 615, 620 (N.D. Ill. 1994) (commenting

on disclosure requirements of Rule 1.2(c)).  Defendant's contrived effort to now rely on the

"disclaimer" it unilaterally embedded into its Tax Opinion simply does not comport with its

professional obligations. *See id.*; Pa. R. Prof. Conduct 1.2(c).

　　　　Based on the plain language Defendant had used in the December 2000

engagement letter and LRF's subsequent conduct in representing them continuously for more

than a year by the time the Amnesty Announcement was issued, Plaintiffs reasonably concluded

that Defendant's representation embraced all legal issues related to the Tax Transaction and their

other federal income tax matters.  P/X 2 at 151:2 - 154:14.  If the Court needs confirmation of

the reasonableness of Plaintiffs' belief, it need only examine the estate and tax planning services

Defendant provided to Plaintiffs throughout 2001 and extending late into 2003.  *See* Stmt. of

Facts at Nos. 78-99.

　　　　Aside from the chronological rendering of legal services, Defendant also knew, in

October 2001 – two months before the Amnesty Announcement was issued - that the IRS was

---

[16] Defendant is likely to insist that the Missouri Rules of Professional Conduct apply to the actions of their lawyers even though their conduct was directed at, and impacted Plaintiffs in, Pennsylvania.  Regardless, the distinction is one without a difference since both states have adopted the ABA's model rules of professional conduct and the relevant rules on scope of representation are functionally equivalent.  *Compare* ABA Model Professional Rules (P/X 54) *with* Pa. R. Prof. Conduct 1.2(c) *and* Mo. R. Prof. Conduct 4-1.2(c).

seeking Plaintiffs' 2000 federal income tax return – the return that reflected the tax treatment of the Tax Transaction as opined upon by Defendant in the Tax Opinion. *See* P/X 36.

Plaintiffs' expert witness, Professor Geoffrey Hazard, one of the preeminent authorities on professional responsibility in the legal profession, has concluded that the Penskes had an attorney-client relationship from December 1, 2000 until October of 2003 and, given the nature of their representation, owed a duty to inform the Penskes of Announcement 2002-2.[17] P/X 55 at ¶¶ 4, 6-7. During this entire period, the Penskes paid over $500,000 in fees to LRF for legal services directly related to the Tax Transaction and Tax Opinion. P/X 52; P/X 53.

This indisputable evidence compels the conclusion that, as a matter of law, an attorney client relationship existed between Plaintiffs and the Defendant in December 2001 that imposed a duty on Defendant to inform the Penskes of the existence, terms and conditions of the Amnesty Announcement.

**2.    Defendant's Deliberate Decision Not to Disclose the Amnesty Announcement to Plaintiffs Breached the Duty of Care LRF Owed to Plaintiffs as Their Legal Counsel.**

"The standard of care to which an attorney must adhere is measured by the skill generally possessed and employed by practitioners of the profession." *Thompson v. Glenmeade Trust Co.*, No. Civ. A. 92-5233, 1996 WL 635682, *4 (E.D. Pa. Oct. 31, 1996) (internal quotations and citations omitted). Generally, expert testimony is required in legal malpractice cases to establish the relevant standard of care and determine conformity with that standard.

---

[17] Not surprisingly, Defendant has found a professional responsibility "expert" willing to opine that Defendant owed Plaintiffs no duty with regard to the Amnesty Announcement. What is surprising is that the "report" furnished by David C. Mann encompasses only six lines of text in its entirety and is bereft of any supporting analysis. P/X 58 (Mann Report) at ¶¶ 1-2. As such, it is as useless to the Court as Defendant's Tax Opinion proved to be to Plaintiffs. Given Professor Geoffrey Hazard's opinions (P/X 55 at ¶¶ 4, 6-7) and the undisputed facts regarding the relationship between Plaintiffs and Defendant, no reasonable juror could conclude from Mr. Mann's sparse and cryptic comments that LRF owed no duty to disclose the Amnesty Announcement to Plaintiffs. Defendant should not be permitted to avoid summary judgment and force Plaintiffs to the time and expense of a trial on this issue on the basis of such insipid observations. Where there is "an absence of evidence to support the non-moving party's case," summary judgment is warranted. *Celotex Corp. v. Catrett*, 477 U.S. at 325.

*Romy v. Burke*, No. 1236 May Term 2002, 2004 WL 3050866, *3-4 (Pa. Com. Pl. Dec. 28,

2004); *see also Glenmeade Trust Co.*, 1996 WL 635682 at *4, 8 (same).  Plaintiffs, through

Professor Hazard, provide this expertise.  The reports of Defendant's experts do not.

> According to Professor Hazard,
>
>> LRF should, as a matter of reasonable care in representing a client,
>> have notified the Penskes of Announcement 2002-2 promptly and
>> in any event at a reasonable time before April 23, 2002, and either
>> advised them of the implications of the amnesty offer or advised
>> them to get independent advice about it. Even a nonspecialist
>> lawyer, and certainly tax experts, should reasonably have realized
>> that the Announcement was highly relevant to the matter on which
>> the firm had provided legal assistance.

P/X 55 at ¶ 1.  Plaintiffs also offer a second expert witness, William Goldstein, a tax lawyer with

over thirty years of experience, who, as part of his analysis of the tax issues associated with the

Tax Transaction and the impact of the Amnesty Announcement on Plaintiffs from the

perspective of a tax practitioner, has concluded that

> under the facts of this case, a reasonable tax practitioner,
> employing the skills, knowledge, and professional responsibility
> generally possessed by those practicing in the field of Federal
> taxation, would have concluded that the Plaintiffs should have
> been informed of the existence and terms of IRS Announcement
> 2002-2 containing the disclosure initiative regarding listed tax
> transactions.

P/X 56 (Goldstein Report) at 21, 18-20.

> Aside from this expertise, the prevailing jurisprudence simply does not condone

Defendant's conduct.  Specifically, case law discussing an attorney's responsibility in the

settlement context is especially informative given that the Amnesty Announcement essentially

represented a settlement overture from the IRS to those, like Plaintiffs, who had engaged in tax

shelter transactions.[18]  In Pennsylvania, an attorney is duty-bound to communicate settlement offers to the client.  *Rizzo v. Haines*, 555 A.2d 58, 65-66 (Pa. 1989) (finding attorney negligent for failing to inform client of settlement offer).   Here, RHP emphatically testified that if Defendant has informed him of the Amnesty Announcement, he would have participated "in a minute."  P/X 2 at 188:12-190:8.

Plaintiffs acknowledge that this element of a malpractice claim (*i.e.,* the question of a breach of duty) typically is resolved through a "battle of the experts;" but, here, Defendant has offered no combatant capable of engaging in that battle.  Aside from David Mann's suspect and unsupported comments, Defendant's offer only Henry Ordower, who professes no particular expertise in professional responsibility but gratuitously offers that "informing the [Penskes] of Announcement 2002-2 *served no useful purpose* for the [Penskes]" and the Penskes' had other advisors, LRF had no obligation to inform them of the Announcement.  P/X 59 at 4 (emphasis added).  Assessing the relative value that *he* assigned to the Amnesty Announcement affords no basis for avoiding summary judgment.

### 3.    Defendant's Failure To Advise Plaintiffs' Of the Amnesty Announcement Was The Proximate Cause Of Damage To Plaintiffs.

To recover for legal malpractice, Plaintiffs must show that Defendant's wrongful conduct was a substantial factor in bringing about the harm they have suffered and that harm must be of an "actual loss rather than . . . nominal damages, speculative harm or the threat of future harm."  *Kituskie v. Corbman*, 714 A.2d 1027, 1030 (Pa. 1998) (citations omitted).  Proximate cause, *i.e.*, whether the attorney's conduct is the cause of the client's injury or loss, is a factual inquiry usually left for the jury "[u]nless the evidence is such that reasonable people

---

[18] In fact, Professor Ordower, one of Defendant's experts, refers to Announcement 2002-2 as "the IRS offer."  P/X 59 at 1.

cannot disagree."[19]  *Romy v. Burke*, No. 1236 May Term 2002, 2004 WL 3050866, *3 (Pa. Com.

Pl. Dec. 28, 2004) (*citing Fiorentino v. Rapoport*, 693 A.2d 208, 215 (Pa. Super. 1997).

The causal link between Defendant's negligence and Plaintiffs' loss is

indisputably apparent.  The Amnesty Announcement afforded unconditioned immunity from

accuracy-related penalties (and the concomitant interest on those penalties) had Plaintiffs

disclosed the Tax Transaction in the manner required by the Announcement.  Instead, Plaintiffs

paid $2,615,469.40 in accuracy-related penalties (plus $302,821.91 in penalty-related interest)

for a total of $2,918,291.31 in penalties and related interest associated with the underpayment of

federal income tax for calendar years 2000 and 2001 attributable to the tax treatment on which

Defendant had favorably opined in the Tax Opinion.  Stmt. of Facts at No. 106.  There is no

genuine basis upon which to dispute that Defendant's misconduct proximately caused this loss.

**B.      Defendant Breached Its Engagement Agreement With Plaintiffs By Failing
          To Advise Plaintiffs of the Amnesty Announcement.**

In Pennsylvania, "if a plaintiff demonstrates by a preponderance of the evidence

that an attorney has breached his or her contractual duty to provide legal service in a manner

consistent with the profession at large, then the plaintiff has successfully established a breach of

contract claim against the attorney." *Gorski v. Smith*, 812 A.2d 683, 697 (Pa. Super. 2003).

As with a tort theory of legal malpractice, a client-plaintiff may introduce expert

testimony to "support[] [its] contract claim to the extent that it indicates the [lawyers] did not

provide their client with professional services consistent with those expected of the profession at

large." *Gorski v. Smith*, 812 A.2d at 694-695 (internal quotations omitted) (*citing Fiorentino v.*

---

[19] It is important to note that the alleged malpractice need not be the sole cause of Plaintiffs' loss.  Even where there are multiple causes for a single loss each, as a but-for cause, may be responsible for the entire loss in the sense that had that party not acted as it did, there would have been no loss.  *Loughman v. Consol-PA Coal Co.*, 6 F.3d 88, 106, 106-107 (3d Cir. 1993).  For example, in *Loughman*, the Third Circuit concluded that there was no inconsistency in the jury's finding that the attorney-defendants' malpractice was 100% the but-for cause of the client-plaintiff's harm even though the jury also found that attorney-defendants and other defendants conspired to defraud plaintiff because the harm was an indivisible injury that rendered it impossible to apportion plaintiff's loss between the causes.  *Id.*

*Rapoport*, 693 A.2d 208, 214 (Pa. Super. 1997)).  The recoverable damages, however, are "limited to the amount actually paid for the services plus statutory interest." *Bailey v. Tucker*, 621 A.2d at 115.

In *Gorski v. Smith*, the client-plaintiffs brought a breach of contract action alleging their attorneys' "failed to represent them, in connection with the sale of their property . . ., in a manner which comported with the standards of the profession at large." 693 A.2d at 694-95.  The *Gorski* court concluded that, "Attorney Jenkins never fully made the Gorskis aware of what their obligations were under the contract, nor properly explained to the Gorskis the full import of each clause contained therein, prior to them having signed it, Attorney Jenkins cannot be said to have fulfilled his contractual obligation to the Gorskis to provide legal services in a manner consistent with the profession at large." *Id.* at 696.

Here, Defendant's breach is readily apparent.  In failing to inform Plaintiffs as to the Amnesty Announcement, Defendant failed to "render[] advice concerning the tax and legal consequences of the transactions in which [Plaintiffs] engage[d]." *See* P/X 23.  As Professor Hazard concludes in his report, Defendant "should reasonably have realized that the Announcement was highly relevant to the matter on which the firm had provided legal assistance."  Specifically, as Professor Hazard explains:

> It was in the interest of the Penskes to consider seeking the amnesty; while it was in the interest of LRF to avoid having to confront the IRS concerning a Heritage transaction.  This was particularly sensitive to the firm because it was reasonably foreseeable that if the firm did so with reference to the Penskes, it could soon have a confrontation on the other 20 or so Heritage transactions it had addressed in its opinions.  The firm had an obligation to inform the Penskes of the Announcement and advise them of its significance or to get independent advice concerning it.

P/X 55 at ¶3.  No reasonable juror could disagree with the conclusions of both Professor Hazard and William Goldstein that Defendant had an obligation to notify the Penskes of the Amnesty

Announcement and, by purposefully choosing to remain silent, LRF failed to render professional

services consistent with those expected of the profession at large.  P/X 55 ¶ 1; P/X 56 at 18-20.

      The evidence of record indisputably establishes a breach of contract by

Defendant, and Plaintiffs are entitled to summary judgment on Count 3 of their Complaint.

    **C.**    **The Tax Transaction Lacks Economic Substance and the Tax Treatment of the Short Sale of U.S. Treasury Notes in Defendant's Tax Opinion Does Not Comply With Federal Tax Law.**

      The Tax Transaction on which Defendant favorably opined in this case is one not

unfamiliar to the courts.  In recent years, in *Colm Producer, Inc. v. U.S.,* 460 F. Supp. 2d 713

(N.D. Tex. 2006) ("*Colm*") and in *Salina Partnership LP v. Comm'r*, T.C. Memo. 2000-352,

2000 WL 1700928 (2000) ("*Salina*"), both a federal district court in Texas and the Tax Court

have properly concluded that the obligation to close a short sale is a partnership liability under

§752 of the Code (26 U.S.C. § 752) and cannot be disregarded in calculating the tax

consequences of a partner's gain or loss.  This conclusion is a matter of law and is equally

applicable to the Tax Transaction in this case.

      The pertinent facts describing the mechanics of the Tax Transaction are set forth

in paragraphs 52 through 67 of Plaintiffs' *Statement of Undisputed Facts* and will not be

repeated here.  In sum, based on RHP's 16-day exposure to the short sale transaction through his

partnership holding in RHPI, Plaintiffs were issued a K-1 by RHPI for the year 2000 reflecting a

loss of approximately $77 million (the difference between the value of the proceeds in the

brokerage account and the amount paid by Heritage and VILP[20] for the interests in RHPG sold

by RHPI and PMC) even though Plaintiffs had suffered no out of pocket loss remotely

approaching $77 million in connection with the Tax Transaction.  *See* P/X 42 at WP-Penske

0288-0290.  Based on this sequence of events, Defendant opined that there was "substantial

---

[20] "VILP" is Valiant Investments 95-2 L.P., a Heritage affiliate.  Stmt. of Facts at No. 62.

authority" supporting the proposed tax treatment that (1) "the obligation to replace the Treasury Notes borrowed for the short sale will not be treated as a "liability" within the meaning of Code section 752," and that (2) "upon the sale by RHPI of its interest in RHPG to VILP, RHPI will realize a capital loss pursuant to Code section 741. The amount of loss to be recognized will be the excess of the adjusted basis of the partnership interest sold over the amount realized. Mr. Penske and RHPM, the partners of RHPI, will recognize its capital loss." P/X 34 at WP-Penske 0617. Emphasizing, Defendant concluded that it was "more likely than not that [this] Federal income tax treatment . . . [was] proper." *Id.* These conclusions are entirely incorrect as a matter of law.

### 1.    <u>The obligation to close the short sale is a liability under § 752.</u>

Defendant audaciously proffered its Tax Opinion into the teeth of the Tax Court's holding in *Salina* (issued just weeks before Defendant first met with RHP and Reed in St. Louis) that an obligation to replace U.S. Treasury Bills borrowed for a short sale was a "liability" within § 752 of the Code. *Salina,* 2000 WL 1700928, at *12. Moreover, as the court acknowledged in *Colm,* the Tax Court decision in *Salina* represented judicial recognition and acceptance of the IRS position expressed in Revenue Ruling 95-26 that a short sale of securities creates a liability under § 752 because it both increases the basis in the partnership and generates an obligation to replace the borrowed securities. Rev. Rule 95-26, 1995-14 I.R.B. 6; *see Colm,* 460 F.Supp.2d at 715-716 (describing the import of Rev. Rule 95-26); *see also Salina,* 2000 WL 1700928, *17-*18 (applying Rev. Rule 95-26 to a short sale of U.S. Treasury Notes).

In *Colm,* the district court applied the precedent and logic of both Rev. Rule 95-26 and *Salina* while concluding that the obligation to replace borrowed Treasury Notes in a short sale transaction is a liability within the meaning of § 752 of the Code. As the *Colm* court

correctly recognized, the obligation to close the short sale is not "contingent" because the

obligation exists as a legally enforceable obligation and the amount of the gain or loss on the

short sale can be determined by reference to the current market rates for Treasury Notes. *Colm,*

460 F.Supp.2d at 716.

       *Colm* should certainly resonate with the Court here because the transaction in

*Colm* is, in all material respects, the Tax Transaction at issue here. Indeed, the Court will

undoubtedly recognize some of the characters in *Colm* – like Brian Czerwinski, the same

Heritage employee who closed the short sale in *Colm* and served as the delivery man for the

transactional documents that Defendant prepared for this Tax Transaction (*Compare Colm,* 460

F.Supp.2d at 714 *with* Stmt. of Facts at No. 47), and the use of a "Valiant" partnership as the

brokerage account holding the proceeds from the short sale is funneled through various

partnerships to generate the proposed tax loss. *See Colm,* 460 F.Supp.2d at 714-717; Stmt. of

Facts at No. 62 (sale to Valiant Investments 95-2 L.P.; *i.e.,* "VILP").

       Defendant can produce no authority that contradicts either *Colm* or *Salina.*[21]

Indeed, since the issuance of IRS Notice 2000-44 (P/X 5), no court in the land has concluded that

---

[21] The best that the Court may see from Defendant is reliance on *Klamath Strategic Growth Inv. Fund, LLC v. U.S.,* 440 F. Supp. 2d 608 (E.D. Tex. 2006) ("*Klamath*") where the court declined to find that certain loan premiums represented a "liability" for purposes of § 752 of the Code. *Id.* at 617. *Klamath,* which was decided three months before *Colm,* is clearly distinguishable from this case. First, *Klamath* did not involve a short sale of U.S. Treasury Notes but, instead, considered certain loan premiums that, unlike the obligation to close the short sale, were payable *at the option of the plaintiffs* – or, in other words, were completely contingent. *Id.* Second, the *Klamath* court specifically cited the issuance of IRS Notice 2000-44 (P/X 5) in September 2000 (2 months before the *Salina* decision) as a demarcation regarding the designation of a "liability" under § 752. *Id.* at 623-624. In the view of the *Klamath* court, transactions executed *before* the issuance of IRS Notice 2000-44 could more legitimately express uncertainty over the status of a "liability" under § 752 of the Code but later transactions, undertaken *after* IRS Notice 2000-44 was promulgated, could profess no such uncertainty. *Klamath,* 440 F.Supp.2d at 623-625. The final element rendering *Klamath* entirely inapposite to any *defense* of Defendant's Tax Opinion was the issuance, in January 2007, of the *Klamath* court's conclusion that, regardless of the application of § 752 to the materially different *Klamath* transaction, that transaction lacked economic substance under prevailing tax law. *Klamath Strategic Growth Inv. Fund, LLC v. U.S.,*472 F. Supp. 2d 885, 898 (E.D. Tex. 2007) ("*Klamath II*"). Consequently, neither *Klamath* nor any other published decision provides *any* support for the tax treatment endorsed by Defendant in the Tax Opinion.

the obligation to close a short sale of U.S. Treasury Notes is *not* a liability under § 752 of the Code.  Neither logic nor the law suggests that this Court should become the first.

>    2.    **The Tax Transaction lacks economic substance.**

In this Circuit, the inquiry into whether a transaction has sufficient economic substance, apart from its tax consequences, to be respected for federal tax purposes turns on both the "objective economic substance of the transaction" and the "subjective business motivation" behind it. *ACM Partnership v. C.I.R.*, 157 F.3d 231, 247 (3rd Cir. 1998) ("*ACM*").  To assess the "objective economic substance," courts need to examine "whether the taxpayer has any practical economic effects other than the creation of income tax losses." *Id.* at 248.

In *ACM,* the Third Circuit specifically examined the taxpayer's "shortswing acquisition and disposition" of certain notes and concluded that the difference in yield over the 24-day holding period in *ACM* could not have had a material effect on the taxpayer's financial position especially considering the transactional costs associated with the transaction. *Id.* at 249. In this case, Plaintiffs offer the expert report of Dr. David DeRosa, who has analyzed the Tax Transaction and, specifically, the short sale of U.S. Treasury Notes in that Transaction, and concludes, *inter alia,* (1) that the short sale transactions had "zero expected return," (2) that the short sale created an obligation to return the borrowed securities in-kind when the short sale was closed, and (3) there was no economic chance for the U.S. Treasury short sales to make a profit if the fees paid to Defendant and to Heritage are considered.  P/X 57 at 7-8.

Defendant has no rebuttal to Dr. DeRosa because the 16-day exposure of Plaintiffs in the Tax Transaction (Stmt. of Facts at No. 67) "involve[s] only a fleeting and economically inconsequential investment in and offsetting divestment from" the Treasury Note short sale that was identified as lacking substance by the Third Circuit in *ACM. ACM,* 157 F.3d

at 250.  In sum, the undisputed facts distinctly show that the Tax Transaction had no "practical economic effects other than the creation of income tax losses."  *Id.* at 248; *see* P/X 57 at 7-8.

RHP knew this – and testified that he understood that the Tax Transaction was designed to generate a tax loss.  P/X 2 at 204:19-205:4.  Thus, he completely relied on his tax counsel to tell him whether the Tax Transaction was a "good transaction."  *Id.* at 205:8-206:11.  Defendant will undoubtedly point to the "representations" letter (P/X 1) to document the subjective economic interests underlying the Transaction, but the material facts indisputably show that the "representations" letter was a creation of LRF attorney Falk that was sent to RHP weeks *after* the Tax Transaction had closed.  Stmt. of Facts at Nos. 69-73.  Moreover, as the Third Circuit noted in *ACM,* meticulously recorded tax-independent rationales cannot withstand scrutiny where the factual record of the transaction belies those professed rationales.  *ACM,* 157 F.3d at 256.

No court yet has endorsed the "economic substance" of these "Son of BOSS" transactions.  Logic, analysis, the undisputed facts, and the governing standard provided by the Third Circuit in *ACM* dictate, again, that this Court should not become the first.

## VI.    <u>CONCLUSION</u>

As demonstrated herein, on the issues posited by Plaintiffs for summary judgment, there is simply no dispute requiring resolution at a trial.  For all the reasons set forth herein, Plaintiffs respectfully request that the Court grant summary judgment in their favor.

Dated:  September 21, 2007

                    /s/ George W. Croner
George W. Croner, Esquire (I.D. No. 33514)
Christina Donato Saler, Esquire (I.D. No. 92017)
KOHN, SWIFT, & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA  19107-3304
(215) 238-1700

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Christina Donato Saler, hereby certify that true and correct copies of *Plaintiffs' Motion for Partial Summary Judgment; Memorandum of Law in Support Thereof; Statement of Undisputed Material Facts* and *proposed Order* were filed electronically and are available for viewing and downloading from the Electronic Case Filing system.  The above-captioned documents and *Plaintiffs' Appendix of Exhibits, Vol. I, Vol. II, and Vol. III*, which were hand delivered to the Clerk of the Court, are also being served upon counsel in the following manner:

> **Via Hand Delivery**
> Shannon S. Levin, Esquire
> *Hangley, Aronchick, Segal & Pudlin*
> One Logan Square, 27th Floor
> Philadelphia, PA  19103

> **Via First Class Mail Service**
> George M. Kryder, Esquire
> *Vinson & Elkins LLP*
> Trammell Crow Center
> 2001 Ross Ave., Ste. 3700
> Dallas, TX 75201-2975

Dated:  September 21, 2007

Christina Donato Saler
KOHN, SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA  19107-3304
(215) 238-1700

36084_1